1  WILMER CUTLER PICKERING
   HALE AND DORR LLP
2  SONAL N. MEHTA (SBN 222086)
3  JESSICA LEWIS (SBN 302467)
   Sonal.Mehta@wilmerhale.com
4  Jessica.Lewis@wilmerhale.com
   2600 El Camino Real, Suite 400
5  Palo Alto, CA 94306
   Telephone: (650) 858-6000
6
7  ARI HOLTZBLATT (SBN 354631)
   ALLISON M. SCHULTZ (*pro hac vice* pending)
8  NATHANIEL W. REISINGER (*pro hac vice* pending)
   Ari.Holtzblatt@wilmerhale.com
9  Allison.Schultz@wilmerhale.com
   Nathaniel.Reisinger@wilmerhale.com
10 2100 Pennsylvania Avenue NW
   Washington, DC 20037
11 Telephone: (202) 663-6443
12
   *Attorneys for Defendant*
13 *Meta Platforms, Inc.*
14
                    **UNITED STATES DISTRICT COURT**
15              **NORTHERN DISTRICT OF CALIFORNIA,**
                    **SAN FRANCISCO DIVISION**
16

17 JOSHUA BOUCK, et al.,                    | Case No. 3:25-cv-05194-RS
                            Plaintiffs,     |
18              v.                          | **DEFENDANT'S NOTICE OF
                                            | MOTION AND MOTION TO
19                                          | DISMISS**
   META PLATFORMS, INC.,                    |
20                          Defendant.      | Judge: Hon. Richard Seeborg
                                            | Courtroom 3, 17th Floor
21                                          | Date:  October 30, 2025
                                            | Time: 1:30 PM
22
23
24
25
26
27
28

# NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE THAT, on October 30, 2025 at 1:30 P.M. in Courtroom 3 of the U.S. District Court for the Northern District of California, San Francisco Division, at 450 Golden Gate Ave., San Francisco, CA, this Motion To Dismiss filed by Defendant Meta Platforms, Inc. will be heard.

Pursuant to Fed. R. Civ. P. 12(b)(6), Defendant moves to dismiss the Complaint in the above-captioned action. Defendant's Motion to Dismiss is based on this Notice of Motion, the supporting Memorandum of Points and Authorities, and accompanying declaration and exhibits.

Dated: August 25, 2025

Respectfully submitted,

By:/s/ Sonal N. Mehta

WILMER CUTLER PICKERING
HALE AND DORR LLP
SONAL N. MEHTA (SBN 222086)
Sonal.Mehta@wilmerhale.com
JESSICA LEWIS (SBN 302467)
Jessica.Lewis@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

ARI HOLTZBLATT (SBN 354631)
Ari.Holtzblatt@wilmerhale.com
ALLISON SCHULTZ (*pro hac vice* pending)
Allison.Schultz@wilmerhale.com
NATHANIEL W. REISINGER
 (*pro hac vice* pending)
Nathaniel.Reisinger@wilmerhale.com
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6443

*Attorneys for Defendant Meta Platforms, Inc.*

# TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION ................................................................................................. i

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................................... 1

BACKGROUND ....................................................................................................................................... 2

STANDARD OF REVIEW ..................................................................................................................... 4

ARGUMENT ............................................................................................................................................. 4

I.    Plaintiffs' Claims Are Barred By Section 230 ............................................................................ 4

    A.    Meta Is An Interactive Computer Service Provider ............................................................. 5

    B.    Plaintiffs' Claims Would Impose Liability On Meta For Its Conduct As A Publisher Of The Content At Issue ........................................................................................... 5

    C.    Meta Did Not Materially Contribute To The Ads' Unlawfulness ................................... 8

II.   Plaintiffs' Claims Fail On The Merits ......................................................................................... 12

    A.    Plaintiffs Fail To Adequately Allege Aiding And Abetting Fraud (Count I) ......... 12

        1.    Plaintiffs fail to adequately allege actual knowledge of the CLEU scammers' fraudulent scheme ................................................................................. 12

        2.    Plaintiffs fail to adequately allege knowing or purposeful assistance ........................................................................................................................ 15

    B.    Plaintiffs Fail To Adequately Allege Breach Of Contract (Count II) .................... 17

    C.    Plaintiffs Fail To Adequately Allege Negligence (Count III) .................................. 18

    D.    Plaintiffs Fail To Adequately Allege A Violation Of The Unruh Civil Rights Act (Count IV) .......................................................................................................... 20

        1.    Plaintiffs do not allege Meta denied or provided unequal access to any public accommodation. ........................................................................... 21

        2.    Plaintiffs do not allege that any alleged discrimination was willful. ......... 23

    E.    The Parties' Express Contract Bars Plaintiffs' Unjust Enrichment Claim (Count V) .......................................................................................................................... 24

III.  Dismissal Should Be With Prejudice ........................................................................................... 25

CONCLUSION ........................................................................................................................................ 25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Alamilla v. Hain Celestial Group,*
5     30 F. Supp. 3d 943 (N.D. Cal. 2014) .............................................................3, 7, 17

6 *Ashcroft v. Iqbal,*
    566 U.S. 662 (2009).....................................................................................................4
7

8 *Astiana v. Hain Celestial Group, Inc.,*
    783 F.3d 753 (9th Cir. 2015) ......................................................................................24

9 *Bard v. GSV Asset Management, LLC,*
10     2023 WL 6429747 (N.D. Cal. Oct. 2, 2023)..............................................................12

11 *Barfuss v. Live Nation Entertainment, Inc.,*
    2025 WL 1843207 (C.D. Cal. May 14, 2025) ..........................................................18
12

13 *Barnes v. Yahoo!, Inc.,*
    570 F.3d 1096 (9th Cir. 2009) .......................................................................5, 6, 7, 17

14 *Barrett v. Apple Inc.,*
15     523 F. Supp. 3d 1132 (N.D. Cal. 2021) ........................................................15, 16, 17

16 *Birdwell v. AvalonBay Communities, Inc.,*
    742 F. Supp. 3d 1024 (N.D. Cal. 2024) .....................................................................20
17

18 *Bogard v. TikTok Inc.,*
    2025 WL 604972 (N.D. Cal. Feb. 24, 2025) .............................................................20

19 *Bradshaw v. SLM Corp.,*
20     652 Fed App'x 593 (9th Cir. 2016) ......................................................................13, 14

21 *Brown v. USA Taekwondo,*
    11 Cal. 5th 204 (2021) ...............................................................................................18
22

23 *Calise v. Meta Platforms, Inc.,*
    103 F.4th 732 (9th Cir. 2024) ............................................................................6, 8, 9

24 *Carafano v. Metrosplash.com, Inc.,*
25     339 F.3d 1119 (9th Cir. 2003) .............................................................................8, 10

26 *Casey v. United States Bank National Association,*
    127 Cal. App. 4th 1138 (2005) ............................................................................12, 15
27

28 *Castronuova v. Meta Platforms, Inc.,*
    2025 WL 1914860 (N.D. Cal. June 10, 2025) ..........................................................25

*Conroy v. Regents of the University of California,*
  45 Cal. 4th 1244 (2009) ...........................................................................................18

*Copart, Inc. v. Sparta Consulting, Inc.,*
  339 F. Supp. 3d 959 (E.D. Cal. Sept. 10, 2018) ...............................................24, 25

*Curl v. CitiMortgage, Inc.,*
  2014 WL 5321063 (N.D. Cal. Oct. 17, 2014)..........................................................18

*Damner v. Facebook Inc.,*
  2020 WL 7862706 (N.D. Cal. Dec. 31, 2020) .........................................................18

*Dangaard v. Instagram, LLC,*
  2022 WL 17342198 (N.D. Cal. Nov. 30, 2022) .........................................................5

*Delgado v. Trax Bar & Grill,*
  36 Cal. 4th 224 (2005) ........................................................................................19, 20

*Diaz v. Intuit, Inc.,*
  2018 WL 2215790 (N.D. Cal. May 15, 2018).....................................12, 13, 16, 17

*Doe 1 v. Twitter, Inc.,*
  --- F.4th --- (9th Cir. Aug. 1, 2025) ..............................................................9, 10, 11

*Doe No. 14 v. Internet Brands, Inc.,*
  2016 WL 11824793 (C.D. Cal. Nov. 14, 2016)..................................................19, 20

*Doe v. Grindr Inc.,*
  128 F.4th 1148 (9th Cir. 2025) .............................................................6, 7, 9, 10, 11

*Dyroff v. Ultimate Software Group, Inc.,*
  934 F.3d 1093 (9th Cir. 2019) .............................................8, 9, 10, 11, 18, 19, 20

*Estate of Bride ex rel. Bride v. Yolo Technologies, Inc.,*
  112 F.4th 1168 (9th Cir. 2024) ....................................................................5, 6, 9

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC,*
  521 F.3d 1157 (9th Cir. 2008) ...................................................................5, 8, 11, 25

*Forrest v. Meta Platforms, Inc,*
  737 F. Supp. 3d 808 (N.D. Cal. 2024) .....................................................................10

*Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network, Inc.,*
  742 F.3d 414 (9th Cir. 2014) .............................................................................20, 23

*Hardy v. California,*
  2006 WL 563049 (N.D. Cal. Mar. 7, 2006)..............................................................21

*Herskowitz v. Apple Inc.*,
    940 F. Supp. 2d 1131 (N.D. Cal. 2013) ................................................................24

*Hubbard v. Google LLC*,
    2025 WL 82211 (N.D. Cal. Jan. 13, 2025) ..........................................................14

*In re First Alliance Mortgage Co.*,
    471 F.3d 977 (9th Cir. 2006) ......................................................................12, 15

*In re Mortgage Fund '08 LLC*,
    527 B.R. 351 (N.D. Cal. Mar. 23, 2015)...............................................................15

*King v. Facebook, Inc.*,
    2019 WL 6493968 (N.D. Cal. Dec. 3, 2019) ....................................................7, 17

*Koebke v. Bernardo Heights Country Club*,
    36 Cal. 4th 824 (2005) .............................................................................23, 24

*Liapes v. Facebook, Inc.*,
    95 Cal. App. 5th 910 (2023) ......................................................................11, 22

