Leonid Kandinov
MORRIS KANDINOV LLP
555 West B Street, 4th Floor
San Diego, CA 92101
(619) 780-3993
leo@moka.law

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSHUA BOUCK, ATUL SHAH, SHENWEI ZHAO, ADAM SPRING, and GIAO Q. TRAN, individually on behalf of themselves and all others similarly situated,<br><br>                Plaintiffs,<br><br>   vs.<br><br>META PLATFORMS, INC.,<br><br>               Defendant. | Case No.: 25-cv-5194-RS<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Joshua Bouck, Atul Shah, Shenwei Zhao, Adam Spring, and Giao Q. Tran (collectively, "Plaintiffs"), by and through their undersigned counsel, allege the following for their complaint against Defendant Meta Platforms, Inc. ("Meta," "Defendant," or the "Company") upon knowledge as to themselves and their own actions, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on, among other things, the independent investigation of counsel, which includes, but is not limited to: (a) review of Meta's publicly disclosed policies, filings with the Securities and Exchange Commissions (the "SEC"), and other public statements; (b) review of media reports about the Company; (c) review of public filings and court orders in other litigation relating to the fraudulent scheme discussed herein (the "CLEU Scheme"); and (d) discussions with, surveys of, and review of documents and information provided by more than 500 victims of the CLEU Scheme (the "CLEU Victim Group").

## I.  **INTRODUCTION**

1.      This case arises from Meta's role in enabling, facilitating, and materially contributing to a stock manipulation scheme that used advertisements created by Meta and distributed through the Company's Facebook and Instagram social media platforms, and its WhatsApp messaging service, to extract millions of dollars from unsuspecting victims.

2.      Meta's core business is selling its advertising services, which include generating online advertisements and targeting them to Facebook and Instagram users based on data that Meta collects regarding each user's interests and activities both within the Facebook and Instagram platforms and on devices linked to the user's social media accounts.

3.      Meta plays an instrumental role in creating and developing ads, targeting particular user groups based on a range of demographic characteristics (*e.g.*, geographic location, income, age, and ethnicity) and interests (*e.g.*, past engagement with content related to a particular activity or product), and optimizing the ads to increase the likelihood of engagement by the targeted users.

4.      While Meta has invested significantly in developing its services from the perspective of its advertising customers, it has failed to take meaningful action to prevent fraudulent advertisements, allowing its advanced ad generation and targeting technology to inure to the benefit of scammers who use Meta's platforms and services to extract billions of dollars from Meta's users.

5.      Meta has long been aware of scam ads on its social media platforms, but it has refused to invest meaningfully in technology, personnel, and processes to monitor, identify, and prevent scam ads. Instead, Meta has invested billions in developing generative artificial intelligence tools that have caused fraudulent advertisements to proliferate and enhanced their effectiveness by generating hundreds of variations of advertisements that are optimized to drive engagement by vulnerable users.

6.      Moreover, Meta personnel have reported that the Company has deliberately turned a blind eye to the problem of scam ads and has continued to court business from known scammers despite promising its users that it "does not allow" such ads and will "take action" when it is made aware of them.

7. Among the multitude of scam ads on Meta platforms are investment scams, with scammers impersonating celebrities, well-known investors, and legitimate financial advisory firms to lure unsuspecting users into fraudulent schemes.

8. Meta specifically has been alerted to these investment scams through complaints by the people and firms being impersonated (which Meta has ignored), lawsuits filed by impacted social media users in Japan and the government of Australia, notices issued by governmental and self-regulatory organizations, and its own internal reporting. Yet, Meta not only has allowed investment scam ads to proliferate, it has materially contributed to creating those ads and maximizing their reach and effectiveness.

9. Plaintiffs in this action were victimized by one such investment scam, perpetrated by an organized criminal network operating out of China, Taiwan, and Malaysia, certain members of which are facing criminal prosecution. *See United States v. Lim Xiang Jie Cedric, et al.*, No. 1:25-cr-00161 (N.D. Ill. filed Mar. 20, 2025).

10. Meta's advertising tools enabled the scammers to target victims with hundreds of advertisements for supposed investment clubs associated with celebrities, well-known investors, and advisory firms.

11. Victims who clicked on the ads were then added to WhatsApp groups where the scammers posed as financial advisors and encouraged victims to purchase securities whose prices the scammers were manipulating so that their co-conspirators could unload their holdings at inflated prices, reaping massive, illicit profits.

12. Beginning on January 22, 2025, the scammers recommended that Plaintiffs and other victims who responded to their Meta advertisements purchase shares of China Liberal Education Holdings Ltd. ("CLEU"), a Chinese penny stock then listed on NASDAQ and trading under the ticker CLEU.

13. CLEU publicly reported that it had 29,000,000 shares outstanding; however, the company had secretly issued 240,000,000 additional shares to the CLEU scammers in a private offering in late December 2024 that had not been publicly disclosed.

14.     Operating through WhatsApp groups, the scammers instructed victims to make purchases of CLEU shares at specified price points. Meanwhile, their co-conspirators, who held the secretly issued 240,000,000 CLEU shares, entered sell orders at matching price points, thereby liquidating their massive—and previously undisclosed—shareholdings in exchange for the victims' cash.

15.     Then, in the early hours of January 30, 2025, the market became aware of CLEU's previously secret share issuance, meaning the number of CLEU shares outstanding was nearly 10 times the amount previously known.

16.     The stock price immediately collapsed, and Plaintiffs and other victims of the scheme lost hundreds of millions of dollars they had invested in CLEU shares. Plaintiffs estimate total losses to the proposed Class to be in excess of $300 million.

17.     Meta's advertising tools and its failure to address scam ads on its platforms were essential to, enabled, and facilitated the CLEU Scheme. The ads generated by Meta's tools and technology were the critical first step in the scheme, which led to Plaintiffs and other victims interacting with and being victimized by the scammers.

18.     Meta's advertising tools developed and determined the content and appearance of the ads used to perpetrate the scam. Meta's tools directed the ads to particular Facebook and Instagram users based on data indicating the users would be vulnerable to the ads, including by targeting users who demonstrated an interest in investing. Meta's tools also optimized the particular ads targeted to each user, including by showing users ads featuring celebrities or investors of their same race or ethnicity in order to increase the appeal of the ads. If not for Meta's advertising tools, the CLEU scammers would not have been able to accomplish their scheme on the scale and with the efficiency they achieved.

19.     This action seeks to hold Meta liable for its role in enabling, facilitating, and materially contributing to the CLEU Scheme, including, in particular, its central role in generating the scam ads that lured Plaintiffs and other victims into the scammers' trap. Plaintiffs seek (i) monetary damages on behalf of themselves and a proposed Class comprised of other victims of the CLEU Scheme; (ii) disgorgement of Meta's unjust profits from fraudulent advertisements used in connection with the

CLEU Scheme; and (iii) injunctive relief requiring Meta to implement appropriate advertising review and monitoring procedures to prevent the creation of investment scam ads through Meta's advertising tools.

## II.     THE PARTIES

20.     Plaintiff Joshua Bouck is a Fire Captain in Los Angeles County and resides in California. Plaintiff Bouck was lured into the CLEU Scheme through Instagram advertisements while he was fighting the Southern California wildfires. Plaintiff Bouck was led to purchase shares of CLEU between January 22 and 30, 2025, and he lost more than $865,000. Plaintiff Bouck has taken out a home equity loan and has been working endless overtime to recover his losses, depriving him of precious time with his three young children.