*Lloyd v. Facebook, Inc.*,
    2022 WL 4913347 (N.D. Cal. Oct. 3, 2022)....................................................7, 17

*Marcelos v. Dominguez*,
    2008 WL 2788173 (N.D. Cal. July 18, 2008).........................................................15

*Martinez v. Cot'n Wash, Inc.*,
    81 Cal. App. 5th 1026 (2022) ...........................................................................23

*Maya v. Centex Corp.*,
    658 F.3d 1060 (9th Cir. 2011) ............................................................................4

*Melton v. Boustred*,
    183 Cal. App. 4th 521 (2010) .......................................................................18, 19

*Moore v. Mars Petcare US, Inc.*,
    966 F.3d 1007 (9th Cir. 2020) ............................................................................4

*Morton v. Twitter, Inc.*,
    2021 WL 1181753 (C.D. Cal. Feb. 19, 2021)...................................................17, 18

*Musk v. OpenAI, Inc.*,
    2025 WL 1482386 (N.D. Cal. May 1, 2025) ........................................................12

*Nevis v. Wells Fargo Bank*,
    2010 WL 11636091 (N.D. Cal. Jan. 13, 2010) .......................................................14

*Noah v. AOL Time Warner, Inc.*,
    261 F. Supp. 2d 532 (E.D. Va. 2003) ....................................................................8

*O'Connor v. Uber Technologies, Inc.*,
   58 F. Supp. 3d 989 (N.D. Cal. 2014) ...................................................................25

*Olson v. Children's Home Society*,
   204 Cal. App. 3d 1362 (1988) ............................................................................20

*OpenTV, Inc. v. Netflix Inc.*,
   76 F. Supp. 3d 886,893 (N.D. Cal. 2014) .............................................................22

*Parents for Privacy v. Barr*,
   949 F.3d 1210 (9th Cir. 2020) ............................................................................25

*Pirozzi v. Apple Inc.*,
   913 F. Supp. 2d 840 (N.D. Cal. 2012) ..................................................................20

*Planet Green Cartridges, Inc. v. Amazon.Com, Inc.*,
   2025 WL 869209 (9th Cir. Mar. 20, 2025)..........................................................8, 19

*Prager University v. Google LLC*,
   85 Cal. App. 5th 1022 (2022) ...............................................................................7

*Pratt v. Higgins*,
   2023 WL 4564551 (N.D. Cal. July 17, 2023)........................................................15

*Ragin v. N.Y. Times Co.*,
   923 F.2d 995 (2d Cir. 1991)................................................................................22

*Rigsby v. GoDaddy Inc.*,
   59 F.4th 998 (9th Cir. 2023) .................................................................................5

*S&S Worldwide, Inc. v. Wells Fargo Bank*,
   509 F. Supp. 3d 1154 (N.D. Cal. 2020) ................................................................14

*Shared.com v. Meta Platforms, Inc.*,
   2022 WL 4372349 (N.D. Cal. Sept. 21, 2022) ........................................................7

*Sikhs for Justice, Inc. v. Facebook, Inc.*,
   697 F. App'x 526 (9th Cir. 2017) ........................................................................25

*Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*,
   144 F. Supp. 3d 1088 (N.D. Cal. 2015) ..................................................................5

*Stringer v. Combe, Inc.*,
   2017 WL 6539779 (N.D. Cal. Dec. 21, 2017).....................................................22, 24

*Thurston v. Omni Hotels Management Corp.*,
   69 Cal. App. 5th 299 (2021) ...............................................................................21

*United States v. Cedric et al.*,
   No. 1:25-cr-00161 (N.D. Ill.)................................................................................3

*United States v. Funds in the Amount of $19,901,190.42 Seized From Company A*
  *Account Number XXXX9087 Held in the Name of Lim Xiang Jie Cedric,*
  No. 1:25-cv-02965 (N.D. Ill.) .................................................................................................3

*Vargas v. Facebook, Inc.,*
  2023 WL 6784359 (9th Cir. 2023) .......................................................................................11

*WhatsApp Inc. v. NSO Group Technologies Limited,*
  17 F.4th 930 (9th Cir. 2021) ................................................................................................14

*White v. Square, Inc.,*
  7 Cal. 5th 1019 (2019) .........................................................................................................21

*Young v. Facebook, Inc.,*
  2010 WL 4269304 (N.D. Cal. Oct. 25, 2010).............................................................7, 17, 18

*Zahabi v. Bank of America, N.A.,*
  2012 WL 12920507 (N.D. Cal. July 16, 2012 .....................................................................12

*Ziencik v. Snap, Inc.,*
  2023 WL 2638314 (C.D. Cal. Feb. 3, 2023).........................................................................19

**Statutes, Rules, Regulations**

47 U.S.C. § 230...........................................................................................................................4, 8

Cal. Civ. Code § 51.........................................................................................................................20

1

### MEMORANDUM OF POINTS AND AUTHORITIES

2      Plaintiffs allege that they were defrauded by an organized criminal network in Asia that

3   orchestrated a "pump-and-dump" scheme involving shares of China Liberal Education Holdings

4   Ltd. ("CLEU").  According to Plaintiffs, the scammers used Facebook and Instagram to publish

5   ads promoting "investment clubs" that promised high returns.  After clicking on the ads,

6   Plaintiffs claim they were led to group chats on WhatsApp, where the scammers engaged in

7   months-long conversations and ultimately advised Plaintiffs to invest in CLEU.  Federal

8   prosecutors are pursuing criminal charges against the CLEU scammers, as well as a civil

9   forfeiture action to return money to the alleged victims.

10      Meta Platforms, Inc. ("Meta") is not alleged to have participated in the criminal conduct

11   or to have been implicated in the criminal prosecution whatsoever.  Nonetheless, Plaintiffs seek

12   to hold Meta liable for failing to prevent them from seeing or being misled by the third-party ads

13   that solicited Plaintiffs into participating in the alleged "investment clubs."  Plaintiffs do not

14   plausibly allege that Meta materially contributed any of the fraudulent content in the ads, knew

15   the CLEU scammers were engaged in a fraudulent scheme, or had any reason to suspect the ads

16   were unlawful at the time they were posted—each of which independently dooms their claims.

17      Plaintiffs' claims are barred by Section 230 of the Communications Decency Act, which

18   prohibits attempts to impose liability on Meta for publishing third-party content.  Plaintiffs

19   attempt to circumvent Section 230 by alleging Meta "developed" the ads at issue, but they fall

20   short: they do not allege, as they must, that Meta materially contributed to the ads' alleged

21   unlawfulness.  Instead, they point to neutral, generally available tools that optimized the format,

22   placement, and combination of ad components *provided by the scammers*.  Providing such

23   neutral tools does not strip a provider of Section 230's protections.  Section 230 bars claims, like

24   those asserted here, that would impose liability on Meta merely because it published and did not

25   remove content created by third parties.  Prejudicial dismissal is appropriate on this basis alone.

26      Beyond that, Plaintiffs fail to plausibly allege essential elements of each of their claims.

27   *First*, Plaintiffs' claim for aiding and abetting fraud (Count I) fails because Plaintiffs do not

28   plausibly allege that Meta had actual knowledge of the CLEU scammers' fraudulent scheme, or

1    that Meta made a conscious decision to assist the CLEU scammers' unlawful aims.

2         *Second*, Plaintiffs' breach of contract claim (Count II) fails because Plaintiffs do not

3    identify any enforceable contractual obligation requiring Meta to remove potentially harmful

4    content.  The provisions on which they rely restrict user behavior, not Meta's.  Moreover, Meta's

5    Terms of Service expressly disclaim responsibility for third-party content, including unlawful or

6    objectionable material.

7         *Third*, Plaintiffs' negligence claim (Count III) fails because Plaintiffs seek to hold Meta

8    liable for failing to prevent third parties from using neutral and generally available tools to cause

9    them harm.  Such purported inaction or "nonfeasance" can create a cognizable duty for purposes

10   of negligence only where the defendant has a "special relationship" with the plaintiff.  Settled

11   precedent rejects any notion that Meta formed a special relationship with its users simply

12   because it offered them online services.

13        *Fourth*, Plaintiffs' Unruh Civil Rights Act claim (Count IV) fails because Plaintiffs do

14   not allege denial of or differential access to Meta's services or any other public accommodation,

15   nor do they allege that whether a person received one of the challenged ads depended on their

16   racial identity.  To the contrary, Plaintiffs' own allegations make clear that users were shown the

17   ads for a different reason: because they had demonstrated interest in investment-related content.

18   Regardless, Plaintiffs also fail to plausibly allege that Meta acted willfully to discriminate against

19   them because they nowhere allege that Meta was aware of the fraudulent nature of the ads at

20   issue when they were shown to users.

21        *Finally*, Plaintiffs' unjust enrichment claim (Count V) fails because there is no such cause

22   of action recognized under California law and it is well-settled that no quasi-contract cause of

23   action may lie where an express contract between the parties covers the subject matter of the

24   claim.  Here, Meta's Terms expressly disclaim any obligation to remove potentially harmful

25   third-party content, the basis for Plaintiffs' claim.

26        Plaintiffs' claims are incurably legally deficient and should be dismissed with prejudice.

27                                    **BACKGROUND**

28        Plaintiffs allege they fell victim to an "investment scam[] perpetrated by an organized

1    criminal network operating out of China, Taiwan, and Malaysia." Compl. ¶ 8. Members of that

2    alleged criminal network are currently facing criminal charges and civil forfeiture proceedings in

3    the Northern District of Illinois. *See id.*; *see also United States v. Cedric et al.*, No. 1:25-cr-

4    00161 (N.D. Ill.); *United States v. Funds in the Amount of $19,901,190.42 Seized From*

5    *Company A Account Number XXXX9087 Held in the Name of Lim Xiang Jie Cedric*, No. 1:25-

6    cv-02965 (N.D. Ill.). According to the Complaint, the "scammers" ran ads on Facebook and

7    Instagram promoting "investment clubs" with access to stock recommendations. *Id.* ¶¶ 9, 63-69.

8    The scammers often featured celebrities or well-known investors in these ads and touted

9    investment strategies with high potential returns. *Id.* ¶¶ 64-69.