21.     Plaintiff Atul Shah immigrated to the United States to study chemistry, ultimately earning Masters degrees in Chemistry and Business Administration, and he now operates a small drycleaning business. Plaintiff Shah resides in Georgia with his wife, who is a retired pharmacist. Plaintiff Shah and his wife were lured into the CLEU Scheme through Facebook advertisements and were led to purchase shares of CLEU between January 22 and 30, 2025. Plaintiff Shah and his wife together lost approximately $1.8 million, including all of the retirement savings they had accumulated over the last 30 years.

22.     Plaintiff Shenwei Zhao is a first-generation immigrant to the United States who resides in New Jersey with his wife and son. Plaintiff Zhao is the founder of an information technology consulting firm with a background in systems engineering. Plaintiff Zhao was lured into the CLEU Scheme through Facebook advertisements and was led to purchase shares of CLEU in his and his wife's accounts between January 22 and 30, 2025. Plaintiff Zhao and his wife collectively lost more than $271,000.

23.     Plaintiff Adam Spring is a Lieutenant Colonel in the United States Air Force and a married father of three of children who is stationed in North Carolina. Plaintiff Spring was lured into the CLEU Scheme through Facebook advertisements and was led to purchase shares of CLEU between January 22 and 30, 2025. Plaintiff Spring lost more than $143,000, representing 20 years of retirement savings and nearly half of his liquid net worth.

24.     Plaintiff Giao Q. Tran is a retired technology executive who resides in Texas. Plaintiff Tran was lured into the CLEU Scheme through Facebook advertisements and was led to purchase shares of CLEU between January 22 and 30, 2025. Plaintiff Tran lost approximately $141,000, which she had set aside as seed funds for the launch of a non-profit organization to provide educational support for children living below the poverty line. Plaintiff Tran planned to dedicate the organization to her late father, who worked multiple jobs to provide for his family and instilled in her the value of higher education as a means to open the doors to financial well-being.

25.     Defendant Meta Platforms, Inc. is a Delaware corporation which has its principal place of business in Menlo Park, California.

26.     Meta is owner and operator of the Facebook and Instagram social media platforms. Facebook is the world's largest social media platform with more than 3 billion monthly active users, while Instagram is the third largest platform with 2 billion monthly active users.

27.     Meta also operates the WhatsApp messaging service, which is billed as an end-to-end encrypted service allowing for private communications among its users.

### III.     <u>JURISDICTION AND VENUE</u>

28.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).

     a.     This action is a putative class action filed under Fed. R. Civ. P. 23, 28 U.S.C. § 1332(d)(1)(B);

     b.     The number of members of the Class is greater than 100 because, on information and belief, the Class consists of thousands of members, including the more than 500 members of the CLEU Victim Group, 28 U.S.C. § 1332(d)(5)(A);

     c.     The amount in controversy is in excess of $5,000,000 because the Class suffered damages of more than $300,000,000, including more than $64,000,000 in monetary damages suffered by the CLEU Victim Group, 28 U.S.C. § 1332(d)(2); and

     d.     CAFA's minimal diversity requirement is satisfied because Meta is a citizen of California, where it maintains its principal place of business, and of Delaware, where it is incorporated, and at least one member of the Class is a citizen of a different state because four of the

five named Plaintiffs reside in states other than California and Delaware (namely, Georgia, North Carolina, Texas, and New Jersey), 28 U.S.C. § 1332(d)(2)(A).

29.     Venue is proper in this judicial district under 28 U.S.C. §1391(b) and (c)(2) because Defendant maintains its principal place of business in this District and because a substantial part of the acts and omissions giving rise to this action occurred in this District.

30.     This Court has jurisdiction over Defendant because it has its principal place of business in California, transacts a substantial amount of business in California, has substantial ties to California, and/or is a citizen or resident of California or otherwise maintains sufficient minimum contacts with California to render jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

31.     This Court also has jurisdiction over Defendant because Meta's Terms of Service ("ToS") for its social media platforms include a forum selection clause in favor of this Court.[1]  The ToS require that all claims to which Meta is a party "will be resolved exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Meta Profits from Scam Ads

32.     Meta generates substantially all of its revenues from selling advertising to businesses seeking to market their products and services to users of Meta's social media platforms. In its most recent fiscal year ended December 31, 2024, Meta collected approximately $160,633,000,000 in advertising revenues, representing greater than 97% of the Company's' total revenues ($164,501,000,000).

33.     Meta collects vast amounts of data from each Facebook and Instagram user, which allows the Company to sell targeted advertisements to millions of advertisers.

---

[1] The ToS in effect when Plaintiffs and other members of the Class were targeted with fraudulent ads in the fourth quarter of 2024 are attached hereto as Exhibit A. The ToS were later updated effective January 1, 2025, and the current version of the ToS is available at https://www.facebook.com/terms/ (last visited Sept. 13, 2025).

34.     Meta collects user data from each user's activity on Facebook or Instagram, such as the content the user posts and the content the user likes or otherwise interacts with. Meta also collects data from the user's activity outside of Meta's platforms, including searches the user runs through Google or other search engines, websites the user visits, and purchases the user makes on devices linked to their Facebook or Instagram account.

35.     Meta's ability to target ads to Facebook and Instagram users based on the data collected is a key selling point to advertisers. As Meta CEO Mark Zuckerberg testified before the Senate's Commerce and Judiciary Committees on April 10, 2018:

> What we allow is for advertisers to tell us who they want to reach, and then we do the placement. So, if an advertiser comes to us and says, 'All right, I am a ski shop and I want to sell skis to women,' then we might have some sense, because people shared skiing-related content, or said they were interested in that, they shared whether they're a woman, **and then we can show the ads to the right people** . . ."[2]

36.     Meta acknowledged in its most recent Form 10-K filed with the SEC that improvements to its "ad targeting and measurement tools" had driven an increase in the prices paid by advertisers, and it identified regulatory developments and changes in user behavior that may limit the use and effectiveness of those tools as a key risk factor that could impact the Company's future performance.

37.     In addition to targeting third-party advertisements to users of the Facebook and Instagram social media platforms, Meta increasingly has transitioned its business model to include the creation and development of ads for its advertising customers, with the objective of filling the role of a traditional advertising agency for many of the Company's customers.

---

[2] *See* Joint Full Committee Hearing, *Facebook, Social Media Privacy, and the Use and Abuse of Data*, Committee on the Judiciary (Apr. 10, 2018, 2:15 PM), https://www.govinfo.gov/content/pkg/CHRG-115shrg37801/html/CHRG-115shrg37801.htm (last visited Sept. 13, 2025). Unless otherwise indicated, all emphasis herein is added.

38. Meta's advertising services include a suite of tools, enhanced by artificial intelligence ("AI"), that generate and optimize advertisements for use on Facebook and Instagram. According to Meta, these tools have the ability to generate thousands of variations of potential ads for the Company's advertising customers.

39. Meta's advertising tools include "Ads Manager," which the Company touts as "an all-in-one tool for creating ads, managing when and where they'll run, and tracking how well your campaigns are performing towards your marketing goals."[3]

40. As Meta well knows, not all advertisers operate legitimate businesses, and fraudsters increasingly have learned to exploit Meta's ad development and targeting capabilities to put deceptive, false, and misleading ads in front of the users calculated to be the most likely to respond to those ads and be lured into bait-and-switch and other fraudulent schemes.

41. According to a recent report in *The Wall Street Journal*, an internal analysis by Meta from 2022 found that 70% of newly active advertisers on Meta's platforms were promoting scams, illicit goods or "low quality" products.[4]

42. In October 2020, the Federal Trade Commission ("FTC") reported that about 94% of the complaints it collected concerning online shopping fraud on social media identified Facebook or Instagram as the source.