10       In creating and publishing these ads, the scammers allegedly used Meta's advertising

11   tools such as the Dynamic Creative tool, which mixes and matches different media and ad

12   components (such as images, text, and videos) provided by the advertiser. Compl. ¶¶ 105, 112-

13   114; *see also* Declaration of Allison Schultz ("Schultz Decl.") Exs. B, C. The scammers are also

14   alleged to have used Meta's Flexible Format tool, Compl. ¶¶ 110-111, which optimizes ad

15   formats (e.g., by displaying a single image, video, or collection of images) based on the ad

16   placement (e.g., whether the ad is shown on Facebook, Instagram, or Messenger). Schultz Decl.

17   Ex. D. However advertisers use these tools, Meta users retain under Meta's Terms the ability to

18   control both "the types of information … use[d] to determine which ads" they see and "the types

19   of ads and advertisers [they] see." Schultz Decl. Ex. A at 5 (§ 2).[1]

20       Plaintiffs are individuals who clicked on the scammers' ads and were then either

21   "automatically added into" or "invited to click an embedded link to join" a "private WhatsApp

22   group," where they interacted with "purported financial advisor[s]." Compl. ¶¶ 70-72.

23   WhatsApp is "an end-to-end encrypted service allowing for private communications among its

24   users." *Id.* ¶ 27. Using such communications, the purported advisers built trust with Plaintiffs

25   "over a period of months." *Id.* ¶ 75. On January 22, 2025, the "advisors" recommended that the

26   WhatsApp group members purchase shares of CLEU at specified prices, which drove up

27

28   _____

[1] These pages, as well as Meta's Terms of Service, are quoted and relied on in the Complaint,
*see* Compl ¶¶ 94, 111, 113, 137-141, and are therefore incorporated therein by reference. *See*
*Alamilla v. Hain Celestial Grp.*, 30 F. Supp. 3d 943, 944 (N.D. Cal. 2014).

1   CLEU's stock price.  *Id.* ¶¶ 76, 79-80.  According to the Complaint, the scammers had

2   previously acquired large shares of undisclosed CLEU shares in a secret offering.  *Id.* ¶ 82.

3   While the WhatsApp group members purchased the stock, the alleged co-conspirators sold off

4   their shares at inflated prices.  *Id.*  The Complaint alleges that the scheme collapsed on January

5   30 when the market became aware of the previously undisclosed shares and CLEU's stock price

6   plummeted, causing Plaintiffs to lose their investments in CLEU.  *Id.* ¶¶ 83-92.

7          The Complaint nowhere alleges that Meta was aware of the fraudulent nature of the

8   CLEU scammers' ads—or that Meta could even see or review their subsequent WhatsApp

9   communications, which are "encrypted" and "private," *see* Compl. ¶ 27—at any point before the

10  CLEU stock price collapsed in January 2025.[2]

11                                    **STANDARD OF REVIEW**

12         A complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to

13  relief that is plausible on its face.'"  *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1016 (9th

14  Cir. 2020) (quoting *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009)).  "[T]he complaint cannot

15  survive a motion to dismiss unless it alleges facts that plausibly (not merely conceivably) entitle

16  plaintiff[s] to relief."  *Maya v. Centex Corp.*, 658 F.3d 1060, 1067-1068 (9th Cir. 2011).

17  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory

18  statements, do not suffice."  *Iqbal*, 556 U.S. at 678.  "[T]he tenet that a court must accept as true

19  all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Id.*

20                                          **ARGUMENT**

21         Each of Plaintiffs' claims is barred by Section 230, which prohibits claims that seek to

22  impose liability on interactive computer service providers like Meta for publishing third-party

23  content.  Alternatively, even absent Section 230, Plaintiffs' claims fail on the merits.

24  **I.    PLAINTIFFS' CLAIMS ARE BARRED BY SECTION 230**

25         Section 230 provides that "[n]o provider or user of an interactive computer service shall

26  be treated as the publisher or speaker of any information provided by another information

27  
    _____

28  [2] Plaintiffs allege in one stray paragraph that "the scammers … continue[d] their stock market
    manipulation scheme" after January 2025, Compl. ¶ 104, but limit their Complaint to the scheme
    that concluded in January 2025, *e.g.*, *id.* ¶ 122.

1    content provider," 47 U.S.C. § 230(c)(1), and prohibits any cause of action or imposition of

2    liability "under any State or local law that is inconsistent with this section," *id.* § 230(e)(3).  "In

3    short, § 230 protects apps and websites which receive content posted by third-party users (i.e.,

4    Facebook, Instagram, …, etc.) from liability for any of the content posted on their services."  *Est.*

5    *of Bride ex rel. Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1175 (9th Cir. 2024).  Section 230's

6    "robust" protections "appl[y] to '(1) a provider or user of an interactive computer service (2)

7    whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of

8    information provided by another information content provider.'"  *Id.* (quoting *Barnes v. Yahoo!,*

9    *Inc.*, 570 F.3d 1096, 1100-1101 (9th Cir. 2009)).  Each prong is satisfied here.

10           **A.      Meta Is An Interactive Computer Service Provider**

11           The term "interactive computer service" has a "relatively expansive definition" and "'has

12   been construed broadly to effectuate the statute's speech-protective purpose.'"  *Rigsby v.*

13   *GoDaddy Inc.*, 59 F.4th 998, 1007 (9th Cir. 2023).  It is well-established that Meta is an

14   interactive computer service provider.  *See, e.g.*, *Dangaard v. Instagram, LLC*, 2022 WL

15   17342198, at *4 (N.D. Cal. Nov. 30, 2022) (Meta "certainly provide[s] interactive computer

16   services" via Facebook); *Sikhs for Just. "SFJ", Inc. v. Facebook, Inc.*, 144 F. Supp. 3d 1088,

17   1093 (N.D. Cal. 2015) (similar).

18           **B.      Plaintiffs' Claims Would Impose Liability On Meta For Its Conduct As A**
             **Publisher Of The Content At Issue**
19

20           Each of Plaintiffs' claims "inherently requires the [C]ourt to treat [Meta] as the 'publisher

21   or speaker' of content provided by another,'"  meeting the second prong.  *Barnes*, 570 F.3d at

22   1102.  A claim satisfies this prong where it seeks to impose liability for "reviewing, editing, and

23   deciding whether to publish or withdraw from publication third-party content."  *Id.*; *see also Fair*

24   *Hous. Council of San Fernando Valley v. Roommates.com*, *LLC*, 521 F.3d 1157, 1170-1171 (9th

25   Cir. 2008) ("[A]ny activity that can be boiled down to deciding whether to exclude material that

26   third parties seek to post online is perforce immune under section 230.").

27           Here, each of Plaintiffs' claims seeks to hold Meta liable for "allow[ing] ads by the

28   CLEU scammers."  Compl. ¶ 96.  *First*, Plaintiffs' aiding-and-abetting fraud claim (Count I)

seeks to hold Meta liable for "provid[ing] the platforms necessary to conduct the fraud" and "select[ing] … the content that would be shown to specific users." *Id.* ¶ 134. *Second*, Plaintiffs' negligence claim (Count III) would impose liability on Meta for failing to "identify and remove the ads" at issue, generally "failing to … monitor, detect, and remove investment scam ads," and purportedly "targeting"—that is, publishing—those ads to particular users. *Id.* ¶¶ 145-146. Plaintiffs' addition of a "failure to warn" negligence theory does not change this conclusion; the Ninth Circuit has held that a "failure to warn claim" that "faults" a provider "for not mitigating, in some way, the harmful effects of the … [challenged] content," would "essentially fault[]" the provider "for not moderating content in some way, whether through deletion, change, or suppression." *See Est. of Bride*, 112 F.4th at 1180. *Third*, Plaintiffs' Unruh Act claim (Count IV) likewise seeks to hold Meta liable for "serv[ing] to Facebook and Instagram users" the "scam ads" at issue. Compl. ¶ 153. *Fourth*, Plaintiffs' unjust enrichment claim (Count V) would impose liability on Meta for failing to "monitor, detect, and remove fraudulent advertisements." *Id.* ¶ 163. Each of these claims inherently requires the Court to treat Meta as the publisher of the scam ads and hinges on Plaintiffs' disagreement with Meta's "deci[sion] whether to publish or withdraw from publication" those ads. *Cf. Barnes*, 570 F.3d at 1102.

Section 230 also bars Plaintiffs' claim for breach of contract (Count II). To be sure, the Ninth Circuit has held that Section 230 does not bar claims that seek to enforce an express contractual duty as opposed to a duty derived from publishing activity. *See Barnes*, 570 F.3d at 1107. But that limitation applies only where there are plausible allegations that the defendant "manifested its intent to be legally obligated to" take certain content-moderation actions. *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 743 (9th Cir. 2024). As the Ninth Circuit has recently explained, to avoid Section 230's bar, a contract claim must "s[eek] to hold the defendant accountable for a specific promise or representation, 'not for failure to take certain moderation actions.'" *Doe v. Grindr Inc.*, 128 F.4th 1148, 1154 (9th Cir. 2025). And it has long been the law in this circuit that "a general monitoring policy … on the part of an interactive computer service" does not give rise to a contractual obligation sufficient to evade Section 230's bar. *Barnes*, 570 F.3d at 1108. Other courts agree: Section 230 continues to "foreclose[] liability

1   where plaintiffs have identified no enforceable promise allegedly breached." *Prager Univ. v.*

2   *Google LLC*, 85 Cal. App. 5th 1022, 1036 (2022) (citing *Murphy v. Twitter, Inc.*, 60 Cal. App.

3   5th 12, 29-30 (2021)).