43. While scam ads cause untold financial harm to Meta's customers, Meta has little incentive to intervene because it receives revenues regardless of whether the ad is part of a scam.[5]

---

[3] *See* https://www.facebook.com/business/tools/ads-manager (last visited Sept. 13, 2025).

[4] Jeff Horowitz & Angel Au-Yeung, *Meta Battles an 'Epidemic of Scams' as Criminals Flood Instagram and Facebook*, WALL ST. J., May 15, 2025, https://www.wsj.com/tech/meta-fraud-facebook-instagram-813363c8?reflink=desktopwebshare_permalink

[5] Federal Trade Commission, *FTC Data Shows Big Jump in Consumer Reports about Scams Originating on Social Media*, Oct. 21, 2020, https://www.ftc.gov/news-events/news/press-releases/2020/10/ftc-data-shows-big-jump-consumer-reports-about-scams-originating-social-media

44. According to the recent *Wall Street Journal* article, current and former employees say Meta is reluctant to create impediments for ad-buying clients in view of the Company's dependence on advertising for substantially all of its revenues.[6]

45. The article further reports that Meta refuses to remove advertisers even where they demonstrate a history of scamming. For example, an internal company document from late 2024 shows that Meta will allow an advertiser to accrue between 8 and 32 automated "strikes" for financial fraud before it bans their accounts.[7]

46. The article also reports that Meta has deprioritized scam enforcement in recent years, including abandoning plans for advertiser verification requirements like those it mandates for political ads and failing to invest in automated tools or the personnel needed to effectively identify and remove scam ads.[8]

47. As a coalition of more than 40 State Attorneys General, including California Attorney General Rob Bonta, put it bluntly in a recent letter calling on Meta to improve its processes to identify scam ads: "***Meta's Solutions Do Not Work*** . . . The ease with which these scams can be initiated and disseminated on your platforms, targeting our most vulnerable population, is alarming . . . If Meta is unable to implement a more effective process, then it should just stop running investment advertisements as a category."[9]

---

[6] Jeff Horowitz & Angel Au-Yeung, *Meta Battles an 'Epidemic of Scams' as Criminals Flood Instagram and Facebook*, WALL ST. J., May 15, 2025, https://www.wsj.com/tech/meta-fraud-facebook-instagram-813363c8?reflink=desktopwebshare_permalink

[7] *Id.*

[8] *Id.*

[9] Letter from National Association of Attorneys General to Jennifer Gillian Newstead, Esq., Chief Legal Officer of Meta Platforms, Inc. (June 5, 2025) https://www.naag.org/wp-content/uploads/2025/06/Letter-to-Meta-re-Scam-Investments-_FINAL.pdf (emphasis added). *See also* https://oag.ca.gov/news/press-releases/attorney-general-bonta-urges-immediate-action-meta-prevent-investment-scam.

48.     Chinese vendors have become particularly lucrative for Meta, accounting for approximately 11.2% of revenues in 2024, up from 6.4% in 2021.[10] According to Meta's 2024 10-K, China revenue was $18.35 billion, versus $7.40 billion in 2022.

49.     These ads come at a cost, however, as Chinese ads are particularly prone to be connected to fraudulent activities. According to news reports, one internal Meta study showed that nearly 30% of the advertisements placed by China-based advertisers—estimated to account for $2.6 billion in 2020 ad sales alone—violated at least one of Facebook's own ad policies.[11]

50.     Nevertheless, Meta's business development strategies have included fostering relationships with Chinese scammers and deliberately ignoring their misconduct. Meta representatives have delivered presentations to conferences heavily attended by known fraudsters, socialized with those scam perpetrators, and driven business by encouraging known scammers to continue to purchase Meta ads.

51.     Sources familiar with Meta's ad policies have told journalists that Meta employees are directed to ignore sponsored fraudulent advertisements and violations of the Company's internal policies, particularly from Chinese-affiliated advertisers. In one report on Meta's profits from scams, an internal source reported: "We're not told in the exact words, but [the idea is to] look the other way. It's 'Oh, that's just China being China. It is what it is. We want China revenue.'"[12]

**B.      Meta Is Aware of Investment Fraud on Its Platforms**

52.     For several years, and increasingly through 2024, Meta has received repeated warnings about the prevalence of fraudulent investment schemes on its platforms, including advertisements

---

[10]   *See* https://stockdividendscreener.com/information-technology/meta-revenue-breakdown-by-region-and-user-geography/#D1; *see also* Paul Mozur & Lin Qiqing, *How Facebook's Tiny China Sales Floor Helps Generate Big Ad Money*, N.Y. TIMES, Feb. 7, 2019, https://www.nytimes.com/2019/02/07/technology/facebook-china-internet.html.

[11]   Craig Silverman & Ryan Mac, *Facebook Gets Paid*, BUZZFEED NEWS, Dec. 10, 2020, https://www.buzzfeednews.com/article/craigsilverman/facebook-ad-scams-revenue-china-tiktok-vietnam.

[12]   Craig Silverman & Ryan Mac, *Facebook Gets Paid*, BUZZFEED NEWS, Dec. 10, 2020, https://www.buzzfeednews.com/article/craigsilverman/facebook-ad-scams-revenue-china-tiktok-vietnam

AMENDED CLASS ACTION COMPLAINT

developed through its advertising tools featuring unlicensed images of celebrities and financial advisors purportedly touting individual investments and promising various "get-rich-quick" schemes.

53. As early as April 2018, British personal finance expert Martin Lewis sued Meta after his name and likeness were used by scammers advertising get-rich-quick schemes on Facebook.[13]

54. In March 2022, the Australian Competition and Consumer Commission filed a lawsuit alleging that Meta aided and abetted investment scam ads featuring prominent Australians claiming to have profited from cryptocurrency investments, later telling the court that evidence revealed that Meta had been aware of the practice since at least January 2018.[14]

55. In January 2024, FINRA issued a statement that it had "seen a recent significant spike in investor complaints resulting from recommendations made by fraudulent 'investment groups' promoted through social media."[15]

56. In February 2024, nine victims of a Facebook investment-fraud scam sent a letter to Meta detailing 21 scam ads featuring finance leaders including Bill Ackman.[16]

57. In April 2024, Barclays warned that investment scams had risen "by nearly a third" in the previous 12 months, "with 6 in 10 falling victim on social media."[17]

---

[13] *British finance expert sues Facebook over scam ads featuring his name and face*, CANADIAN BROADCASTING CORPORATION, Apr. 23, 2018, https://www.cbc.ca/radio/asithappens/as-it-happens-monday-full-episode-1.4631377/british-finance-expert-sues-facebook-over-scam-ads-featuring-his-name-and-face-1.4631381

[14] Amy Bainbridge, *Facebook, Instagram parent company Meta sued over scam ads featuring Dick Smith, David Koch*, AUSTRALIA BROADCASTING CORPORATION, March 17, 2020, https://www.abc.net.au/news/2022-03-18/facebook-instagram-meta-sued-over-fake-ads/100920146; Josh Taylor, *Half of crypto ads on Facebook are scams or violate Meta's policies, consumer regulator alleges*, THE GUARDIAN, Aug. 14, 2024, https://www.theguardian.com/technology/article/2024/aug/15/crypto-ad-scams-facebook-meta-accc-court-case

[15] *Investor Alert: Social Media "Investment Group" Imposter Scams on the Rise*, YAHOO! FINANCE, Jan. 17, 2024, https://finance.yahoo.com/news/investor-alert-social-media-investment-100000532.html

[16] Randall Smith, *Phony Billionaires on Facebook are Scamming Americans Out of their Life Savings*, WALL ST. J., March 15, 2024, https://www.wsj.com/tech/fake-bill-ackman-cathie-wood-scam-a8df6ce7 ("A group of nine scam victims sent a letter Feb. 28 to Facebook detailing 21 times scam ads of Ackman, Cohen or Wood were reported to Facebook in January and February.").