4          Here, Plaintiffs' contract claim hinges on general language in Meta's Community

5   Standards—incorporated by reference in Meta's Terms of Service—that Meta "'does not allow'

6   investment scam ads." Compl. ¶ 139.  But the page Plaintiffs quote for this assertion makes no

7   guarantee that Meta's services will be free of potentially harmful content, instead using the

8   aspirational language that Meta "aim[s]" to protect its users from deceptive content.  Schultz

9   Decl. Ex. E at 1.[3]  Meta's Community Standards are "guidelines outlin[ing] [Meta's] standards

10  regarding the content [a user] post[s] to Facebook and [their] activity on Facebook and other

11  Meta Products."  *Id.* Ex. A at 12 (§ 5).  In other words, they "place restrictions on user behavior"

12  but "do not create affirmative obligations" on Meta.  *Young v. Facebook, Inc.*, 2010 WL

13  4269304, at *3 (N.D. Cal. Oct. 25, 2010); *accord King v. Facebook, Inc.*, 2019 WL 6493968, at

14  *2 (N.D. Cal. Dec. 3, 2019), *aff'd*, 845 F. App'x 691 (9th Cir. 2021); *cf. Shared.com v. Meta*

15  *Platforms, Inc.*, 2022 WL 4372349, at *3 (N.D. Cal. Sept. 21, 2022) ("To the extent Facebook's

16  Terms … outline a set of criteria for suspending accounts …, this simply restates Meta's ability

17  to exercise editorial discretion.").  "[M]erely stating that Facebook does not allow users to post

18  harmful content and that they will remove [such content] is mere[ly] 'a general monitoring

19  policy' that the Ninth Circuit noted was insufficient" to evade Section 230's bar.  *Lloyd v.*

20  *Facebook, Inc.*, 2022 WL 4913347, at *9 (N.D. Cal. Oct. 3, 2022) (quoting *Barnes*, 570 F.3d at

21  1108).  Because Plaintiffs premise their contract claim on a "failure to take certain moderation

22  actions," *Grindr*, 128 F.4th at 1158—*e.g.*, "allowing the ads," Compl. ¶ 140—rather than any

23  "specific promise," Section 230 bars that claim, *Grindr*, 128 F.4th at 1158.

24         Moreover, Meta "disclaim[ed] any intention to be bound" by the purported promise on

25  which Plaintiffs rely, negating any possible argument that Meta's general policy could be an

26  enforceable promise.  *Barnes*, 570 F.3d at 1108.  Meta's Terms expressly state that Meta

27  "make[s] no guarantees that [its Products] will always be safe, secure, or error-free" and Meta

28

---

[3] This page is quoted and relied on in the Complaint, *see* Compl ¶ 139, and is therefore
incorporated therein by reference.  *See Alamilla*, 30 F. Supp. 3d at 944.

1   "do[es] not control or direct what people and others do or say, and [Meta is] not responsible for

2   their actions or conduct (whether online or offline) or any content they share (including

3   offensive, inappropriate, obscene, unlawful, and other objectionable content)."  Schultz Decl. Ex.

4   A at 10-11 (§ 4.3).  Such "disclaimer of any obligation to enforce [Meta's] Community

5   Guidelines is perfectly in line with the evident Congressional intent of § 230 … to ensure that

6   service providers are not held responsible for content provided by third parties."  *Noah v. AOL*

7   *Time Warner, Inc.*, 261 F. Supp. 2d 532, 545 (E.D. Va. 2003) (citing *Green v. Am. Online (AOL)*,

8   318 F.3d 465, 471 (3d Cir. 2003); *Zeran v. America Online, Inc.*, 129 F.3d 327, 331 (4th Cir.

9   1997)).  Given this express disclaimer, Plaintiffs have not plausibly alleged that Meta

10  "manifested its intent to be legally obligated to … combat scam advertisements."  *Calise*, 103

11  F.4th at 743.  Their contract claim thus seeks to hold Meta liable not for its role as a contractual

12  promisor, but as a publisher that allegedly did not take content moderation actions in the way

13  Plaintiffs would have preferred.  Section 230(c)(1)'s second prong is satisfied by such a claim.

14          **C.      Meta Did Not Materially Contribute To The Ads' Unlawfulness**

15          Section 230's third prong is satisfied because Plaintiffs do not plausibly allege Meta is

16  "responsible, in whole or in part, for the creation or development of" the challenged ads.  47

17  U.S.C § 230(f)(3).  Under this prong, "[o]ne 'develop[s]' content in the relevant sense by

18  'materially contributing to its alleged unlawfulness.'"  *Planet Green Cartridges, Inc. v.*

19  *Amazon.Com, Inc.*, 2025 WL 869209, at *1 (9th Cir. Mar. 20, 2025) (quoting *Roommates*, 521

20  F.3d at 1167-1168).  The inquiry makes "a 'crucial distinction between, on the one hand, taking

21  actions (traditional to publishers) that are necessary to the display of unwelcome and actionable

22  content, and, on the other hand, responsibility for what makes the displayed content illegal or

23  actionable.'"  *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1099 (9th Cir. 2019)).

24          This prong cannot be evaded by claiming Meta "merely … augment[ed] the content

25  generally," *Roommates*, 521 F.3d at 1167-1168, or "facilitated the expression of information by

26  individual users," *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1124 (9th Cir. 2003).  Nor

27  is it enough "that an internet company provid[ed] tools … manipulated by third parties for

28  unlawful purposes."  *Calise*, 103 F.4th at 745.  A provider does not materially contribute to the

1    unlawfulness of third-party content where it "use[s] features and functions, including algorithms,

2    to analyze user posts …, recommend[s] other user groups," or "match[es] users based on

3    geographic data it extracted from them," because such features are "'meant to facilitate the

4    communication and content of others'" and are "'not content in and of themselves.'"  *Grindr*,

5    128 F.4th at 1153 (quoting *Dyroff*, 934 F.3d at 1098); *see also Estate of Bride*, 112 F.4th at 1181

6    ("automated processes" in site's algorithm" were not "content").  Put directly, Meta "is immune

7    from liability for the alleged third-party abuses of its" neutral, generally available ad tools.  *Doe*

8    *I v. Twitter, Inc.*, --- F.4th ---, 2025 WL 2178534, at *7 (9th Cir. Aug. 1, 2025).

9        Here, Plaintiffs point only to neutral tools available generally to advertisers to allege

10    Meta somehow materially contributed to the fraudulent nature of the ads at issue.  Despite

11    conclusory allegations that Meta "assist[ed] in the development" of the ads at issue, *e.g.*, Compl.

12    ¶¶ 36, 105, Plaintiffs' only concrete allegations on this front relate to two neutral tools available

13    to any advertiser in Meta's "Ads Manager" service.  *First*, Plaintiffs allege that the advertisers

14    here used Meta's "Dynamic Creative tool," which allows advertisers to display different ad

15    media and components to different users based on the users' internet-browsing activity.  Compl.

16    ¶¶ 112-113.  This tool produces "creative variations … only based on the media and ad

17    components [an advertiser] provide[s]."  Schultz Decl. Ex. C at 1.  *Second*, Plaintiffs allege the

18    CLEU scammers used Meta's Flexible Format tool, which allows advertisers to "automatically

19    optimize [their] ad format."  *Id.* Ex. D at 1.  Critically, advertisers using the Flexible Format

20    tool—and not Meta—(1) select flexible formatting and (2) select the images, videos, and text for

21    their ad.  *Id.*  The advertiser—not Meta—"can group certain media, such as images and videos,

22    with different combinations of texts, allowing *you* to customize *your ads*."  *Id.* (emphasis added).

23        Plaintiffs fail to plausibly allege these neutral tools materially contributed to what made

24    the ads unlawful.  As in *Calise*, Meta's ad tools are "on their face, neutral. They are allegedly

25    used for unlawful purposes, but that does not result from Meta's efforts."  103 F.4th at 745.

26    Instead, Plaintiffs at most claim Meta's tools optimized the format, combination, and grouping of

27    ad elements provided by third parties, and determined which users to show which combination of

28    those third-party ad elements.  Although the tools "facilitated the expression of information …,

1   the selection of the content was left exclusively to the [advertiser]." *Carafano*, 339 F.3d at 1124.

2   Meta does not materially contribute to the unlawfulness of any ads' content where "no

3   [advertisement] has any content until a user actively creates it." *Id.*  Here, as Plaintiffs allege,

4   what made these ads unlawful was not any optimization, but that the ads were "fraudulent,"

5   Compl. ¶¶ 134, 151, 163 (Counts I, IV, V), and "scam[s]," *id.* ¶¶ 139, 144 (Counts II and III).

6   　　　*Forrest v. Meta Platforms, Inc*, 737 F. Supp. 3d 808 (N.D. Cal. 2024), is not to the

7   contrary.  There, the court held only that the particular allegations at issue failed to resolve "a

8   factual dispute" because the plaintiff did "not clearly allege how Meta's ad tools work or

9   contribute to the challenged ads" and thus, it was disputed "whether the tools themselves

10  contributed to the *content* of the ads, including to the aspects of the content that are allegedly

11  illegal." *Id.* at 818.  Here, the allegedly illegal content was the fraudulent promise of investment

12  advice.  That content was provided exclusively by the "advertisers"—not Meta—including when

13  the advertisers "provide[d] a combination of images, text, and platform-specific preferences,"

14  which the neutral tools allegedly combined.  Compl. ¶ 115.  Plaintiffs similarly (and repeatedly)

15  allege they were "targeted with ads *by the CLEU scammers*"—not by Meta.  *Id.* ¶¶ 107-109.

16  And, of course, it was the "scammers"—not Meta—that "posed as financial advisors" in the

17  private WhatsApp group chats and "encouraged victims to purchase securities." *Id.* ¶ 10.

18  　　　In short, Plaintiffs here, unlike the *Forrest* plaintiff, leave no room to dispute that the ads'

19  allegedly unlawful content and subsequent chats were provided by the scammers, while Meta's

20  tools provided only content-neutral assistance with formatting, ad organization, and matching of

21  particular users with the ads.  Courts—including the Ninth Circuit after *Forrest* was decided—

22  have repeatedly held that such "content-neutral" "features and functions" "'meant to facilitate the

23  communication and content of others,'" are protected by Section 230, even where malicious

24  actors misuse those tools to cause harm to innocent users.  *See Grindr*, 128 F.4th at 1152-1153

25  (quoting *Dyroff*, 934 F.3d at 1098); *Doe 1*, 2025 WL 2178534, at *7.