[17] *Barclays urges action as investment scams rise by 29 per cent – with 6 in 10 falling victim on social media*, BARCLAYS, April 17, 2024, https://home.barclays/insights-old/2024/04/barclays-urges-action-as-investment-scams-rise-by-29-per-cent---/

58.     In May 2024, *Financial Times* reported on the "surge" of "social media investment scams." The article explained how one type of "online fraud consists of scammers using images of trusted public figures or celebrities to convince people to move their money into fake funds or non-existent investments."[18]

59.     Also in May 2024, *The Wall Street Journal* reported on the trend, describing how victims were directed to advertisements that pitched "WhatsApp groups, often moderated by [] fictitious people" and featured images of "titans of finance" pitching opportunities for lucrative returns.[19]

60.     In June 2024, Capital Wealth Planning, LLC, an investment advisory firm in Naples, Florida, discovered that parties were impersonating its Chief Executive Officer, Kevin Simpson, on WhatsApp. The firm alerted local law enforcement, the FBI, and the SEC, and also contacted Meta to request that the fraudulent posts be removed.[20]

61.     In September 2024, Meta itself acknowledged that "[s]cammers often use public figures and celebrities' images to bait people into engaging with scam content, including ads. This type of scam can harm both those who are victimized by the unauthorized use of their likeness, as well as members of the public who are deceived by scam 'endorsements.'"[21]

62.     In October 2024, Japanese plaintiffs filed suit against Meta alleging it had facilitated investment scams on its platforms through fraudulent advertisements, often "featuring famous entrepreneurs."[22]

---

[18] *Advisers Worry as Social Media Investment Scams Surge*, FINANCIAL TIMES, May 17, 2024, https://www.ft.com/content/6f5055fc-08f6-4d83-9b66-414f7f09971e

[19] Randall Smith, *Phony Billionaires on Facebook are Scamming Americans Out of their Life Savings*, WALL ST. J., March 15, 2024, https://www.wsj.com/tech/fake-bill-ackman-cathie-wood-scam-a8df6ce7

[20] *Unknown Rogue Elements Impersonate Capital Wealth Planning, LLC and its Founder and Chief Executive Officer, Kevin Simpson*, CAPITAL WEALTH PLANNING, June 7, 2024, https://capitalwealthplanning.com/press-release-6-7-2024/

[21] *Testing New Ways to Combat Scams*, META, https://www.meta.com/help/policies/494835429957019/

[22] Karin Kaneko, *Meta faces Japan lawsuits over fake ads linked to investment fraud*, THE JAPAN TIMES, Oct. 29, 2024, https://www.japantimes.co.jp/news/2024/10/29/japan/crime-legal/investment-fraud-meta/

63.     Despite these warning signs and the clear risks to Facebook and Instagram users from investment scam ads on those platforms, Meta failed to address the problem of investment scam ads, enabling the CLEU scammers to carry out their scheme.

**C.      Scammers Rely on Meta-Generated Ads to Carry Out the CLEU Scheme**

64.     The CLEU scammers first targeted potential victims with ads generated by Meta's advertising tools and deployed on Facebook and Instagram. These scam advertisements promoted fake investment clubs, but in reality were vehicles for the scammers to execute a stock manipulation scheme.

65.     Some of the ads featured celebrities. For example, Plaintiff Bouck was targeted with ads featuring Kevin O'Leary, a/k/a "Mr. Wonderful" from Shark Tank, while other members of the CLEU Victim Group were targeted with ads featuring Dave Portnoy of Barstool Sports and conservative commentator Tucker Carlson.

66.     Other ads featured well-known investors. For example, Plaintiffs Zhao and Tran were targeted with ads featuring Tom Lee, a featured commentator on CNBC programs, and Plaintiff Spring was targeted with ads featuring Liz Ann Sanders, Managing Director and Chief Investment Strategist at Charles Schwab. Other members of the CLEU Victim Group were targeted with ads featuring Savita Subramanian, Head of U.S. Equity and Quantitative Strategy at Bank of America Merrill Lynch, and Cathie Wood of ARK Invest.

67.     Still other ads appeared to be from reputable financial advisory firms whose likenesses, branding, and other information had been appropriated and exploited by the scammers. For example, Plaintiff Bouck was targeted with ads that appeared to be for Sageview Capital, an investment firm based in Newport Beach, California, while other members of the CLEU Victim Group were target with ads seemingly for Circle Advisors, Blue Wolf Capital, and Viking Global Investments.

68.     The ads, generated and optimized through Meta's advertising tools, told targeted Facebook and Instagram users that investment club members would have access to stock recommendations from the featured financial advisors and promised that the recommendations would result in tremendous returns.

69.     For example, advertisements for "Mr. Wonderful Wealth Sharing" touted that the previous week's three stock recommendations were up 48%, 66%, and 108%, respectively.



70.     Another ad, purportedly for Ms. Subramanian's "trading training" program, promised potential returns of 30%-40% "everyday."



AMENDED CLASS ACTION COMPLAINT

71. Facebook and Instagram users who clicked on the ads either were automatically added into, or were invited to click an embedded link to join, a private WhatsApp group.

72. Within the WhatsApp group, scammers posed as representatives of the featured advisors and communicated with users regarding the club's operations, including the timing of stock recommendations.

73. For example, the purported financial advisor representatives in one group communicated that they would make two or three short-term recommendations each week, with returns of 10%-15% over a three- to seven-day holding period, and that they periodically would make medium- to long-term investment recommendations with profits exceeding 160%.

74. The scammers also created dozens of fake accounts, posing as club members within the WhatsApp group and touting their prior successes following the advisors' recommendations, which created the appearance of legitimacy and reliability that helped lure victims into the scheme.

75. Users were offered a free trial period (typically 60 to 90 days) to try out the investment club, after which they would be charged commissions based on the returns they realized.

76. Then, over a period of months, the scammers communicated with users in the WhatsApp group, providing investment recommendations and friendly communications to build trust.

77. On January 22, 2025, the scammers, posing as financial advisor representatives, began recommending that WhatsApp group members purchase shares of CLEU at specified price points. They predicted that the price of CLEU stock would appreciate significantly in the near future, typically promising returns of 380% within 20-30 days. They also promised to reimburse investors for up to 80% of any losses on the CLEU investment.

78. The scammers pressured victims to buy quickly, claiming that waiting even a few days would cause them to miss out on the stock's rise.

79. The scammers continued to recommend additional purchases of CLEU at higher price points over the coming days, pressuring victims to liquidate other investments, move cash from other accounts, and even take out loans to fund their purchases.

80. Because hundreds, if not thousands, of victims across hundreds of WhatsApp groups were making purchases, CLEU's stock price rose rapidly. With the promised returns seemingly materializing, victims were falsely reassured and continued to make additional purchases, further inflating the stock price.

81. CLEU's stock price increased from a closing price of $5.32 per share on January 21, 2025 to a peak of $7.90 per share on January 29, 2025, as shown in the chart below.