26  　　　Plaintiffs' allegations of discrimination—relevant, if at all, to their Unruh Act claim

27  alone—do not alter Section 230's applicability.  Plaintiffs do not allege that the scammers

28  targeted or excluded particular demographic groups; rather, they contend that *all* users exposed

1 to the ads likely saw an endorser of the same racial or ethnic background as the user. *Infra* 21-

2 22. But even if Plaintiffs had alleged the ads were targeted to particular groups of users, Section

3 230 would still bar their claims. The Ninth Circuit has consistently held that Section 230 bars

4 claims alleging that a provider's neutral tools matched or targeted harmful conduct to particular

5 users, even where it was alleged that the targeting *itself* was unlawful or harmful. *See Doe 1*,

6 2025 WL 2178534, at *7 (Section 230 barred claims despite allegations Twitter did not prevent

7 hashtags, a neutral tool there allegedly used "specifically for the purpose of searching, finding,

8 and sharing [child pornography]"); *Grindr*, 128 F.4th at 1153 (same for allegation that neutral

9 match-making tools were not designed to "prevent a minor from being matched with predators"

10 or "abusive adults"); *Dyroff*, 934 F.3d at 1099 (same, matching drug-seekers with drug dealers).

11 Other cases that have rejected Section 230 have involved allegations that certain demographic

12 groups were allegedly *excluded* from seeing third-party content or that the provider's tools were

13 not neutral. *See, e.g.*, *Roommates*, 521 F.3d at 1169-1170 ("[T]he act of hiding certain listings is

14 *itself unlawful* under the [FHA][.]" (emphasis added)); *Liapes v. Facebook, Inc.*, 95 Cal. App.

15 5th 910, 922-924, 930 (2023) (describing allegations as unlawfulness resulting from "difficult[y]

16 for individuals with certain protected characteristics to find or access insurance ads"); *Vargas v.

17 Facebook, Inc.*, 2023 WL 6784359, at *2-3 (9th Cir. 2023) (similar). Plaintiffs' claims are like

18 those in the former set of cases, not the latter. They allege injury from exposure to allegedly

19 harmful third-party content (fraudulent ads), not from having been excluded from access to that

20 content. And demographic-based advertising is a neutral tool with many entirely lawful uses.

21 *See infra* 22. As in *Dyroff*, *Doe 1*, and *Grindr*, Plaintiffs here cannot evade Section 230 by

22 alleging that Meta's tools were used to tailor or target that content to them.

23 Accordingly, the third prong is satisfied because Plaintiffs allege only that Meta

24 provided "neutral features … 'meant to facilitate the communication and content of others,'"

25 *Grindr*, 128 F.4th at 1153, and that the scammers misused those tools for unlawful purposes.

26 Because each of Plaintiffs' claims seeks to hold Meta liable as a publisher of third-party content,

27 Section 230 requires that the Complaint be dismissed.

28

1    II.    **PLAINTIFFS' CLAIMS FAIL ON THE MERITS**

2        A.    **Plaintiffs Fail To Adequately Allege Aiding And Abetting Fraud (Count I)**

3            Plaintiffs' claim alleging aiding and abetting fraud suffers from multiple deficiencies.

4    Under California law, liability for aiding and abetting fraud requires that the abettor "'(a) knows

5    the other's conduct constitutes a breach of duty and gives substantial assistance or

6    encouragement to the other to so act or (b) gives substantial assistance to the other in

7    accomplishing a tortious result and the person's own conduct, separately considered, constitutes

8    a breach of duty to the third person.'" *Musk v. OpenAI, Inc.*, 2025 WL 1482386, at *5 (N.D. Cal.

9    May 1, 2025) (quoting *Casey v. United States Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1144

10    (2005)). Here, Plaintiffs allege only the former. *See* Compl. ¶¶ 134-135 ("Meta gave substantial

11    assistance to the CLEU scammers" and "knew the scammers were engaged in fraud").[4] But

12    Plaintiffs fail to plausibly allege that Meta either knew about the alleged third-party fraud at the

13    relevant time or substantially assisted in that alleged fraud.

14        1.    **Plaintiffs fail to adequately allege actual knowledge of the CLEU
                 scammers' fraudulent scheme.**
15

16            To state an aiding-and-abetting claim, a plaintiff must allege that the defendant had

17    "'actual knowledge of the specific primary wrong the defendant substantially assisted.'" *Diaz v.*

18    *Intuit, Inc.*, 2018 WL 2215790, at *6 (N.D. Cal. May 15, 2018) (quoting *In re First Alliance*

19    *Mortg. Co.*, 471 F.3d 977, 993 (9th Cir. 2006)); *accord Bard v. GSV Asset Mgmt., LLC*, 2023

20    WL 6429747, at *2 (N.D. Cal. Oct. 2, 2023) ("Aiding and abetting liability under California law

21    requires a finding of actual knowledge." (citing *In re First Alliance Mortg. Co.*, 471 F.3d at

22    993)). "[A] mere suspicion that the fraudulent actor is behaving unlawfully" is not enough.

23    *Zahabi v. Bank of America, N.A.*, 2012 WL 12920507, at *5 (N.D. Cal. July 16, 2012). And the

24    alleged aider-and-abettor must have the requisite knowledge "at the time" it allegedly acted in

25    furtherance of the primary wrong. *Diaz*, 2018 WL 2215790, at *7 (no actual knowledge

26    established where plaintiffs did not allege that the defendant was aware of fraudulent activity "at

27    the time" defendant engaged in conduct related thereto).

28    ---

[4] To the extent the Complaint could be read to plead a claim under the second prong, that claim
also fails, because Plaintiffs allege no breach of any duty. *See supra* Part I.B; *infra* Parts II.B, C.

1    *Diaz* is informative.  There, Intuit (developer of TurboTax, an online tax preparation

2    service) was alleged to have aided and abetted fraud carried out by third parties who used its

3    online tax software to open fraudulent accounts and file fraudulent tax returns.  *See Diaz*, 2018

4    WL 2215790, at *1.  The plaintiffs alleged that internal documents and "widely reported data

5    breaches" demonstrated that Intuit knew about the fraud but failed to implement better security

6    measures.  *See id.* at *1-2.  But the court held those allegations to be insufficient, because

7    although "Plaintiffs allege[d] that Intuit generally knew tax fraud was occurring on a massive

8    scale every year through TurboTax," the Complaint "lack[ed] … allegations of 'actual

9    knowledge of the specific primary wrong' against Plaintiffs.'"  *Id.* at *6.  Here, as in *Diaz*,

10   Plaintiffs allege that Meta "actually knew the scammers were engaged in fraud" because it had

11   previously been alerted to *other* similar alleged scams, including through "prior lawsuits and

12   reports."  Compl. ¶ 135.  That is insufficient.  General knowledge that some are using Meta's

13   tools to commit fraud does not suffice; rather, Plaintiffs must plead that "[Meta] knew of the

14   'specific wrongful acts' of fraud by the [CLEU scammers] at the relevant time," *Bradshaw v.*

15   *SLM Corp.*, 652 Fed App'x 593, 594 (9th Cir. 2016).

16       The Complaint pleads no facts suggesting Meta had actual knowledge of CLEU's alleged

17   fraud "at the time" Meta allegedly acted in furtherance of that fraud by allowing and not

18   removing certain ads displayed to Plaintiffs.  *Diaz*, 2018 WL 2215790, at *7 (no actual

19   knowledge established where plaintiffs did not allege defendant was aware of fraudulent activity

20   "at the time" it engaged in related conduct).  Rather, the Complaint alleges only that unidentified

21   users "reported" posts associated with the alleged CLEU fraud (though the Complaint does not

22   specify how and to whom the posts were reported) *months after* Plaintiffs saw the allegedly

23   fraudulent ads and, indeed, after the alleged investment fraud was completed.  *See* Compl. ¶¶

24   102-103.  Though Plaintiffs do not allege specifically when they saw and clicked on the

25   allegedly fraudulent ads, they do allege that the "scammers" first recommended purchasing

26   CLEU stock "months" later, on January 22, 2025—suggesting that Plaintiffs clicked on the

27   allegedly fraudulent ads in late 2024.  *Id.* ¶¶ 75-76.  They then allege that the CLEU stock price

28   fell, and Plaintiffs suffered corresponding losses, on January 30.  *Id.* ¶¶ 83-84; *see also id.*, ¶¶ 20-

24 (alleging that each Plaintiff "was led to purchase shares of CLEU between January 22 and

30"). But the only reports to Meta regarding the CLEU scheme that Plaintiffs allege were made

in February 2025, *see id.* ¶ 103—*months* after Plaintiffs clicked on the allegedly fraudulent ads

and weeks after (1) the fraudulent scheme allegedly began, *see id.* ¶ 76; (2) the "market became

aware" of the alleged stock scheme, *see id.* ¶ 83; and (3) any of the Plaintiffs suffered any losses,

*see id.* ¶ 122 (seeking relief for conduct occurring between January 22, 2025, and January 30,

2025). That is not knowledge "at the relevant time." *Bradshaw*, 652 Fed App'x at 594; *see also

S&S Worldwide, Inc. v. Wells Fargo Bank*, 509 F. Supp. 3d 1154, 1166 (N.D. Cal. 2020) (no

actual knowledge without "facts to support a finding that, *prior to or at the time of* the [wrongful

conduct], [defendant] had actual knowledge of [the third party's] scheme" (emphasis added)).

Nor do any of Plaintiffs' allegations plausibly suggest that Meta knew of the alleged

fraud from delivering the third-party ads. *See, e.g.*, *Nevis v. Wells Fargo Bank*, 2010 WL

11636091, at *6 (N.D. Cal. Jan. 13, 2010) (aiding and abetting claim dismissed where the

"complaint d[id] not allege with the requisite specificity that [defendant] knew that [the third

party] was making objective misrepresentations"); *see also Hubbard v. Google LLC*, 2025 WL

82211, at *18 (N.D. Cal. Jan. 13, 2025) (failure to "connect" the provision of services to

"knowledge that doing so would contribute to the wrongful" conduct "does not lead to a

reasonable inference of actual knowledge"). Plaintiffs never allege that Meta knew these

specific ads were fraudulent.