82. Trading volume was exceptionally high, with 126 million shares traded on January 22nd, 71.6 million shares on January 23rd, and at least 23 million shares traded on each of the following four trading days. In contrast, CLEU's prior trading volume typically was less than 1 million shares daily.

83. Unbeknownst to the victims, however, the scammers' co-conspirators were standing on the other side of the CLEU transactions from January 22 through January 29, 2025. The co-conspirators had acquired 240,000,000 CLEU shares in a secret offering and were unloading those shares by entering sale transactions at price points matching those fed to victims by the scammers posing as financial advisors in the WhatsApp groups.

84. The market became aware of the 240,000,000 previously undisclosed shares in the early hours of January 30, 2025, causing the stock price to fall precipitously before the U.S. markets opened that day.

85. CLEU's stock price collapsed to less than $0.15, causing hundreds of millions of dollars in losses to the victims of the scheme.

**D.** **The CLEU Scheme's Devastating Impact on Victims**

86.    The CLEU Scheme caused significant financial harm to its victims. The more than 500 members of the CLEU Victim Group collectively suffered losses of more than $64 million, and Plaintiffs estimate that the overall loss to the Class was more than $300,000,000.

87.    Members of the CLEU Victim Group and the proposed Class come from all walks of life—parents, grandparents, retirees, young families, veterans, active-duty military personnel, first responders, public servants, business executives, scientists, engineers, university professors, and students.

88.    Several victims report having lost their entire life savings, and many face difficulties paying their mortgages or their children's college tuition. Others have been forced to take out loans or commit to long hours of overtime to make ends meet.

89.    In addition to the CLEU Scheme's financial impact, victims have suffered emotional, psychological, social, and physical distress, including feelings of shame, depression, and anxiety, with physical impacts including elevated blood pressure, heart palpitations, and insomnia, with some victims requiring medication and/or therapy.

90.    In addition to Plaintiffs, members of the CLEU Victim Group include a 71-year-old grandmother, who has been battling neuroendocrine cancer for eight years, who was lured into the CLEU Scheme because she was looking for investment income to replace the $3,200 per month she lost when her long-term disability policy expired. She ended up losing a majority of her savings and is uncertain how she will pay for her monthly chemotherapy treatments. She reports an "overwhelming" emotional toll and that she has been required to begin taking medication for insomnia.

91.    Another victim is a single mother of a one-and-a-half-year-old daughter, who recently escaped an abusive marriage. She lost 15 years of savings and is now living paycheck-to-paycheck and questions how she will afford childcare (which she needs to be able to work full-time), healthcare (including treatment for pregnancy-related complications), housing, and finalization of her divorce.

92.     Additionally, a married couple lost approximately $985,000, including all of the money they had saved to pay college tuition for their four children. The couple has been forced to overhaul their finances and reassess college plans and other family expenses.

93.     Similarly, a 68-year-old senior and her 69-year-old husband have been forced to delay their plans to retire this year. Despite deteriorating health, they must continue to work to pay for medical treatment because they lost the approximately $182,000 they had saved to pay for future medical expenses.

**E.      Meta Created and Failed to Remove Scam Ads in Violation of Its Stated Policies and Contractual Obligations**

94.     Meta's agreement with its users of its social media platforms explicitly prohibits—and states that Meta "do[es] not allow" and will "take action" to prevent and remove—ads like those used by the CLEU scammers, but Meta failed to comply with its contractual obligations.

95.     The ToS constitute an agreement between Meta and the users of its social media platforms, including Plaintiffs and other members of the Class, pursuant to which (a) the users are given the right to use Meta's social media platforms in exchange for (b) Meta's right to "show [them] ads that may be relevant to" the user.[23]

96.     Section 1 of the ToS sets forth "The services [Meta] provide[s]." One of those services is "Promot[ing] the safety, security, and integrity of our services, combat[ting] harmful conduct and keep[ing] our community of users safe." In that regard, Meta represents that it:

> employ[s] dedicated teams around the world, work[s] with external
> service providers, partners and other relevant entities and develop[s]
> advanced technical systems to detect potential misuse of our
> Products, harmful conduct towards others, and situations where we
> may be able to help support or protect our community, ***including to
> respond to user reports of potentially violating content***. If we learn

---

[23] *See* Exhibit A at 2. The current version of the ToS expressly acknowledges that the ToS "constitute an agreement between [the user] and Meta." https://www.facebook.com/terms/ (last visited Sept. 13, 2025).

of content or conduct like this, we may **take appropriate action** based on our assessment that may include – notifying you, offering help, **removing content**, removing or restricting access to certain features, **disabling an account**, or contacting law enforcement.[24]

97.     Meta's ToS incorporate additional policies, including "Community Standards" and "Advertising Policies" (also referred to as "Advertising Standards").[25]

98.     Meta states that the "policies define what is and isn't allowed on Meta's technologies. **If content goes against our policies, we take action on it**."[26]

99.     In terms of "what . . . isn't allowed" on the Company's platforms, Meta's Community Standards distinguish between two categories of content: (i) content that is strictly prohibited (*i.e.*, "Content that's **not allowed**") and (ii) content that may or may not be allowed under certain circumstances (*i.e.*, "Content that requires additional information or context to enforce on, content that is allowed with a warning screen or content that is allowed but can only be viewed by adults aged 18 and older.").[27]

100.    Meta's Community Standards include a standard on "Fraud, Scams, and Deceptive Practices," which unequivocally states:

> We **do not allow**: Content that attempts to scam or defraud users and/or businesses by means of … [offering] investment opportunities where returns on investment are guaranteed or risk-free [or] investment opportunities where the opportunity is of a "get-rich-quick" nature and/or claims that a small investment can be turned into a large amount.[28]

---

[24] Exhibit A at 3-4.

[25] *See id.* at 12-13.

[26] https://transparency.meta.com/policies (last visited Sept. 13, 2025).

[27] *See id.*

[28] The Community Standard on Fraud, Scams, and Deceptive Practices in effect during the fourth quarter of 2024 is attached hereto as Exhibit B. The standard was later updated on February 10, 2025,

101. The same Community Standard on Fraud, Scams, and Deceptive Practices further purports to strictly prohibit content that "[a]ttempts to scam or defraud users by mispresenting the identity of the poster," including "falsely claiming to represent, or speak in the voice of, an established business or entity, in an attempt to scam or defraud."[29]

102. Meta represents that it "remov[es] content and combat[s] behavior" that violates the Community Standard on Fraud, Scams, and Deceptive Practice, and that it has "the same policies around the world, for everyone on Facebook."[30]

103. Meta's Advertising Standards incorporate the Community Standard on "Fraud, Scams and Deceptive Practices," stating that "Ads Must Comply" with that standard.[31]

104. Meta also represents that it has established an "ad review system [to] review[] ads for violations of our policies." The system purportedly "starts automatically before ads begin running" and includes review of "the specific components of an ad, such as images, video, text and targeting information."[32]

105. Based on the foregoing, Plaintiffs and other members of the Class were reasonably led to believe that Meta had systems in place to prevent, detect, and remove fraudulent ads. Absent such assurances, Plaintiffs and other members of the Class would not have consented to give Meta the right to target them with advertisements in exchange for their use of Facebook and Instagram.

106. Nevertheless, Meta not only allowed ads by the CLEU scammers that plainly violate its stated policies, it materially contributed to the development of those ads through its tools and technology.

107. For example, ads for the "Tom Lee Investing Group" promised participants could "leave any time, with no loss."

---

and the current version is available at https://transparency.meta.com/policies/community-standards/fraud-deception (last visited Sept. 13, 2025).