Plaintiffs likewise do not allege Meta had knowledge of the fraudulent scheme executed

over WhatsApp, where Plaintiffs allege the CLEU scammers communicated with them for

months. *See* Compl. ¶¶ 71-78. As Plaintiffs concede, *id.* ¶ 27, the fraudulent, third-party

communications took place on WhatsApp, "an encrypted communication service" through which

"every type of communication … can be viewed *only* by the intended recipient," *WhatsApp Inc.

v. NSO Grp. Tech. Ltd.*, 17 F.4th 930, 933 (9th Cir. 2021) (emphasis added), and Plaintiffs do not

allege that Meta knew about these statements. Thus, *a fortiori*, Plaintiffs fail to allege that Meta

knew these third-party scammers were using WhatsApp to "unload[]" shares of stock from a

"secret offering" not even disclosed to the market. *See* Compl. ¶¶ 82-83.

1      Because Plaintiffs' Complaint does not—and cannot—plead factual allegations that show

2   Meta actually knew that the third-party scammers were engaged in the alleged fraudulent

3   investment activity, Plaintiffs' aiding and abetting fraud claim fails at the first step—actual

4   knowledge—and should be dismissed.

5              **2.        Plaintiffs fail to adequately allege knowing or purposeful assistance.**

6      Plaintiffs' aiding and abetting claim also fails because they do not plausibly allege Meta

7   knowingly or purposefully assisted the underlying fraud, as they must to allege "substantial

8   assistance." "[T]he substantial assistance prong of a claim for aiding and abetting fraud must be

9   pled with heightened specificity." *Marcelos v. Dominguez*, 2008 WL 2788173, at *9 (N.D. Cal.

10  July 18, 2008). "Substantial assistance requires a significant and active, as well as a knowing

11  participation in the wrong[.]" *Pratt v. Higgins*, 2023 WL 4564551, at *10 (N.D. Cal. July 17,

12  2023). Plaintiffs must allege Meta "'reach[ed] a conscious decision to participate in tortious

13  activity for the purpose of assisting another in performing a wrongful act.'" *Barrett v. Apple

14  Inc.*, 523 F. Supp. 3d 1132, 1145 (N.D. Cal. 2021).

15     Here, Plaintiffs do not plausibly allege Meta "acted to aid the primary tortfeasor '*with

16  knowledge of the object to be attained*.'" *Casey*, 127 Cal. App. 4th at 1146 (emphasis added).

17  Plaintiffs fail to allege Meta even knew *of* the fraud, *supra* Part II.A.1, and thus also do not

18  allege Meta knew its services were *assisting* in the commission of that fraud. *See Casey*, 127

19  Cal. App. 4th at 1152 (banks that lacked knowledge of challenged conduct "did not know that

20  [their services] … w[ere] assisting in … the primary violation"). Nor do Meta's advertising tools

21  cure this defect; "[o]rdinary business transactions may satisfy the substantial assistance element

22  if the defendant *actually knew* those ordinary transactions assisted the commission of the specific

23  tort." *In re Mortg. Fund '08 LLC*, 527 B.R. 351, 365 (N.D. Cal. Mar. 23, 2015). Knowledge is

24  the crucial element. Plaintiffs fail to allege substantial assistance because they do not allege

25  Meta "'actually knew [its conduct] w[as] assisting … in committing a specific tort.'" *In re First

26  Alliance Mortg. Co.*, 471 F.3d at 995.

27     Plaintiffs also fail to plausibly allege Meta "'reached a conscious decision to participate'

28  in the [fraud]," *Barrett*, 523 F. Supp. 3d at 1145, or acted with "the purpose of assisting another

1    in performing a wrongful act," *Howard*, 2 Cal. App. 4th at 749. Rather, they assert only "failure

2    to act allegations … insufficient to establish substantial assistance for purposes of aiding and

3    abetting liability." *Diaz*, 2018 WL 2215790, at *8.

4        *Barrett* is instructive. The plaintiffs there alleged that Apple aided and abetted various

5    tortious scams using Apple's iTunes gift cards, including by "transferr[ing] payments to parties it

6    knew or could have known were engaging in unlawful activity, … retain[ing] funds it knew or

7    could have known were received because of unlawful activity, and … ma[king] misleading or

8    false statements regarding its ability to respond to unlawful activity." 523 F. Supp. 3d at 1145.

9    Despite allegations that Apple "knew that the gift card scams were illegal yet processed

10   payments associated with the scams anyway," the court held that the plaintiffs failed to plead

11   substantial assistance because they "d[id] not allege that Apple gave any specific authorization to

12   the [alleged scammers] *other than the authorization granted to all Apple Developers and Apple*

13   *IDs*." *Id.* at 1148 (emphasis added). Instead, Apple merely "failed to revoke previously granted

14   authorizations." *Id.* That "failure[] to act … fail[ed] to show a 'conscious decision to

15   participate.'" *Id.* at 1149; *see also Diaz*, 2018 WL 2215790, at *8.

16       Plaintiffs' allegations here that Meta "allowed … ads even though it … [was] aware that

17   its social media platforms were being used to carry out investment scams," Compl. ¶ 100,

18   likewise cannot establish substantial assistance. *See Barrett*, 523 F. Supp. 3d at 1145; *Diaz*,

19   2018 WL 2215790, at *8. Plaintiffs cannot evade this conclusion based on Meta's provision of

20   advertising tools. Plaintiffs acknowledge that "*[t]he CLEU scammers used* the Flexible Format

21   and Dynamic Creative tools to deploy an array of advertisements" to users. Compl. ¶ 114

22   (emphasis added). Nor do allegations that Meta was, as a general matter, financially incentivized

23   to host ads from Chinese advertisers, *id.* ¶¶ 46-50, suffice to establish that Meta reached a

24   conscious decision to participate in the CLEU scheme; Plaintiffs make no effort to tether these

25   general allegations to the CLEU scheme, and admit in any event that 70% of such advertisements

26   are not fraudulent. *Id.* ¶ 47. Meta's alleged involvement consists of not "remov[ing] the ads

27   …[,] implement[ing] safeguards to prevent them from recurring," or limiting access to the tools

28   that third-party scammers "used … to deploy" the ads. *Id.* at ¶¶ 101, 114. Plaintiffs cannot pin

1    aiding and abetting liability on Meta for merely not revoking access to services "granted to all

2    [advertisers]." *Barrett*, 523 F. Supp. 3d at 1148. Such "failure to act allegations … are

3    insufficient to establish substantial assistance." *Diaz*, 2018 WL 2215790, at *8.

4        **B.    Plaintiffs Fail To Adequately Allege Breach Of Contract (Count II)**

5        Plaintiffs' breach of contract claim fails because they do not identify a contractual

6    promise that Meta allegedly breached. Plaintiffs' claim is premised on the statement in Meta's

7    Community Standards that "[w]e do not allow: Content that attempts to scam or defraud users

8    and/or businesses by means of … investment opportunities where the opportunity is of a 'get-

9    rich-quick' nature and/or claims that a small investment can be turned into a larger amount."

10   Compl. ¶ 95. Plaintiffs allege that Meta breached this provision by failing to remove ads

11   involved in the CLEU scheme and "facilitating the development, optimization, and targeting of

12   those ads." *Id.* ¶ 140. That theory fails for two independent reasons.

13       *First*, the description of what Meta "do[es] not allow" does not create a binding

14   obligation upon Meta to immediately remove all fraudulent ads. Rather, as explained above, the

15   Community Standards establish standards for users—not promises enforceable against Meta.

16   *See supra* Part I.B; *Young*, 2010 WL 4269304, at *3, (N.D. Cal. Oct. 25, 2010) (statements about

17   what users may post "place restrictions on user behavior" but "do not create affirmative

18   obligations" on Meta); *King v. Facebook, Inc.*, 2019 WL 6493968, at *2 (N.D. Cal. Dec. 3,

19   2019), *aff'd*, 845 F. App'x 691 (9th Cir. 2021) (same). Nor does this conclusion change because

20   Meta's Community Standards say "if content goes against [Meta's] policies, [Meta] take[s]

21   action on it." Schultz Decl. Ex. F at 2.[5] "[M]erely stating that Facebook does not allow users to

22   post harmful content and that they will remove [such content] is mere[ly] 'a general monitoring

23   policy'"—not a "'promise [made] with the constructive intent that it be enforceable.'" *Lloyd*,

24   2022 WL 4913347, at *9 (quoting *Barnes*, 570 F.3d at 1108-1109); *see also Morton v. Twitter,*

25   *Inc.*, 2021 WL 1181753, at *5 (C.D. Cal. Feb. 19, 2021) (finding Twitter's content moderation

26   policies to be "merely aspirational statements" and not binding promises to take action against

27   allegedly violative content). Plaintiffs' breach of contract claim therefore "fails because [their]

28    

---

[5] This page is relied on in the Complaint, *see* Compl ¶¶ 138-140, and is therefore incorporated
therein by reference. *See Alamilla*, 30 F. Supp. 3d at 944.

1    complaint does not identify any express contractual provision that was breached." *Curl v.*

2    *CitiMortgage, Inc.*, 2014 WL 5321063, at *2 (N.D. Cal. Oct. 17, 2014) (collecting cases).

3          *Second*, Meta's Terms expressly disclaim precisely the purported promise Plaintiffs now

4    seek to enforce.  The Terms state that Meta "make[s] no guarantees that [its Products] will

5    always be safe, secure, or error-free," Meta "do[es] not control or direct what people and others

6    do or say, and [Meta] is not responsible for their actions or conduct (whether online or offline) or

7    any content they share (including offensive, inappropriate, obscene, unlawful, and other

8    objectionable content)."  Schultz Decl. Ex. A at 10-11 (§ 4.3).  That "express disclaimer" is fatal

9    to Plaintiffs' breach-of-contract claim.  *See Young*, 2010 WL 4269304, at *3 (dismissing breach

10   of contract claim where similar disclaimer in Facebook's terms undermined the alleged promise

11   to remove certain content); *see also Damner v. Facebook Inc.*, 2020 WL 7862706, at *7 (N.D.

12   Cal. Dec. 31, 2020) (dismissing breach of contract claim because alleged breach arose from

13   Facebook's promise to "keep Facebook safe and bug-free" but this was disclaimed in Facebook's

14   Statements of Rights and Responsibilities); *Barfuss v. Live Nation Ent., Inc.*, 2025 WL 1843207,

15   at *5 (C.D. Cal. May 14, 2025) (dismissing Plaintiff's breach of contract claim where express

16   terms "directly contradict Plaintiffs' allegations").