[29] Exhibit B at 4.

[30] *See id.* at 1, 11.

[31] https://transparency.meta.com/policies/ad-standards/ (last visited Sept. 13, 2025).

[32] *Id.*

108.    Ads featuring Savita Subramanian promised "95% accuracy" and daily potential returns of "30%-40%," while another offered the prospect of a stock with a current price of $6 that "should rise to $18 in 30 days," a return of 200%.

109.    Ads for Mr. Wonderful's investment club promised that an investment of $100,000 "would increase by $220,000," a 220% return.

110.    Meta substantially assisted in the production of these ads through its advertising tools, as discussed below. Meta's involvement included the development, use, and manipulation of images, text, and other content that had the hallmarks of investment fraud specifically identified in the Community Standards. Although Meta used its technology to enhance and optimize that content, it did not deploy technology to ensure the content complied with its Community Standards and Advertising Policies, despite representing to users that its ad review system would do exactly that.

111.    Meta's creation of ads including fraudulent investment content is particularly troubling in view of the strict regulations governing investment advisors and their advertising and the fact that Meta long has been aware that its social media platforms are being used to carry out investment scams as a result of the lawsuits and public information discussed above.

112.    Providers of investment advisory services are subject to a robust regulatory scheme, including requirements that they register with the SEC and FINRA. Investment advisor advertising is also strictly regulated, with FINRA Rule 2210 broadly prohibiting projections or predictions regarding investment performance. Nevertheless, Meta did not have any processes in place to verify that the CLEU scammers were legitimate, FINRA-registered investment advisory firms or to confirm that the advertisements comply with applicable regulations. Meta failed to establish these processes even though it has the capacity to implement verification procedures and has done so for other types of advertising, including politics, elections, and social issues.[33]

113.    Moreover, while many of the ads featured celebrities and reputable investment firms, Meta did not take any action to confirm that the ads were authentic. Even worse, based on Plaintiffs'

---

[33] *See* https://transparency.meta.com/policies/ad-standards/SIEP-advertising/SIEP ("Any advertiser running ads about social issues, elections or politics who is located in or targeting people in designated countries must complete the authorization process required by Meta, except for news publishers identified by Meta.") (last visited Sept. 14, 2025).

investigation, advisory firms impersonated by the CLEU scammers previously had become aware of scam ads purportedly featuring them and contacted Meta to have the offending ads removed. However, Meta failed to remove the ads or to implement safeguards to prevent them from recurring, despite representing in the ToS that it would respond to user reports and "take appropriate action" when alerted to improper content.

114. Indeed, scammers continued to utilize the same types of ads utilized in the CLEU Scheme for months despite the fact that dozens of members of the CLEU Victim Group reported the fraudulent ads to Meta (often multiple times) after the scheme was revealed.

115. For example, on February 9, 2025, a user reported a post for "impersonating Savita [Subramanian]" for "a pump and dump stock scam." The user added, "I was a victim of this and lost $$$$." On February 25, 2025, another user reported the post, writing: "This is a scammer impersonating [a] financial advisor." That same day, another complaint wrote: "This is not [Savita] Subramanian from Bank of America. [It is] an imposter for [a] pump and dump scam." Subsequent reports warning the same were filed in the following days, yet, as recently as April 7, 2025, Meta had taken no action to remove the post. Indeed, even after this action was filed, members of the CLEU Victim Group have continued to be targeted with ads featuring Ms. Subramanian's image and likeness as recently as August 27, 2025.

116. Meta's failure to take down the ads, even when specifically brought to the Company's attention by members of the CLEU Victim Group, enabled the scammers to continue their stock market manipulation scheme, targeting other Chinese penny stock companies (such as Jayud Global Logistics Ltd., Ostin Technology Group Ltd., Park Ha Biological Technology Co. Ltd., Pheton Holdings Ltd., Lixiang Education Holding Co. Ltd., and Everbright Digital Holding Ltd.) and inflicting billions of dollars in damages on thousands of additional victims.

### F. Meta Materially Contributed to Developing the Scam Ads and Targeting Vulnerable Users

117. Meta actively assisted the CLEU scammers in luring victims into their scheme through Meta's advertising tools, including Ads Manager, which created the ads and targeted them to specific

subsets of customers with known vulnerabilities with accuracy and efficiency that would have been impossible without Meta's assistance.

118. The scam ads were created and deployed using Meta's "Flexible Format," "Dynamic Creative," and "Advantage+ Creative" tools within Ads Manager. These tools drive and determine how the advertisements will appear. As a result, Meta's tools, not the advertiser, control the appearance of the advertisements.

119. When the Flexible Format tool is used, Meta "automatically optimizes" the ad and "show[s] [it] in the format that [Meta] predict[s] may perform best," meaning advertisers "don't need to select different ad formats for different ad placements, as it'll be selected for [them] based on what the ad delivery system determines people are most likely to respond to."[34] Meta exercises significant control over ads created through the Flexible Format tool, including selecting the specific images and other content that will be included, the layout, the platform (Facebook or Instagram), and how the ad will be displayed to a particular user (*e.g.*, in the user's feed, as a story, etc.).

120. Similarly, the Dynamic Creative tool "takes multiple media, such as images and videos, and multiple ad components, such as images, videos, text, audio and calls-to-action, and then mixes and matches them in new ways to improve . . . ad performance. It allows [the advertiser] to automatically create personalized creative variations for each person who views [the] ad, with results that are scalable."[35]

121. The Advantage+ Creative tool uses generative AI to apply "creative enhancements" to optimize advertisements. These "enhancements" include AI-generated text and images, which alter the contents of the advertisements to improve performance. The alterations may include modifications to images (such as applying different text overlays or modifying the image background), generating

---

[34] *See* https://www.facebook.com/business/help/835561738423867 (last visited Sept. 13, 2025).

[35] *See* https://www.facebook.com/business/help/170372403538781?id=244556379685063 (last visited Sept. 13, 2025).

variations of the ad's text to target different audiences, and inserting "Call to Action" buttons, such as a link to purchase a product or join a WhatsApp group.[36]

122.    Meta touts that its tools "enable [advertisers] to automatically promote [their] entire product catalog across Facebook [and] Instagram . . . without having to create thousands of individual ads. Dynamic ads capture the intent signals that customers show on websites and apps to ensure the right products are connected to the right people"[37]—or, in this case, the most misleading ads were connected to the most vulnerable victims.

123.    The CLEU scammers used these advertising tools to deploy an array of advertisements that were optimized to target a range of different Facebook and Instagram users. For example, Meta's tools developed at least *86 different variations* of ads featuring Ms. Subramanian that were utilized by the scammers.

124.    Following are just three examples of those ads that were targeted to different members of the CLEU Victim Group based on Meta's assessment of what would be most likely to drive engagement by that particular user.

  

---

[36]    *See*    https://www.facebook.com/business/help/297506218282224?id=649869995454285    (last visited Sept. 13, 2025); *see also* https://www.facebook.com/business/help/180641596861873 (last visited Sept. 13, 2025).
[37] *See* https://www.facebook.com/business/m/one-sheeters/dynamic-ads (last visited Sept. 13, 2025).

125.     In the Ad Library profile for the ads featuring Ms. Subramanian, Meta admits that the ads were developed "us[ing] one of [Meta's] dynamic products, where advertisers provide a combination of images, text and platform-specific preferences so [Meta's] system can automatically create the right combination for the audience."