17          **C.      Plaintiffs Fail To Adequately Allege Negligence (Count III)**

18          To state a negligence claim, Plaintiffs must establish "duty, breach, causation, and

19   damages." *Conroy v. Regents of Univ. of Cal.*, 45 Cal. 4th 1244, 1250 (2009).  Duty "is an

20   essential element." *Melton v. Boustred*, 183 Cal. App. 4th 521, 529 (2010).  Duty "is not

21   universal; not every defendant owes every plaintiff a duty of care" and it exists only "if the

22   'plaintiff's interests are entitled to legal protection against the defendant's conduct.'" *Brown v.*

23   *USA Taekwondo*, 11 Cal. 5th 204, 213 (2021) (citations omitted).

24          Here, Plaintiffs seek to impose a duty on Meta not for any actions that Meta itself took,

25   but because Meta purportedly failed to prevent the third-party CLEU scammers from using

26   Meta's generally available tools to defraud them.  "When analyzing a duty of care in the context

27   of third-party acts," like those alleged here, "California courts distinguish between 'misfeasance'

28   and 'nonfeasance.'" *Dyroff*, 934 F.3d at 1100.  Misfeasance occurs "when a defendant makes

1  the plaintiff's position worse," whereas nonfeasance applies "when a defendant does not help a

2  plaintiff." *Id.* at 1100-1101.  Only in cases of misfeasance is "an ordinary duty of care" created

3  "where none may have existed before." *Id.*  Nonfeasance, by contrast, creates a duty only in the

4  context of a "special relationship." *Melton*, 183 Cal. App. 4th at 531; *see also Planet Green*

5  *Cartridges, Inc. v. Amazon.com, Inc.*, 2025 WL 869209, at *2 (9th Cir. Mar. 20, 2025) ("[O]ne

6  'who has not created a peril is not liable in tort merely for failure to take affirmative action to

7  assist or protect another' from the acts of a third party, absent a special relationship.").

8    Plaintiffs here allege only nonfeasance.  Specifically, they allege Meta was negligent in

9  failing to "identify and remove the ads," "failing to implement reasonable policies and

10 procedures," and "fail[ing] to warn Facebook and Instagram users of the risk… from investment

11 scam ads."  Compl. ¶¶ 145-147.  In *Dyroff*, the Ninth Circuit held that similar "content-neutral

12 functions … did not create a risk of harm" nor made the Plaintiff "worse off," and thus

13 constituted only nonfeasance.  934 F.3d at 1100-1101; *see also Planet Green Cartridges, Inc*,

14 2025 WL 869209, at *2 (similar).  No duty of care arises from the nonfeasance of providing

15 "communication platform[s]…[that] do[] not by [themselves] create a risk of third-party

16 misuse." *Ziencik v. Snap, Inc.*, 2023 WL 2638314, at *5 (C.D. Cal. Feb. 3, 2023).  Indeed, "[n]o

17 website could function if a duty of care was created when a website facilitates communication, in

18 a content-neutral fashion, of its users' content." *Dyroff*, 934 F.3d at 1101.  Nor does Plaintiffs'

19 failure-to-warn theory change this conclusion.  As in *Dyroff*, it is "misguided" to construe a

20 "failure to warn claim" as "misfeasance." *Id.* at 1100; *see also, e.g., Doe No. 14 v. Internet*

21 *Brands, Inc.*, 2016 WL 11824793, at *4 (C.D. Cal. Nov. 14, 2016) (website's alleged "fail[ure]

22 to warn … users of the danger presented by criminal acts of third party" was nonfeasance).

23    Accordingly, to allege the existence of a duty, Plaintiffs must plausibly allege a "special

24 relationship" between themselves and Meta.  They do not.  Courts have recognized only a few

25 "special relationships" including those "between business proprietors such as shopping centers,

26 restaurants, and bars, and their tenants, patrons, or invitees," "common carriers and passengers,"

27 "innkeepers and their guests," and "mental health professionals and their patients." *Delgado v.*

28 *Trax Bar & Grill*, 36 Cal. 4th 224, 235 & n.14 (2005).  These relationships "generally involve

1    some kind of dependency or reliance." *Olson v. Children's Home Soc'y*, 204 Cal. App. 3d 1362,

2    1366 (1988).  Here, Plaintiffs assert Meta has "a special relationship with Plaintiffs," Compl.

3    ¶ 143, but offer no factual allegations supporting that threadbare legal conclusion.  For example,

4    they do not allege—nor could they—that Meta's services create any heightened dependency.

5    Instead, they allege only the standard website-user relationships that courts have repeatedly

6    deemed insufficient to establish a "special relationship."  *See Dyroff*, 934 F.3d at 1101; *Bogard*

7    *v. TikTok Inc.*, 2025 WL 604972, at *9 (N.D. Cal. Feb. 24, 2025) (reporting mechanisms for

8    harmful videos did not give rise to a "special relationship"); *Pirozzi v. Apple Inc.*, 913 F. Supp.

9    2d 840, 851-852 (N.D. Cal. 2012) (no "special relationship" merely because of Apple's "control

10   over the user experience from development of the Apple Devices to selection of the Apps

11   available at the Apps Store"); *Doe No. 14*, 2016 WL 11824793, at *4-6 (website had no "special

12   relationship" with its users requiring website to warn users of known risk).

   **D.    Plaintiffs Fail To Adequately Allege A Violation Of The Unruh Civil Rights Act (Count IV)**

13

14
          Plaintiffs' claim under Cal. Civ. Code § 51 (the "Unruh Act") must be dismissed because

15   Plaintiffs fail to allege intentional discrimination in the provision of "accommodations,

16   advantages, facilities, privileges, or services."  Cal. Civ. Code § 51(b).  To state a claim,

17   Plaintiffs must allege they were "denied the full and equal accommodations, advantages,

18   facilities, privileges, or services in a business establishment" and that a protected characteristic

19   "was a motivating factor for this denial."  *Birdwell v. AvalonBay Communities, Inc.*, 742 F.

20   Supp. 3d 1024, 1045 (N.D. Cal. 2024).  Additionally, because the Act prohibits only "intentional

21   discrimination," a plaintiff must allege "'willful, affirmative misconduct.'"  *Greater Los Angeles*

22   *Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 425 (9th Cir. 2014).

23   Plaintiffs therefore must "allege, and show, more than the disparate impact of a facially neutral

24   policy."  *Id.*  Here, Plaintiffs' Unruh Act claim must be dismissed because they fail to allege that

25   Meta denied or provided unequal access to a public accommodation on account of their protected

26   characteristics, or that any discrimination by Meta was willful.

27

28

1

### 1.    Plaintiffs do not allege Meta denied or provided unequal access to any public accommodation.

Plaintiffs' claim fails because they do not allege Meta is denied or restricted their access to a public accommodation.  The Unruh Act is not a freestanding prohibition against any alleged discrimination.  Instead, "a person suffers discrimination under the Act when the person presents himself or herself to a business with an intent to use its services but encounters an exclusionary policy or practice that prevents him or her from using those services." *White v. Square, Inc.*, 7 Cal. 5th 1019, 1023 (2019).  For example, an Unruh Act claim may be adequately alleged where members of certain racial groups are required to pay only in cash while others are permitted to purchase items "on credit," or where "a male plaintiff visited several 'car washes on "Ladies' Day,"'" and was denied access to discount prices offered to female customers. *Id.* at 1026, 1030. As for websites, a violation of the Unruh Act requires, among other things, that the site's "terms and conditions exclude [the plaintiff] from full and equal access to its services." *Id.* at 1023; *accord Thurston v. Omni Hotels Mgmt. Corp.*, 69 Cal. App. 5th 299, 307 (2021).  "[T]here is no support in statutes nor in the case law for a[n] Unruh Act claim where plaintiff … was not denied access to services." *Hardy v. California*, 2006 WL 563049, at *3 (N.D. Cal. Mar. 7, 2006).

Here, Plaintiffs do not plausibly allege they were denied access to any public accommodation.  They do not allege they were denied or restricted access to Meta's services—based on their race or any other reason.  Nor do they allege they were denied or restricted from accessing ads on Meta's services.  This failure to allege exclusion under Meta's Terms from "full and equal access to [Meta's] services" dooms their Unruh Act claim. *White*, 7 Cal. 5th at 1023.

Plaintiffs also do not allege that race or ethnicity determined *whether* they encountered one of the challenged ads.  In alleging "targeted ads were disproportionately served to Facebook and Instagram users with racial or ethnic backgrounds matching those of the purported investors featured in the scam ads," Compl. ¶ 153, Plaintiffs assert that *all* users interested in investing, *id.* ¶¶ 106, 116, that received the ads were likely to see an ad featuring an investor with the same racial or ethnic background.  They do not, however, allege that only individuals from specific racial or ethnic groups either received or were prevented from seeing the CLEU ads. *See id.*

1   ¶¶ 115-120.  And Plaintiffs do not allege that the substantive terms of the ads varied across racial

2   or ethnic groups; all ads allegedly offered investment advice, touted favorable results, and urged

3   the viewer to join for investment advice.  *Id.*

4        Even if they had alleged that the ads were targeted to particular racial groups—they do

5   not—neither that nor their allegation that users served the CLEU ads were likely to see ads with

6   a person that shared their race states an Unruh Act claim.  Merely tailoring or targeting

7   advertising, even based on race, is lawful and commonplace absent something additional that

8   makes it unlawful.  "The concept of gathering information about one's intended market and

9   attempting to customize the information then provided is as old as the saying, 'know your

10  audience.'"  *OpenTV, Inc. v. Netflix Inc.*, 76 F. Supp. 3d 886, 893 (N.D. Cal. 2014).  For

11  example, "[a] soft-drink manufacturer seeking to envelop its product in an aura of good will and

12  harmony may portray a group of persons of widely varying nationalities and races singing a

13  cheerful tune on a mountaintop," while "[a] chain of fast-food retailers may use models of the

14  principal races found in urban areas where its stores are located."  *Ragin v. N.Y. Times Co.*, 923

15  F.2d 995, 1001 (2d Cir. 1991).  Indeed, even allegations that a defective product was

16  "aggressively target-market[ed]" to a particular racial group were not unlawful where it was not

17  also alleged, for example, that the marketing was "exclusively targeted to" that group nor that the

18  product was sold at "different prices or on different terms than [to] other races."  *Stringer v.*

19  *Combe, Inc.*, 2017 WL 6539779, at *5 (N.D. Cal. Dec. 21, 2017).  Tailored ads become unlawful

20  only when combined with something *more*—usually an intentional, race-based exclusion or

21  restriction of access—that they may become unlawful.  *See id.*  So too under the Unruh Act,

22  where any alleged discrimination is unlawful only if coupled with a denial of equal access to

23  services, *supra* 20-21, and willful discriminatory intent, *infra* 23-24.  Neither is alleged here.