126.     Meta then targeted the ads to users whose activity suggested an interest in investing. Among other behaviors, members of the CLEU Victim Group reported: (i) performing research regarding investing or investment strategies with the same devices they use to access Facebook and Instagram in the weeks and months before they were targeted; (ii) discussing investing or investment opportunities near their devices; and (iii) using their devices to access their investment accounts.

127.     For example, prior to being targeted with ads by the CLEU scammers, Plaintiff Shah and his wife had been looking for a financial advisor to manage their savings through retirement. After clicking on an advertisement featuring Sri Lankan-born venture capitalist and entrepreneur Chamath Palihapitiya, the Shahs were placed into a WhatsApp group where the scammers posed as representatives of Blue Wolf Capital, a legitimate investment firm the Shahs were led to believe would provide the types of services they had been looking for.

128.     Similarly, shortly before he was targeted with ads by the CLEU scammers, Plaintiff Bouck had begun to research investing and had enrolled in an investment education program that also was advertised on Instagram. After clicking on the link for that program, Plaintiff Bouck was repeatedly targeted with investment-related content in his Instagram account, including ads by the CLEU scammers.

129.     Plaintiff Zhao, who uses the same devices to access Facebook and third-party applications to monitor and manage his and his wife's investment and retirement accounts, was aggressively targeted with ads by the CLEU scammers. In contrast, Plaintiff Zhao's wife, who uses Facebook more frequently than he does, but does *not* access investment and retirement accounts, was not targeted with similar advertisements.

130.     Meta targeted users with particular ads based on their past activity within the Facebook and Instagram apps in order to enhance the effectiveness of the scam ads. For example, based on the experience of the CLEU Victim Group, ads featuring Dave Portnoy were targeted to users who

previously viewed content from Barstool Sports, and ads featuring Tucker Carlson were targeted to users who engaged with content from conservative news outlets and commentators.

131.    Even more troubling, Meta targeted ads to individuals based on their race and ethnic background, creating a sense of shared community, values, and trust between the user and the advisor featured in the ad.

132.    For example, out of the 79 members of the CLEU Victim Group who were targeted with scam advertisements featuring Ms. Subramanian, who is Indian-American, 77 (or 97.5%) shared her ethnicity.

133.    Similarly, out of the 17 members of the CLEU Victim Group, including Plaintiffs Zhao and Tran, who were targeted with ads featuring Mr. Lee, who is Korean-American, 14 (or 82.4%) were also of East Asian heritage.

134.    Through its generative content tools and targeting technology, Meta was instrumental in carrying out the CLEU Scheme and increasing its scale and effectiveness.

## V.    CLASS ACTION ALLEGATIONS

135.    Plaintiffs bring this Action pursuant to Rule 23 of the Federal Rules of Civil Procedure individually and as a class action.

136.    The proposed class includes all persons who were lured into investing in CLEU between January 22, 2025 and January 30, 2025 directly or indirectly as a result of fraudulent advertisements on Facebook and Instagram and suffered losses as a result (the "Class").

137.    The members of the Class are so numerous that joinder of all members is impracticable. Upon information and belief, the Class consists of thousands of geographically dispersed victims.

138.    There are questions of law and fact common to the Class, which predominate over questions affecting any individual Class member. These common questions include, *inter alia*, whether Defendant is liable for materially contributing to the content of the scam advertisements; whether Defendant breached civil rights and anti-discrimination laws by developing race-based advertisements to target its users; whether Defendant breached its contractual obligations to its users;

and whether Defendant was unjustly enriched by profiting from fraudulent advertisements that resulted in users losing millions in investments.

139. No difficulties are likely to be encountered in the management of this case as a class action.

140. Defendant has acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

141. Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.

142. Plaintiffs' claims are typical of the claims of other Class members, and Plaintiffs have the same interests as other Class members. Accordingly, Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.

143. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendant or adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

144. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CAUSES OF ACTION

### COUNT I

### Aiding and Abetting Fraud

145. Plaintiffs repeat and reallege the allegations set forth in the paragraphs above as if fully set forth herein.

146. The CLEU Scheme was a fraudulent scheme designed to manipulate the price of CLEU shares, enabling the perpetrators of the fraud to unload their previously undisclosed

shareholdings, reaping hundreds of millions of dollars of profits for themselves at the expense of Plaintiffs and the Class.

147. Fraudulent advertisements on Facebook and Instagram were an essential element used to lure Plaintiffs and the Class into purchasing large amounts of CLEU shares at specified price points, allowing the CLEU scammers and their co-conspirators to dispose of their shares.

148. Meta gave substantial assistance to the CLEU scammers in carrying out their fraudulent scheme. Through its advertising tools, Meta created and developed hundreds of fraudulent advertisements utilized by the scammers.

149. Meta also facilitated the targeting of those ads to vulnerable Facebook and Instagram users, including Plaintiffs and the Class. Accordingly, Meta provided the platforms necessary to conduct the fraud, and its advertising tools were central to both developing the scam ads and selecting the users who would be targeted as well as the content that would be shown to specific users.

150. Meta actually knew the scammers were engaged in fraud or were willfully blind to the scammers' conduct because it repeatedly had been alerted to investment scams, including from prior lawsuits and reports by financial advisors who were being impersonated on Meta's platforms.

151. As a direct and proximate result of the CLEU Scheme and Meta's aiding and abetting of that scheme, Plaintiffs and the Class were damaged, and Meta is liable for those damages.

## COUNT II

### Breach of Contract

152. Plaintiffs repeat and reallege the allegations set forth in the paragraphs above as if fully set forth herein.

153. Plaintiffs and the Class entered into a services contract with Meta consisting of the ToS, which incorporated by reference the Community Standards and Advertising Policies.

154. The ToS contain enforceable promises that Meta made to Plaintiff and the Class, including that Meta "does not allow" investment scam ads, has processes in place to review advertisements for compliance with Meta's policies, and will "take appropriate action" when it becomes aware of content that violates its policies.

155.    If not for Meta's representations in the ToS, Plaintiffs and other members of the Class would not have consented to being shown advertisements by Meta in exchange for their user of Facebook and Instagram.

156.    The ads utilized in connection with the CLEU Scheme violated the ToS because they included promises of exorbitant returns and returns that were guaranteed or risk free. The ads also fraudulently impersonated celebrities and legitimate financial advisors.

157.    In breach of its obligations under the ToS, Meta not only allowed the ads to be utilized on Facebook and Instagram, it materially contributed to the development of the ads, including by generating, manipulating, and enhancing content that violated the ToS.

158.    Meta also failed to take any action to verify that the celebrities and financial advisors featured in the ads had authorized their use. Moreover, contrary to promises that it would "take action" when made aware of potentially fraudulent content, Meta ignored reports by financial advisors that their images and likenesses were being utilized in fraudulent ads on Facebook and Instagram.

159.    As a direct and proximate result of Meta's breaches of the ToS, Plaintiffs and the Class suffered damages, and Meta is liable for those damages.

## COUNT III

### Breach of the Implied Covenant of Good Faith and Fair Dealing

160.    Plaintiffs repeat and reallege the allegations set forth in the paragraphs above as if fully set forth herein.

161.    In every contract there is an implied promise of good faith and fair dealing.

162.    Plaintiffs and other members of the Class entered into a services contract with Facebook consisting of the ToS, which incorporated by reference the Community Standards and the Advertising Policies.

163.    The ToS contains enforceable promises that Meta made to Plaintiffs and other members of the Class, including without limitation, the promises set forth above.