24        This case is thus unlike, for example, *Liapes v. Facebook, Inc.*, which held that an Unruh

25  Act claim could proceed past the pleading stage where it was alleged that discriminatory ad

26  targeting prevented certain demographic groups from seeing certain insurance ads *at all*.  95 Cal.

27  App. 5th 910, 922-924 (2023).  There, the plaintiffs alleged that ad tools "expressly ma[d]e

28  distinctions based on gender and age when creating the target audience for insurance ads," such

1   that women and older individuals *did not receive* insurance ads that other individuals received.

2   *Id.* at 923.  The plaintiffs there thus alleged that they were excluded from (restricted access to)

3   receiving certain ads based on their protected traits.  *Id.* at 922-924.  Conversely, Plaintiffs here

4   allege only that some users received CLEU ads depicting individuals of similar racial or ethnic

5   backgrounds as themselves—they do not allege any denial or restriction of access to ads on

6   Facebook or Instagram or that a user's race or ethnicity determined whether they received a

7   CLEU ad.  *See* Compl. ¶¶ 115-120, 151-154.  Plaintiffs thus do not allege the CLEU ads denied

8   access to any public accommodation, dooming their Unruh Act claim.

9                 **2.      Plaintiffs do not allege that any alleged discrimination was willful.**

10          The second flaw in Plaintiff's Unruh Act claim is that they plead no facts supporting a

11  plausible inference that any alleged discrimination was willful.  To state a claim, Plaintiffs must

12  allege "willful, affirmative misconduct" with the specific intent "to accomplish discrimination on

13  the basis" of a protected trait.  *Koebke v. Bernardo Heights Country Club*, 36 Cal. 4th 824, 853-

14  854 (2005).  The Unruh Act "requires allegations supporting '"willful, affirmative misconduct"'

15  with the specific intent 'to accomplish discrimination on the basis of [a protected trait].'"

16  *Martinez v. Cot'n Wash, Inc.*, 81 Cal. App. 5th 1026, 1036 (2022).  Allegations of "knowledge

17  that a protected right is substantially likely to be infringed upon, and a failure to act upon that

18  knowledge," are insufficient.  *Greater L.A. Agency on Deafness, Inc.*, 742 F.3d at 427.

19          Here, Plaintiffs' theory of discrimination turns on the allegedly fraudulent nature of the

20  challenged ads, *see* Compl. ¶ 151 ("Meta violated the Unruh Act by targeting fraudulent

21  advertisements… to Plaintiffs and the Class"), but Plaintiffs do not allege that Meta had any

22  knowledge of the fraudulent nature of the ads, much less the underlying fraudulent scheme.

23  Plaintiffs claim Meta had knowledge of other fraudulent ad schemes, *id.* ¶¶ 101-104, but this

24  general knowledge of other schemes is insufficient to allege the specific intent "to accomplish

25  discrimination on the basis" of a protected trait with regard to the particular ads at issue.

26  *Koebke*, 36 Cal. 4th at 853-854.  Similarly, even if it were true (it is not) that Meta generally

27  "chose to prioritize ad performance and engagement by designing its advertising tools to enable

28  and facilitate race-and-ethnicity-based targeting," Compl. ¶ 155, that still stops short of alleging,

as Plaintiffs must, that Meta specifically intended to accomplish discrimination via the CLEU scammers' use of its generally available tools.  Moreover, as in *Stringer*, Plaintiffs nowhere allege that the challenged ads were "exclusively targeted" to a particular demographic group (or groups), which rebuts any finding of "intentional discrimination."   2017 WL 6539779, at *5.

Because Plaintiffs fail to allege Meta knew about the CLEU scheme, knew the ads were fraudulent, or specifically intended to discriminate against individuals based on race by serving CLEU ads to them, Plaintiffs have not alleged Meta undertook any "willful, affirmative misconduct" with the specific intent "to accomplish discrimination on the basis" of a protected trait.  *Koebke*, 36 Cal. 4th at 853-854.  Plaintiffs' Unruh Act claim must be dismissed.

## E.    The Parties' Express Contract Bars Plaintiffs' Unjust Enrichment Claim (Count V)

Plaintiffs' unjust enrichment claim fails twice over.  First, there is no standalone cause of action for unjust enrichment, which is instead a request for restitution.  *See Herskowitz v. Apple Inc.*, 940 F. Supp. 2d 1131, 1148 (N.D. Cal. 2013) (collecting cases and dismissing unjust enrichment claim).  And while courts "may 'construe the cause of action as a quasi-contract claim seeking restitution,'" *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (quoting *Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal. App. 4th 221, 231 (2014)), "a plaintiff may not 'pursue or recover on a quasi-contract claim if the parties have an enforceable agreement [on] a particular subject matter,'" *Copart, Inc. v. Sparta Consulting, Inc.*, 339 F. Supp. 3d 959, 983-984 (E.D. Cal. Sept. 10, 2018) (quoting *Klein v. Chevron U.S.A., Inc.*, 202 Cal. App. 4th 1342, 1388 (2012)).

There is such an agreement here, and any quasi-contract claim for restitution is thus barred.  Plaintiffs allege they "entered into a … contract with Meta consisting of the [Terms]." Compl. ¶ 138.  And those Terms expressly address and rebut Plaintiffs' claim that Meta is obligated to remove allegedly fraudulent ads.  As discussed, the Terms provide that Meta "do[es] not control or direct what people and others do or say" and is "not responsible for their actions or conduct (whether online or offline) or any content they share (including offensive, inappropriate, obscene, unlawful, and other objectionable content)."  Schultz Decl. Ex. A at 10-11 (§ 4.3).

1    Accordingly, the subject matter of Plaintiffs' unjust enrichment claim as alleged—

2  restitution based on Meta's alleged failure to "remove fraudulent advertisements," Compl. ¶

3  163—is covered by the parties' "enforceable agreement." *See Copart*, 339 F. Supp. 3d at 983-

4  984; *see also O'Connor v. Uber Techs., Inc.*, 58 F. Supp. 3d 989, 1000-1001 (N.D. Cal. 2014)

5  (dismissing implied-in-fact contract claim because it would have imposed obligations expressly

6  disclaimed by contract provisions relevant to subject matter at issue).  Plaintiffs' unjust

7  enrichment claim must be dismissed for that reason.

8  **III.    DISMISSAL SHOULD BE WITH PREJUDICE**

9    Dismissal without leave to amend is appropriate where "[f]urther amendment would

10  simply be a futile exercise." *Parents for Privacy v. Barr*, 949 F.3d 1210, 1239 (9th Cir. 2020).

11  That is the case where, for example, "Plaintiff['s] legal theories fail," regardless of any

12  deficiencies in their factual allegations. *Id.*  That is particularly appropriate here, where the

13  futility of amendment is due in part to the operation of Section 230, which is designed to protect

14  providers like Meta not only from "ultimate liability," but also from "having to fight costly and

15  protracted legal battles." *Roommates*, 521 F.3d at 1175.  Courts have repeatedly dismissed

16  claims barred by Section 230 with prejudice.  *See, e.g., Sikhs for Just., Inc. v. Facebook, Inc.*,

17  697 F. App'x 526, 526 (9th Cir. 2017) ("Because [the] claim is barred by [Section 230], granting

18  [the Plaintiff] leave to amend its complaint would have been futile.  As a result, the district court

19  properly dismissed … [the] claim with prejudice."); *Castronuova v. Meta Platforms, Inc.*, 2025

20  WL 1914860, at *4 (N.D. Cal. June 10, 2025) (collecting cases).

21    No additional facts could cure the fundamental legal deficiencies in Plaintiffs' claims,

22  which cannot overcome Section 230 immunity and fail to allege essential elements of each of the

23  causes of action alleged.  Amendment would accordingly be futile, and dismissal should be with

24  prejudice.

25                              **CONCLUSION**

26    For the foregoing reasons, the Complaint should be dismissed with prejudice.

27

28

1    Dated:  August 25, 2025                      Respectfully submitted,

2                                                 By:*/s/ Sonal N. Mehta*
                                                  WILMER CUTLER PICKERING
3                                                 HALE AND DORR LLP
                                                  SONAL N. MEHTA (SBN 222086)
4                                                 Sonal.Mehta@wilmerhale.com
                                                  JESSICA LEWIS (SBN 302467)
5                                                 Jessica.Lewis@wilmerhale.com
                                                  2600 El Camino Real, Suite 400
6                                                 Palo Alto, CA 94306
                                                  Telephone: (650) 858-6000
7
8                                                 ARI HOLTZBLATT (SBN 354631)
                                                  Ari.Holtzblatt@wilmerhale.com
9                                                 ALLISON SCHULTZ (*pro hac vice* pending)
                                                  Allison.Schultz@wilmerhale.com
10                                                NATHANIEL W. REISINGER
                                                    (*pro hac vice* pending)
11                                                Nathaniel.Reisinger@wilmerhale.com
                                                  2100 Pennsylvania Avenue NW
12                                                Washington, DC 20037
                                                  Telephone: (202) 663-6443
13
14                                                *Attorneys for Defendant Meta Platforms, Inc.*
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

**CERTIFICATE OF SERVICE**

2        I hereby certify that on this 25th day of August, 2025, I electronically transmitted the

3   foregoing document to the Clerk's Office using the CM/ECF System.

4                                              */s/ Sonal N. Mehta*                            

5                                              Sonal N. Mehta

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28