164.    Meta engaged in conduct that frustrated and interfered with the rights of Plaintiffs and other members of the Class to the benefits of the ToS, including the right to be targeted only with advertisements that had been subjected to Meta's advertising review system and determined to

comply with Meta's stated policies. Without limitation, Meta materially contributed to the development of ads that facially violated its policies, failed to reasonably review the ads to ensure compliance with its policies, and failed to take action when made aware of ads that violated its policies.

165.    Plaintiffs performed all, or substantially all, of their material obligations under the ToS.

166.    As a direct and proximate result of Meta's breach of the covenant of good faith and fair dealing, Plaintiffs and the Class suffered damages, and Meta is liable for those damages.

## COUNT IV

### Promissory Estoppel

167.    Plaintiffs repeat and reallege the allegations set forth in the paragraphs above as if fully set forth herein.

168.    Defendant promised Plaintiffs and the Class that it "does not allow investment scam ads," that it had processes in place to review advertisements for compliance with Meta's policies, and that it would "take action" when it becomes aware of content that violates its policies.

169.    These promises were included in Defendant's ToS and Community Standards, which stated that Meta does not allow investment scam advertisements like those in the CLEU Scheme.

170.    Plaintiffs and the Class reasonably relied on Defendant's promises when using Meta's products.

171.    Defendant failed to honor its promises by materially contributing to the development of ads that facially violated its policies, failing to reasonably review the ads to ensure compliance with its policies, and failing to take action when made aware of ads that violated its policies.

172.    As a direct and proximate result of Meta's broken promises, Plaintiffs and the Class suffered damages, and Meta is liable for those damages.

## COUNT V

### Negligence

173.    Plaintiffs repeat and reallege the allegations set forth in the paragraphs above as if fully set forth herein.

174.     Meta has a special relationship with Plaintiffs and the Class and owes them independent legal duties to perform the services it provides through its Facebook and Instagram platforms in a manner that protects them from being defrauded by investment scams.

175.     Meta had ample notice and actual knowledge that scammers were using ads on Facebook and Instagram to carry out investment scams.

176.     Meta had the capability, without undue burden, to prevent the creation of the ads utilized to carry out the CLEU Scheme, or to identify and remove those ads once created, but it failed to do so.

177.     Meta actively solicited, encouraged, and assisted the CLEU scammers it knew or reasonably should have known were carrying out a fraudulent scheme by materially contributing to the development of the scam ads, including generating, manipulating, and enhancing fraudulent content used in the ads; by failing to implement reasonable policies and procedures to monitor, detect, and remove investment scam ads, including failing to take appropriate action when made aware of the ads used by the CLEU scammers; and by facilitating the targeting of investment scam ads to vulnerable users, including Plaintiffs and the Class.

178.     Meta knew or should have known that breach of its duty to Plaintiffs and other members of the Class would harm them. Yet, Meta failed to warn Facebook and Instagram users of the risks they faced from investment scam ads on those platforms, despite Meta's knowledge of those risks.

179.     As a direct and proximate result of Meta's breach of its duties, Plaintiffs and the Class foreseeably suffered damages, and Meta is liable for such damages.

## COUNT VI

### Violation of California's Unruh Civil Rights Act
### Cal. Civ. Code § 51 (the "Unruh Act")

180.     Plaintiffs repeat and reallege the allegations set forth in the paragraphs above as if fully set forth herein.

181.     The Unruh Act prohibits businesses in California from discriminating based on age, ancestry, color, disability, national origin, race, religion, gender, and sexual orientation.

182. Meta violated the Unruh Act by targeting fraudulent advertisements, or enabling the CLEU scammers to target fraudulent advertisements, to Plaintiffs and the Class based on protected classes, including their national origin and race.

183. Meta's advertising tools were designed and employed to make distinctions among Facebook and Instagram users based on national origin and race, including enabling targeting of specific ads to users based on those characteristics.

184. Meta's advertising tools not only enabled discriminatory targeting, but also materially contributed to manipulating and altering advertisements that were disproportionately served to Facebook and Instagram users with racial or ethnic backgrounds matching those of the purported investors featured in the scam ads.

185. The consistency with which members of the CLEU Victim Group were targeted with ads featuring investors with matching racial or ethnic backgrounds demonstrates that race- and ethnicity-based targeting was not a coincidence, but rather an intentional act by Meta and the result of its advertising tools.

186. In order to increase its advertising fees and revenues, Meta chose to prioritize ad performance and engagement by designing its advertising tools to enable, facilitate, and contribute to race- and ethnicity-based targeting in violation of the Unruh Act.

187. The deliberate targeting of ads based on protected classes increased the effectiveness of the ads and caused Plaintiffs and other members of the Class to be lured into the CLEU Scheme.

188. As a direct and proximate cause of Meta's violations of the Unruh Act, Plaintiffs and the Class suffered damages, and Meta is liable for such damages.

## COUNT VII

### Unjust Enrichment

189. Plaintiffs repeat and reallege the allegations set forth in the paragraphs above as if fully set forth herein.

190. Virtually all of Meta's revenues are derived from sales of advertising services.

191. Meta profited from its advertising services, which materially contributed to the development of the deceptive advertisements.

192.     Meta knew or should have known that scammers are utilizing its advertising services to carry out investment scams by targeting vulnerable Facebook and Instagram users with deceptive advertisements.

193.     Rather than establishing reasonable policies and procedures to prevent the creation of scam advertisements and to monitor, detect, and remove scam ads that are created, Meta has materially contributed to the creation and proliferation of those ads in order to bolster its valuable advertising revenue stream.

194.     The ads utilized in connection with the CLEU Scheme generated revenue for Meta, but resulted in enormous financial losses and other damages to Plaintiffs and the Class. Allowing Meta to retain the revenues from those ads would be unjust and inequitable.

195.     Plaintiffs and the Class are entitled to disgorgement of all profits Meta unjustly realized from ads utilized in connection with the CLEU Scheme.

196.     Plaintiffs and the Class otherwise have no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment as follows:

A.      Declaring that this suit may proceed as a class action on behalf of the Class, appointing Plaintiffs as Class Representatives, and appointing Plaintiffs' undersigned counsel as Class Counsel pursuant to Fed. R. Civ. P. 23;

B.      Awarding Plaintiffs and the Class monetary relief in the form of damages and/or disgorgement of Defendant's unjust profits in an amount to be proven at trial;

C.      Awarding Plaintiffs and the Class the costs of this action (including without limitation pursuant to Cal. Code of Civ. P. § 1021.5), including reasonable attorneys' fees, accountants' fees, consultants' fees, and experts' fees, costs, and expenses;

D.      Awarding Plaintiffs and the Class pre-judgment and post-judgment interest;

E.      Awarding declaratory and injunctive relief, including enjoining Defendant from further violation of its contractual and legal duties with respect to fraudulent advertisements on its social media platforms; and

F.      Granting such other and further relief as the Court deems just and equitable.

# JURY DEMAND

Plaintiffs request a trial by jury of all claims that can be so tried.

Dated: September 15, 2025

_____

**MORRIS KANDINOV LLP**
Leonid Kandinov (279650)
555 West B Street, 4th Floor
San Diego, CA 92101
Tel. (619) 780-3993
leo@moka.law

**MORRIS KANDINOV LLP**
Aaron T. Morris
Andrew W. Robertson (admitted *pro hac vice*)
William H. Spruance
305 Broadway, 7th Floor
New York, NY 10007
Tel. (212) 431-7473
aaron@moka.law
andrew@moka.law
william@moka.law

*Attorneys for Plaintiffs*