WILMER CUTLER PICKERING
HALE AND DORR LLP
SONAL N. MEHTA (SBN 222086)
JESSICA LEWIS (SBN 302467)
Sonal.Mehta@wilmerhale.com
Jessica.Lewis@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

ARI HOLTZBLATT (SBN 354631)
ALLISON SCHULTZ (*pro hac vice*)
NATHANIEL W. REISINGER (*pro hac vice*)
Ari.Holtzblatt@wilmerhale.com
Allison.Schultz@wilmerhale.com
Nathaniel.Reisinger@wilmerhale.com
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6443

*Attorneys for Defendant*
*Meta Platforms, Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA,
### SAN FRANCISCO DIVISION

| | |
|---|---|
| JOSHUA BOUCK, et al.,<br><br>                      Plaintiffs,<br><br>    v.<br><br>META PLATFORMS, INC.,<br><br>                     Defendant. | Case No. 3:25-cv-05194-RS<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS AMENDED COMPLAINT**<br><br>Judge: Hon. Richard Seeborg<br>Courtroom 3, 17th Floor<br>Date: January 8, 2026<br>Time: 1:30 PM |

**TABLE OF CONTENTS**

Page

NOTICE OF MOTION AND MOTION ...................................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ...........................................................................1

BACKGROUND ......................................................................................................................................3

ARGUMENT............................................................................................................................................4

I.      Plaintiffs' Claims Are Barred By Section 230...............................................................................4

        A.      Meta Is An Interactive Computer Service Provider....................................................5

        B.      Plaintiffs' Claims Would Impose Liability On Meta As A Publisher ....................5

        C.      Meta Did Not Materially Contribute To The Ads' Unlawfulness ...........................8

II.     Plaintiffs' Claims Fail On The Merits .......................................................................................11

        A.      Plaintiffs Fail To Adequately Allege Aiding And Abetting Fraud (Count I)........11

        B.      Plaintiffs Fail To Adequately Allege Breach Of Contract (Count II),
                Breach Of The Implied Covenant Of Good Faith And Fair Dealing
                (Count III), Or Promissory Estoppel (Count IV) ....................................................15

                1.      Plaintiffs fail to plausibly allege an enforceable promise .........................15

                2.      Plaintiffs' promissory estoppel claim is independently deficient..............17

        C.      Plaintiffs Fail To Adequately Allege Negligence (Count III) ...............................18

        D.      Plaintiffs Fail To Adequately Allege A Violation Of The Unruh Civil
                Rights Act (Count VI)..............................................................................................20

                1.      Plaintiffs do not allege Meta denied or restricted access to a public
                        accommodation.........................................................................................21

                2.      Plaintiffs do not allege that any alleged discrimination was willful..........23

        E.      Plaintiffs Fail To Adequately Allege Unjust Enrichment (Count VII).................24

III.    Dismissal Should Be With Prejudice Given Plaintiffs' Prior Amendment .......................25

CONCLUSION.......................................................................................................................................25

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alamilla v. Hain Celestial Group, Inc.*,
   30 F. Supp. 3d 943 (N.D. Cal. 2014) ......................................................................................3

*Astiana v. Hain Celestial Group, Inc.*,
   783 F.3d 753 (9th Cir. 2015) ................................................................................................24

*Barfuss v. Live Nation Entertainment, Inc.*,
   2025 WL 1843207 (C.D. Cal. May 14, 2025) .......................................................................17

*Barnes v. Yahoo!, Inc.*,
   570 F.3d 1096 (9th Cir. 2009) ............................................................................4, 5, 6, 7, 8

*Barrett v. Apple Inc.*,
   523 F. Supp. 3d 1132 (N.D. Cal. 2021) ...........................................................................14, 15

*Birdwell v. AvalonBay Communities, Inc.*,
   742 F. Supp. 3d 1024 (N.D. Cal. 2024) ................................................................................21

*Bogard v. TikTok Inc.*,
   2025 WL 604972 (N.D. Cal. Feb. 24, 2025) .....................................................................19, 20

*Bradshaw v. SLM Corp.*,
   652 F. App'x 593 (9th Cir. 2016) .....................................................................................12, 13

*Brown v. USA Taekwondo*,
   11 Cal. 5th 204 (2021) ..........................................................................................................18

*Calise v. Meta Platforms, Inc.*,
   103 F.4th 732 (9th Cir. 2024) ...........................................................................................6, 8, 9

*Calise v. Meta Platforms, Inc.*,
   No. 21-cv-06186 (N.D. Cal. Sept. 22, 2025) ..........................................................................8

*Carafano v. Metrosplash.com, Inc.*,
   339 F.3d 1119 (9th Cir. 2003) ...........................................................................................8, 10

*Casey v. U.S. Bank National Association*,
   127 Cal. App. 4th 1138 (2005) ..............................................................................................14

*Castronuova v. Meta Platforms, Inc.*,
   2025 WL 1914860 (N.D. Cal. June 10, 2025) .......................................................................25

*Copart, Inc. v. Sparta Consulting, Inc.*,
   339 F. Supp. 3d 959 (E.D. Cal. Sept. 10, 2018) ...............................................................24, 25

*Curl v. CitiMortgage, Inc.*,
    2014 WL 5321063 (N.D. Cal. Oct. 17, 2014)..............................................................................17

*Damner v. Facebook Inc.*,
    2020 WL 7862706 (N.D. Cal. Dec. 31, 2020).............................................................................17

*Dangaard v. Instagram, LLC,*
    2022 WL 17342198 (N.D. Cal. Nov. 30, 2022) ...........................................................................5

*Delgado v. Trax Bar & Grill*,
    36 Cal. 4th 224 (2005) ...............................................................................................................19

*Diaz v. Intuit, Inc.*,
    2018 WL 2215790 (N.D. Cal. May 15, 2018).................................................................11, 12, 14, 15

*Doe 1 v. Twitter, Inc.*,
    148 F.4th 635 (9th Cir. 2025) .................................................................................................9, 10

*Doe No. 14 v. Internet Brands, Inc.*,
    2016 WL 11824793 (C.D. Cal. Nov. 14, 2016)......................................................................19, 20

*Doe v. Grindr Inc.*,
    128 F.4th 1148 (9th Cir. 2025) ...........................................................................6, 7, 9, 10, 11

*Dyroff v. Ultimate Software Group, Inc.*,
    934 F.3d 1093 (9th Cir. 2019) ...........................................................................8, 10, 11, 18, 19

*Erlich v. Menezes*,
    21 Cal. 4th 543 (1999) ...............................................................................................................20

*Estate of Bride ex rel. Bride v. Yolo Technologies, Inc.*,
    112 F.4th 1168 (9th Cir. 2024) ...........................................................................................4, 5, 9

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*,
    521 F.3d 1157 (9th Cir. 2008) ...........................................................................5, 8, 11, 25

*Forrest v. Meta Platforms, Inc*,
    737 F. Supp. 3d 808 (N.D. Cal. 2024) ........................................................................................10

*Gerber v. Twitter, Inc.*,
    2024 WL 1354449 (N.D. Cal. Mar. 29, 2024).............................................................................20

*Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network, Inc.*,
    742 F.3d 414 (9th Cir. 2014) .................................................................................................21, 23

*Hardy v. California*,
    2006 WL 563049 (N.D. Cal. Mar. 7, 2006).................................................................................21

*Herskowitz v. Apple Inc.*,
    940 F. Supp. 2d 1131 (N.D. Cal. 2013) ................................................................................24, 25

*Howard v. Superior Court of Los Angeles County*,
  2 Cal. App. 4th 745 (2014) ...............................................................................................14

*Hubbard v. Google LLC*,
  2025 WL 82211 (N.D. Cal. Jan. 13, 2025) .......................................................................13

*In re Apple Inc. App Store Simulated Casino-Style Games Litigation*,
  2025 WL 2782591 (N.D. Cal. Sept. 30, 2025) ....................................................................6

*In re First Alliance Mortgage Co.*,
  471 F.3d 977 (9th Cir. 2006) ......................................................................................11, 14

*In re Mortgage Fund '08 LLC*,
  527 B.R. 351 (N.D. Cal. 2015) .........................................................................................14

*Kennedy v. Meta Platforms Inc.*,
  2024 WL 4565091 (N.D. Cal. Oct. 23, 2024)......................................................................7

*King v. Facebook, Inc.*,
  2019 WL 6493968 (N.D. Cal. Dec. 3, 2019).......................................................................7

*King v. Facebook, Inc.*,
  845 F. App'x 691 (9th Cir. 2021) .......................................................................................7

*Koebke v. Bernardo Heights Country Club*,
  36 Cal. 4th 824 (2005) ................................................................................................23, 24

*Kroetch v. BAC Home Loan Services*,
  2011 WL 4502350 (N.D. Cal. Sept. 27, 2011) ..............................................................15, 17

*Liapes v. Facebook, Inc.*,
  95 Cal. App. 5th 910 (2023) .......................................................................................11, 23

*Lloyd v. Facebook, Inc.*,
  2022 WL 4913347 (N.D. Cal. Oct. 3, 2022).....................................................................7, 16

*Marcelos v. Dominguez*,
  2008 WL 2788173 (N.D. Cal. July 18, 2008).................................................................13, 14

*Martinez v. Cot'n Wash, Inc.*,
  81 Cal. App. 5th 1026 (2022) ...........................................................................................23

*Melton v. Boustred*,
  183 Cal. App. 4th 521 (2010) ...........................................................................................18

*Moore v. Centrelake Medical Group, Inc.*,
  83 Cal. App. 5th 515 (2022) .............................................................................................20

*Morton v. Twitter, Inc.*,
  2021 WL 1181753 (C.D. Cal. Feb. 19, 2021)..................................................................6, 16

*Murphy v. Twitter, Inc.*,
   60 Cal. App. 5th 12 (2021) ...........................................................................................................6

*Musk v. OpenAI, Inc.*,
   2025 WL 1482386 (N.D. Cal. May 1, 2025) ..............................................................................11

*Nevis v. Wells Fargo Bank*,
   2010 WL 11636091 (N.D. Cal. Jan. 13, 2010) ...........................................................................13

*Noah v. AOL Time Warner, Inc.*,
   261 F. Supp. 2d 532 (E.D. Va. 2003) ..........................................................................................8

*O'Connor v. Uber Technologies, Inc.*,
   58 F. Supp. 3d 989 (N.D. Cal. 2014) ........................................................................................25

*Olson v. Children's Home Society*,
   204 Cal. App. 3d 1362 (1988) ...................................................................................................19

*OpenTV, Inc. v. Netflix Inc.*,
   76 F. Supp. 3d 886 (N.D. Cal. 2014) ........................................................................................22

*Oster v. Caithness Corp.*,
   2017 WL 3727174 (N.D. Cal. Aug. 30, 2017) ..............................................................16, 17, 18

*Parents for Privacy v. Barr*,
   949 F.3d 1210 (9th Cir. 2020) ...................................................................................................25

*Pirozzi v. Apple Inc.*,
   913 F. Supp. 2d 840 (N.D. Cal. 2012) ......................................................................................20

*Planet Green Cartridges, Inc. v. Amazon.com, Inc.*,
   2025 WL 869209 (9th Cir. Mar. 20, 2025).......................................................................8, 18, 19

*Prager University v. Google LLC*,
   85 Cal. App. 5th 1022 (2022) ......................................................................................................6

*Pratt v. Higgins*,
   2023 WL 4564551 (N.D. Cal. July 17, 2023).............................................................................14

*Ragin v. New York Times Co.*,
   923 F.2d 995 (2d Cir. 1991).......................................................................................................22

*Realtek Semiconductor Corp. v. LSI Corp.*,
   2013 WL 4778140 (N.D. Cal. Sept. 6, 2013) ............................................................................17

*Rigsby v. GoDaddy Inc.*,
   59 F.4th 998 (9th Cir. 2023) .........................................................................................................5

*S&S Worldwide, Inc. v. Wells Fargo Bank*,
   509 F. Supp. 3d 1154 (N.D. Cal. 2020) .....................................................................................13

*Shared.com v. Meta Platforms, Inc.*,
  2022 WL 4372349 (N.D. Cal. Sept. 21, 2022) ....................................................................7, 16

*Sheen v. Wells Fargo Bank, N.A.*,
  12 Cal. 5th 905 (2022) ...........................................................................................................20

*Sikhs for Justice, Inc. v. Facebook, Inc.*,
  697 F. App'x 526 (9th Cir. 2017) ..........................................................................................25

*Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*,
  144 F. Supp. 3d 1088 (N.D. Cal. 2015) ...................................................................................5

*Stringer v. Combe, Inc.*,
  2017 WL 6539779 (N.D. Cal. Dec. 21, 2017).............................................................22, 23, 24

*Thurston v. Omni Hotels Management Corp.*,
  69 Cal. App. 5th 299 (2021) ...................................................................................................21

*United States v. Cedric et al.*,
  No. 1:25-cr-00161 (N.D. Ill. Mar. 20, 2025) ...........................................................................3

*United States v. Funds in the Amount of $19,901,190.42 Seized from Company A Account
  Number XXXX9087 Held in the Name of Lim Xiang Jie Cedric*,
  No. 1:25-cr-00161 (N.D. Ill. Mar. 20, 2025) ...........................................................................3

*Vargas v. Facebook, Inc.*,
  2023 WL 6784359 (9th Cir. Oct. 13, 2023)............................................................................11

*WhatsApp Inc. v. NSO Group Technologies Ltd.*,
  17 F.4th 930 (9th Cir. 2021) ...................................................................................................13

*White v. FCA US LLC*,
  2022 WL 3370791 (N.D. Cal. Aug. 16, 2022) ........................................................................20

*White v. Square, Inc.*,
  7 Cal. 5th 1019 (2019) ............................................................................................................21

*Wong v. Fay Servicing, LLC*,
  2017 WL 950863 (N.D. Cal. Mar. 10, 2017)...........................................................................25

*Young v. Facebook, Inc.*,
  2010 WL 4269304 (N.D. Cal. Oct. 25, 2010)......................................................................7, 17

*Zahabi v. Bank of America, N.A.*,
  2012 WL 12920507 (N.D. Cal. July 16, 2012)..................................................................11, 12

*Zeran v. America Online, Inc.*,
  129 F.3d 327 (4th Cir. 1997) ....................................................................................................8

*Ziencik v. Snap, Inc.*,
    2023 WL 2638314 (C.D. Cal. Feb. 3, 2023)..............................................................................19

**Statutes, Rules, Regulations**

Cal. Civ. Code § 51................................................................................................................20, 21

Cal. Civ. Code § 51(b) .........................................................................................................20, 21

47 U.S.C. § 230(c)(1)...................................................................................................................4

47 U.S.C. § 230(e)(3)...................................................................................................................4

47 U.S.C. § 230(f)(3) ...................................................................................................................8

Fed. R. Civ. P. 12(b)(6).................................................................................................................1

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE THAT, on January 8, 2026 at 1:30 P.M. in Courtroom 3 of the U.S. District Court for the Northern District of California, San Francisco Division, at 450 Golden Gate Ave., San Francisco, CA, this Motion To Dismiss filed by Defendant Meta Platforms, Inc. will be heard. Pursuant to Fed. R. Civ. P. 12(b)(6), Defendant moves to dismiss the Complaint in the above-captioned action. Defendant's Motion to Dismiss is based on this Notice of Motion, the supporting Memorandum of Points and Authorities, and accompanying declaration and exhibits.

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiffs allege they were defrauded by a criminal network in Asia that orchestrated a "pump-and-dump" scheme involving shares of China Liberal Education Holdings Ltd. ("CLEU"). As alleged, the scammers used Facebook and Instagram to publish ads promoting "investment clubs" that promised high returns. After clicking on the ads, Plaintiffs claim they were led to group chats on WhatsApp, where the scammers engaged in months-long conversations and ultimately advised Plaintiffs to invest in CLEU. Federal prosecutors are pursuing criminal charges against the CLEU scammers and a civil forfeiture action to return money to the alleged victims.

Meta Platforms, Inc. ("Meta") is not implicated in the criminal prosecution whatsoever. Nonetheless, Plaintiffs seek to hold Meta liable for failing to prevent them from seeing or being misled by the third-party ads—created by the scammers using Meta's advertising tools—that solicited Plaintiffs into participating in the alleged "investment clubs." Adding only conclusory assertions, their First Amended Complaint ("FAC") remains legally deficient because Plaintiffs still do not plausibly allege Meta materially contributed to the fraudulent content of the challenged ads, or knew either that the CLEU scammers were engaged in a fraudulent scheme or that the ads were unlawful at the time they were posted—each of which dooms their claims.

Plaintiffs' claims remain barred by Section 230 of the Communications Decency Act, which prohibits imposing liability on Meta for publishing third-party content. Plaintiffs try to circumvent Section 230 with conclusory assertions that Meta "developed," "created," or "materially contributed to" the ads at issue, but they do not allege, as they must, that Meta materially contributed to the ads' alleged unlawfulness. Instead, they rely on neutral, generally

available tools that optimized ad components *provided by the scammers*. Section 230 bars claims that would impose liability on Meta merely for publishing or not removing content created by third parties using its content-neutral tools. Dismissal with prejudice is appropriate on this basis alone.

Plaintiffs also fail to plausibly allege essential elements of each claim.

*First*, their aiding and abetting fraud claim (Count I) fails because they do not plausibly allege Meta actually knew of, or made a conscious decision to assist, the alleged scheme.

*Second*, their claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and promissory estoppel (Counts II, III, and IV) fail because they do not identify any enforceable promise by Meta to remove content. The provisions they cite restrict users'—not Meta's—behavior, and repeatedly state only that Meta "may" take the allegedly promised actions. Meta's Terms also expressly disclaim the obligations Plaintiffs seek to enforce.

*Third*, their negligence claim (Count V) fails because Plaintiffs seek to hold Meta liable for failing to prevent third parties from using neutral, generally available tools to cause them harm. Such "nonfeasance" can create a duty only where the defendant has a "special relationship" with the plaintiff. Settled precedent rejects any notion that Meta formed such a relationship merely by offering online services. The negligence claim is also barred by the economic loss rule, because the claim is not independent of the contract between the parties, and thus cannot be used to evade the prohibition against recovery of noneconomic harms in a breach of contract claim.

*Fourth*, their Unruh Civil Rights Act claim (Count VI) fails because Plaintiffs do not allege denial or restriction of access to Meta's services or any public accommodation, nor that whether a person received a challenged ad depended on racial identity. Plaintiffs' own allegations instead show that users saw ads because they had demonstrated interest in investment-related content. Plaintiffs also fail to plausibly allege Meta acted willfully to discriminate, as they do not allege that Meta was aware of the ad's supposedly fraudulent nature when the ads were shown to users.

*Finally*, their unjust enrichment claim (Count VII) fails because no such cause of action exists under California law and no quasi-contract claim may lie where an express contract covers the subject matter. Here, Meta's Terms expressly disclaim any obligation to remove potentially harmful third-party content, the basis for Plaintiffs' claim.

Despite the opportunity to amend their complaint with the benefit of Meta's prior motion to dismiss, Plaintiffs' claims remain incurably deficient and should be dismissed with prejudice.

**BACKGROUND**

The FAC is Plaintiffs' attempt to cure deficiencies identified in Meta's prior motion to dismiss and presumably reflects their strongest case. Much of it remains unchanged. Plaintiffs continue to allege they fell victim to an "investment scam[] perpetrated by an organized criminal network operating out of China, Taiwan, and Malaysia." FAC ¶ 9. The network now faces criminal charges and civil forfeiture proceedings. *See id.*[1] Plaintiffs claim the "scammers . . . target[ed] victims" with Facebook and Instagram ads promoting "investment clubs" with access to stock recommendations, often featuring celebrities and touting high returns. *Id.* ¶¶ 10, 64-70.

Plaintiffs claim the scammers used several Meta tools, available to any advertiser, to create and publish their ads. The scammers allegedly used Meta's "Flexible Format tool," FAC ¶¶ 118-119, which optimizes ad formats (e.g., by displaying a single image, video, or collection of images) based on the ad placement (e.g., whether the ad is shown on Facebook or Instagram). Dkt. 26-5 at 1. The scammers also allegedly used Meta's "Dynamic Creative tool," which purportedly "mixes and matches" advertiser-provided videos, images, and text to "allow [the advertiser] to automatically create personalized creative variations" of its ads. FAC ¶ 120; Dkt. 26-4 at 1. And the scammers allegedly used Meta's "Advantage+ Creative tool," which uses artificial intelligence to add "creative enhancements" to the images, text, and video an advertiser uploads. FAC ¶ 121; Declaration of Tammy Walmsley ("Walmsley Decl.") Ex. A. No tool is alleged to create any content on its own; instead, each optimizes advertiser-provided material. Meta's Terms allow users to control both "the types of information . . . use[d] to determine which ads" they see and "the types of ads and advertisers [they] see." FAC Ex. A at 6; Dkt. 26-3 at 5 (§ 2).[2]

---

[1] *See also United States v. Cedric et al.*, No. 1:25-cr-00161 (N.D. Ill.); *United States v. Funds in the Amount of $19,901,190.42 Seized From Company A Account Number XXXX9087 Held in the Name of Lim Xiang Jie Cedric*, No. 1:25-cv-02965 (N.D. Ill.).

[2] These pages are quoted and relied on in the Complaint, *see* FAC ¶¶ 31, 119-122, and are therefore incorporated therein by reference. *See Alamilla v. Hain Celestial Grp.*, 30 F. Supp. 3d 943, 944 (N.D. Cal. 2014).  The language that appears on some of these pages has changed since Plaintiffs filed the FAC, but none of those changes are material to this motion.

Plaintiffs allegedly clicked on the ads and were then either "automatically added into" or "invited to click an embedded link to join" a "private WhatsApp group," where they interacted with "purported financial advisor[s]." FAC ¶¶ 71-72. WhatsApp is "an end-to-end encrypted service allowing for private communications among its users." *Id.* ¶ 27. The advisors supposedly built trust with Plaintiffs "over a period of months" and, on January 22, 2025, recommended purchasing shares of CLEU at specified prices, driving up CLEU's stock price. *Id.* ¶¶ 76-77, 80-81. While group members bought stock, certain alleged co-conspirators, who had previously acquired large shares of undisclosed CLEU shares in a secret offering, sold at inflated prices. *Id.* ¶ 83. The scheme collapsed on January 30 when the market learned of the undisclosed shares and CLEU's stock price plummeted, causing Plaintiffs to lose their investments. *Id.* ¶¶ 84-93.

The Complaint offers no nonconclusory allegations that Meta was aware of the fraudulent nature of the CLEU ads or could see or review the scammers' encrypted WhatsApp communications before CLEU's stock collapsed in January 2025.[3]

## ARGUMENT

Plaintiffs' claims are barred by Section 230 and fail on the merits.

## I.    PLAINTIFFS' CLAIMS ARE BARRED BY SECTION 230

Plaintiffs' attempts to circumvent Section 230 remain insufficient. Section 230 provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider," 47 U.S.C. § 230(c)(1), and prohibits liability "under any State or local law that is inconsistent with this section," *id.* § 230(e)(3). "In short, § 230 protects apps and websites which receive content posted by third-party users (i.e., Facebook, Instagram, . . . , etc.) from liability" for such content. *Est. of Bride ex rel. Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1175 (9th Cir. 2024). Section 230's "robust" protections "appl[y] to '(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider.'" *Id.* (quoting *Barnes v. Yahoo!,*

[3] Plaintiffs allege in one stray paragraph that "the scammers … continue[d] their stock market manipulation scheme" after January 2025, FAC ¶ 116, but limit their claims to the scheme that concluded in January 2025, *e.g.*, *id.* ¶ 136.

*Inc.*, 570 F.3d 1096, 1100-1101 (9th Cir. 2009)). Each prong is satisfied here.

### A.     Meta Is An Interactive Computer Service Provider

Meta is an interactive computer service provider. *See, e.g.*, *Dangaard v. Instagram, LLC*, 2022 WL 17342198, at *4 (N.D. Cal. Nov. 30, 2022) (Meta "certainly provide[s] interactive computer services" via Facebook); *Sikhs for Just. "SFJ", Inc. v. Facebook, Inc.*, 144 F. Supp. 3d 1088, 1093 (N.D. Cal. 2015) (similar); *see also Rigsby v. GoDaddy Inc.*, 59 F.4th 998, 1007 (9th Cir. 2023) (term "interactive computer service" has a "relatively expansive definition" and "'has been construed broadly to effectuate the statute's speech-protective purpose'").

### B.     Plaintiffs' Claims Would Impose Liability On Meta As A Publisher

Each of Plaintiffs' claims "inherently requires the [C]ourt to treat [Meta] as the 'publisher or speaker' of content provided by another.'" *Barnes*, 570 F.3d at 1102. A claim satisfies this second prong where it seeks to impose liability for "reviewing, editing, and deciding whether to publish or withdraw from publication third-party content." *Id.*; *see also Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1170-1171 (9th Cir. 2008) ("[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230."). Here, each claim seeks to hold Meta liable for "allow[ing] ads by the CLEU scammers." FAC ¶ 106.

Plaintiffs' aiding-and-abetting fraud claim (Count I) seeks to hold Meta liable for "provid[ing] the platforms necessary to conduct the fraud" and "select[ing] . . . the content . . . shown to specific users." FAC ¶ 149. Their negligence claim (Count V) faults Meta for providing the tools the scammers used to "generat[e], manipulat[e], and enhanc[e] fraudulent content used in the ads," failing to "identify and remove the ads" at issue, generally "failing to . . . monitor, detect, and remove investment scam ads," and "targeting"—that is, publishing—those ads to particular users. *Id.* ¶¶ 176-177. Plaintiffs' "failure to warn" theory does not change this conclusion: the Ninth Circuit has held that such claims "essentially fault[]" the provider "for not moderating content in some way." *See Est. of Bride*, 112 F.4th at 1180. The Unruh Act claim (Count VI) seeks to hold Meta liable for "serv[ing] to Facebook and Instagram users" the scam ads. FAC ¶ 184. The unjust enrichment claim (Count VII) similarly targets Meta's alleged failure

to "prevent the creation of scam advertisements and to monitor, detect, and remove scam ads." *Id.* ¶ 193. Each claim requires treating Meta as the publisher of the scam ads and hinges on Plaintiffs' disagreement with Meta's "deci[sion] whether to publish or withdraw from publication" those ads. *Cf. Barnes*, 570 F.3d at 1102.

Section 230 also bars Plaintiffs' claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and promissory estoppel (Count II, III, and IV) because Plaintiffs have not plausibly alleged any enforceable promises. Section 230 does not bar claims enforcing contractual or quasi-contractual promises *only* where a defendant is plausibly alleged to have "manifested its intent to be legally obligated to" take certain content-moderation actions. *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 743 (9th Cir. 2024). To avoid Section 230, a contract claim must target a "specific promise or representation," not a "'failure to take certain moderation actions.'" *Doe v. Grindr Inc.*, 128 F.4th 1148, 1154 (9th Cir. 2025), *cert. denied* No. 24-1202 (U.S. Oct. 14, 2025). A "general monitoring policy" does not create enforceable contract obligations. *Barnes*, 570 F.3d at 1108; *see also Prager Univ. v. Google LLC*, 85 Cal. App. 5th 1022, 1036 (2022) (citing *Murphy v. Twitter, Inc.*, 60 Cal. App. 5th 12, 29-30 (2021)) (Section 230 "forecloses liability where plaintiffs have identified no enforceable promise allegedly breached").[4]

Plaintiffs' contract, implied covenant, and promissory estoppel claims hinge on language that does not reflect any intent by Meta to create enforceable promises. Plaintiffs cite Meta's Community Standards stating it "'does not allow' investment scam ads." FAC ¶¶ 154, 168. Far from a promise to remove all violative content, however, the quoted page uses aspirational language that Meta "aim[s]" to protect its users from deceptive content by "removing content and combatting behavior." FAC Ex. B at 1. *See Morton v. Twitter, Inc.*, 2021 WL 1181753, at *5 (C.D. Cal. Feb. 19, 2021) (site's content policies were "merely aspirational statements," not promises to

---

[4] Judge Davila recently certified for interlocutory review a decision observing that "for the defendant to take down third-party content" even as part of fulfilling a promise, "it would seem that the defendant must monitor the third-party content. … And if that were so, Section 230 immunity should apply under *Calise*." *In re Apple Inc. App Store Simulated Casino-Style Games Litig.*, 2025 WL 2782591, at *21 (N.D. Cal. Sept. 30, 2025). Here, Plaintiffs' contract, implied covenant, and promissory estoppel claims are further barred by Section 230, regardless of whether Plaintiffs plausibly alleged the existence of an enforceable promise, because these claims would require Meta to monitor and remove the challenged ads.

remove content). Further, Meta's Terms clarify that the Standards are "guidelines outlin[ing] [Meta's] standards regarding the content *you* [the user] post to Facebook and *your* activity on Facebook and other Meta Products"—not Meta's obligations. FAC Ex. A at 13 (§ 5).[5] "[M]erely stating that Facebook does not allow users to post harmful content and that they will remove [such content]" is "mere[ly] 'a general monitoring policy" insufficient to evade Section 230. *Lloyd v. Facebook, Inc.*, 2022 WL 4913347, at *9 (N.D. Cal. Oct. 3, 2022); *Kennedy v. Meta Platforms Inc.*, 2024 WL 4565091, at *3 (N.D. Cal. Oct. 23, 2024) (similar); *Young v. Facebook, Inc.*, 2010 WL 4269304, at *3 (N.D. Cal. Oct. 25, 2010) (Terms "place restrictions on users' behavior" but "do not create affirmative obligations"); *accord King v. Facebook, Inc.*, 2019 WL 6493968, at *2 (N.D. Cal. Dec. 3, 2019), *aff'd*, 845 F. App'x 691 (9th Cir. 2021); *cf. Shared.com v. Meta Platforms, Inc.*, 2022 WL 4372349, at *3 (N.D. Cal. Sept. 21, 2022) ("[O]utlin[ing] a set of criteria for suspending accounts . . . simply restates Meta's ability to exercise editorial discretion.").[6]

Plaintiffs also cite Terms language that Meta's services include "[p]romot[ing] the safety, security, and integrity of [its] services" and "combat[ting] harmful conduct and keep[ing] our community of users safe." FAC ¶ 96. But the Terms explain this means that Meta employs teams, works with third parties, and develops advanced technical systems to identify circumstances where it "*may* be able to help." *Id.* Meta states it "*may* take appropriate action," which "*may* include" removing content or disabling accounts—language the FAC repeatedly quotes without the word "may." *Compare id. with id.* ¶¶ 113, 154. This qualified language "simply restates Meta's ability to exercise editorial discretion," and does not reflect an intent to create an enforceable promise. *Shared*, 2022 WL 4372349, at *3. Section 230 bars Plaintiffs' claims based on a general monitoring policy, rather than any "specific promise." *Grindr*, 128 F.4th at 1154.

Moreover, Meta "disclaim[ed] any intention to be bound" by these purported promises, negating any possible argument that its general policy is an enforceable promise. *Barnes*, 570 F.3d

---

[5] Emphasis added and internal citations omitted throughout, unless otherwise noted.

[6] Other provisions of Meta's policies that Plaintiffs claim created enforceable promises also use qualified, discretionary language. For example, Meta's Advertising Standards stating that "Ads Must Comply" with the standards, FAC ¶ 103, appears on a page, incorporated by reference in the FAC, that also says review of advertisements "*may* result in advertising restrictions" and expressly notes that Meta's "review process may not detect all policy violations," Walmsley Decl. Ex. B.

at 1108. Meta's Terms state that it "make[s] no guarantees that [its Products] will always be safe, secure, or error-free," "do[es] not control or direct what people and others do or say," and is not "responsible for their actions or conduct (whether online or offline) *or any content they share* (including offensive, inappropriate, obscene, unlawful, and other objectionable content)." FAC Ex. A at 11 (§ 4.3). This disclaimer aligns with Congress's intent in § 230 "to ensure that service providers are not held responsible for content provided by third parties." *Noah v. AOL Time Warner, Inc.*, 261 F. Supp. 2d 532, 545 (E.D. Va. 2003); *Zeran v. America Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997). Given this express disclaimer, Plaintiffs have not plausibly alleged that Meta "manifested its intent to be legally obligated to . . . combat scam advertisements." *Calise*, 103 F.4th at 743. Because their claims thus seek to hold Meta liable not as a promisor, but as a publisher that allegedly failed to moderate harmful content, they satisfy Section 230(c)(1)'s second prong.[7]

## C.    Meta Did Not Materially Contribute To The Ads' Unlawfulness

Section 230's third prong is satisfied because Plaintiffs do not plausibly allege Meta was "responsible, in whole or in part, for the creation or development of" the challenged ads. 47 U.S.C. § 230(f)(3). A defendant "develop[s]" content by "'materially contributing to its alleged unlawfulness.'" *Planet Green Cartridges, Inc. v. Amazon.com, Inc.*, 2025 WL 869209, at *1 (9th Cir. Mar. 20, 2025). The "crucial distinction" is "'between, on the one hand, taking actions (traditional to publishers) that are necessary to the display of unwelcome and actionable content, and, on the other hand, responsibility for what makes the displayed content illegal or actionable.'" *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1099 (9th Cir. 2019).

This prong cannot be evaded by claiming Meta "merely . . . augment[ed] the content generally," *Roommates*, 521 F.3d at 1167-1168, or "facilitated the expression of information by individual users," *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1124 (9th Cir. 2003). Nor is it enough that Meta "provid[ed] tools" used by "third parties for unlawful purposes." *Calise*, 103

---

[7] Judge White's recent decision in *Calise v. Meta Platforms, Inc.*, No. 21-cv-06186 (N.D. Cal. Sept. 22, 2025), Dkt. 62, is not to the contrary. There, among other distinctions, the Court considered a prior version of Meta's Terms, which stated that Meta "*will* take appropriate action" not that it "may," and language in a prior version of Meta's Community Standards stating "[Meta] remove[s] content," without clarifying that it merely "aim[s]" to. *Id.* at 1-2. The Court relied on this different language in rejecting Meta's argument that it had expressly disclaimed any obligation to remove third-party content. *Id.* at 6-7.

F.4th at 745. A provider also does not materially contribute to the unlawfulness of content by using features or functions like algorithms to analyze user posts, recommend groups, or match users, which are tools "meant to facilitate the communication and content of others,'" and are "not content in and of themselves." *Grindr*, 128 F.4th at 1153; *see also Estate of Bride*, 112 F.4th at 1181 ("automated processes . . . in the site's algorithm were not . . . content"). Meta "is immune from liability for the alleged third-party abuses of its" neutral, generally available ad tools. *Doe 1 v. Twitter, Inc.*, 148 F.4th 635, 646 (9th Cir. 2025).

Despite the FAC's addition of conclusory allegations that Meta "created" or "materially contributed" to the ads, *e.g.*, FAC ¶¶ 1, 3, 8, Plaintiffs offer no *facts* showing that Meta contributed to what made the ads unlawful—i.e., that the ads were "fraudulent," "scam[s]," or "violated [Meta's] policies" against deceptive content. *Id.* ¶¶ 148, 154, 164, 168, 177, 182, 192. Instead, Plaintiffs point to neutral tools available to any advertiser, each of which optimizes content *provided by the advertiser*. *First*, Meta's Flexible Format tool allows advertisers to "automatically optimize [their] ad format." Dkt. 26-5 at 1. Using this tool, advertisers—not Meta—select the media and the text for their ad. *Id.* (advertiser "can group certain media, such as images and videos, with different combinations of texts, allowing *you* to customize *your ads*"). *Second*, the Dynamic Creative tool allows advertisers to display different ad media and components to different users based on the users' internet-browsing activity. FAC ¶ 120. This tool produces "creative variations . . . only based on the media and ad components [an advertiser] provide[s]." Dkt. 26-4 at 1. *Third*, the Advantage+ Creative tool optimizes ad components like "[the advertiser's] images and video" and "[t]he media and text [the advertiser] upload[s]," using "ad formats or placements [the advertiser] select[s]," FAC ¶ 121; Walmsley Decl. Ex. A at 1. As Plaintiffs acknowledge, "the *scammers* . . . target[ed] victims" using "Meta's advertising tools," FAC ¶ 10, which requires advertisers to provide the content that the tools then optimize, *id.* ¶ 125.

Plaintiffs fail to plausibly allege these neutral tools materially contributed to the ads' unlawfulness. As in *Calise*, Meta's ad tools are "on their face, neutral. They are allegedly used for unlawful purposes, but that does not result from Meta's efforts." 103 F.4th at 745. At most, Plaintiffs claim Meta's tools applied the same, neutral optimization features to the scammers' ads

as they would to any advertiser's content. Although the tools "facilitated the expression of information"—in Plaintiff's words, "maximizing the[ ads] reach and effectiveness," FAC ¶ 8—"the selection of the content was left exclusively to the [advertiser]." *Carafano*, 339 F.3d at 1124. Meta does not materially contribute to the unlawfulness of content where "no [advertisement] has any content until a user actively creates it." *Id.*

*Forrest v. Meta Platforms, Inc*, 737 F. Supp. 3d 808 (N.D. Cal. 2024), is not to the contrary. There, the court found that the plaintiff failed to allege how Meta's tools contributed to the ads, leaving a factual dispute as to whether "the tools themselves contributed to the *content* of the ads, including to the aspects of the content that are allegedly illegal." *Id.* at 818. Here, the allegedly illegal content—fraudulent investment advice—was provided by the "advertisers," not Meta. *See* FAC ¶ 125. Plaintiffs repeatedly allege they were "targeted with ads *by the CLEU scammers*"—not Meta. *Id.* ¶¶ 127-129. And it was the "scammers"—not Meta—that "posed as financial advisors" in private WhatsApp group chats and "encouraged victims to purchase securities." *Id.* ¶ 11. Courts, including the Ninth Circuit post-*Forrest,* have held that "content-neutral" features like Meta's advertising tools are protected by Section 230, even when misused. *See Grindr*, 128 F.4th at 1152-1153 (quoting *Dyroff*, 934 F.3d at 1098); *Doe 1*, 148 F.4th at 646.

Plaintiffs' discrimination allegations—relevant, if at all, only to their Unruh Act claim—do not alter Section 230's applicability. Plaintiffs do not allege that the scammers targeted or excluded particular groups; rather, they contend *all* users exposed to the ads likely saw an endorser of the same racial or ethnic background as the user. *Infra* Part II.D. But even if Plaintiffs had alleged targeting of particular groups, Section 230 would still bar their claims. The Ninth Circuit has consistently held that Section 230 bars claims based on a provider's neutral tools matching or targeting harmful conduct to particular users, even where the targeting *itself* was alleged to be unlawful. *See Doe 1*, 2025 WL 2178534, at *7 (Section 230 barred claims despite allegations Twitter failed to prevent hashtags allegedly used "specifically for . . . [child pornography]"); *Grindr*, 128 F.4th at 1153 (same for claim that neutral match-making tools were not designed to prevent minors from matching with predators); *Dyroff*, 934 F.3d at 1099 (same, matching drug seekers with dealers). By contrast, cases rejecting Section 230 involved allegations that certain

groups were allegedly *excluded* from seeing third-party content or that the provider's tools were not neutral. *See, e.g.*, *Roommates*, 521 F.3d at 1169-1170 ("[T]he act of hiding certain listings is *itself unlawful* under the [FHA][.]"); *Liapes v. Facebook, Inc.*, 95 Cal. App. 5th 910, 922-924, 930 (2023) (alleging "difficult[y] for individuals with certain protected characteristics to find or access insurance ads"); *Vargas v. Facebook, Inc.*, 2023 WL 6784359, at *2-3 (9th Cir. Oct. 13, 2023) (similar). Plaintiffs' claims resemble the former set: they allege injury from exposure to allegedly harmful third-party content (fraudulent ads), not exclusion from it. And demographic-based advertising is a neutral tool with many lawful uses. *See infra* 22. As in *Dyroff*, *Doe 1*, and *Grindr*, Plaintiffs cannot evade Section 230 by alleging Meta's tools were used to tailor content to them.

The third prong is thus satisfied: Plaintiffs allege only that Meta provided "neutral features" "meant to facilitate the communication and content of others," *Grindr*, 128 F.4th at 1153, which the scammers misused for unlawful purposes. Because each of their claims seeks to hold Meta liable as a publisher of third-party content, Section 230 requires that the FAC be dismissed.

## II.    PLAINTIFFS' CLAIMS FAIL ON THE MERITS

### A.    Plaintiffs Fail To Adequately Allege Aiding And Abetting Fraud (Count I)

Plaintiffs' aiding and abetting fraud claim remains deficient. Under California law, aiding and abetting fraud requires either (a) actual knowledge of another's breach of duty and substantial assistance or encouragement of that breach, or (b) substantial assistance to another in a tortious result where the defendant's own conduct breaches a duty. *Musk v. OpenAI, Inc.*, 2025 WL 1482386, at *5 (N.D. Cal. May 1, 2025). Here, Plaintiffs allege only the former but fail to make the requisite showing. *See* FAC ¶¶ 148-150 ("Meta gave substantial assistance to the CLEU scammers" and "knew the scammers were engaged in fraud.").[8]

***First,*** Plaintiffs fail to allege that Meta had "actual knowledge" of the CLEU scammers' fraudulent scheme. *Diaz v. Intuit, Inc.*, 2018 WL 2215790, at *6 (N.D. Cal. May 15, 2018) (quoting *In re First Alliance Mortg. Co.*, 471 F.3d 977, 993 (9th Cir. 2006)). Under California law, "a mere suspicion that the fraudulent actor is behaving unlawfully" is not enough. *Zahabi v.*

---

[8] To the extent the FAC could be read to plead a claim under the second prong, it too would fail, because Plaintiffs allege no enforceable duty (or any breach). *Supra* Part I.B; *Infra* Parts II.B, C.

*Bank of America, N.A.*, 2012 WL 12920507, at *5 (N.D. Cal. July 16, 2012). And the alleged aider-and-abettor must have the requisite knowledge "at the time" it allegedly acted in furtherance of the primary wrong. *See Diaz*, 2018 WL 2215790, at *7.

*Diaz* is informative. There, Intuit was alleged to have aided and abetted fraud by third parties who used its online tax software Turbotax to open fraudulent accounts and file fraudulent tax returns. *See* 2018 WL 2215790, at *1. The plaintiffs alleged that internal documents and "widely reported data breaches" showed Intuit knew about the fraud but failed to implement better security measures. *See id.* at *1-2. Those allegations were insufficient, because although "Plaintiffs allege[d] that Intuit generally knew tax fraud was occurring on a massive scale every year through TurboTax," Plaintiffs did not allege "'actual knowledge of the specific primary wrong' against [them].'" *Id.* at *6. Here, Plaintiffs likewise purport to allege Meta "actually knew the scammers were engaged in fraud" by alleging only that Meta had previously been alerted to *other* similar alleged scams, including through "prior lawsuits and reports." FAC ¶ 150. That is insufficient. General knowledge that some are using Meta's tools to commit fraud does not suffice; rather, Plaintiffs must plead that "[Meta] knew of the 'specific wrongful acts' of fraud by the [CLEU scammers] at the relevant time." *Bradshaw v. SLM Corp.*, 652 F. App'x 593, 594 (9th Cir. 2016).

The FAC pleads no facts suggesting Meta had actual knowledge of CLEU's alleged fraud "at the time" Meta allegedly acted in furtherance of that fraud by not preventing the scammers from using Meta's tools to create, develop, and target ads, and by not removing the scammers' ads shown to Plaintiffs. *See Diaz*, 2018 WL 2215790, at *7 (no actual knowledge where plaintiffs did not allege defendant was aware of fraudulent activity "at the time" it engaged in related conduct). Though Plaintiffs do not allege specifically when they saw and clicked on the allegedly fraudulent ads, they do allege that the "scammers" first recommended purchasing CLEU stock "months" later, on January 22, 2025—suggesting that Plaintiffs clicked on the allegedly fraudulent ads in late 2024. FAC ¶¶ 76-77. They then allege that the CLEU stock price fell, and Plaintiffs suffered corresponding losses, on January 30, 2025. *Id.* ¶¶ 84-85; *see also id.*, ¶¶ 20-24 (alleging that each Plaintiff "was led to purchase shares of CLEU between January 22 and 30"). But the FAC alleges that unidentified users only "reported" posts associated with the alleged CLEU fraud in February

2025 at the earliest—*months after* Plaintiffs saw the allegedly fraudulent ads and, indeed, after the alleged investment fraud was completed and any of the Plaintiffs suffered any losses. *See id.* ¶¶ 114-115, 136. That is not knowledge "at the relevant time." *Bradshaw*, 652 Fed App'x at 594; *see also S&S Worldwide, Inc. v. Wells Fargo Bank*, 509 F. Supp. 3d 1154, 1166 (N.D. Cal. 2020) (no actual knowledge without "facts to support a finding that, *prior to or at the time of* the [wrongful conduct], [defendant] had actual knowledge of [the third party's] scheme").

Nor do Plaintiffs plausibly allege that Meta knew of the purported fraud from delivering the third-party ads. *See, e.g.*, *Nevis v. Wells Fargo Bank*, 2010 WL 11636091, at *6 (N.D. Cal. Jan. 13, 2010) (aiding and abetting claim dismissed where the "complaint d[id] not allege with the requisite specificity that [defendant] knew that [the third party] was making objective misrepresentations"); *see also Hubbard v. Google LLC*, 2025 WL 82211, at *18 (N.D. Cal. Jan. 13, 2025) (failure to "connect" the provision of services to "knowledge that doing so would contribute to the wrongful" conduct "does not lead to a reasonable inference of actual knowledge"). Plaintiffs never allege that Meta knew these specific ads were fraudulent. Plaintiffs likewise do not allege Meta had knowledge of the fraudulent scheme executed over WhatsApp, where Plaintiffs allege the CLEU scammers communicated with them for months. *See* FAC ¶¶ 72-79. As Plaintiffs concede, *id.* ¶ 27, the fraudulent, third-party communications took place on WhatsApp, "an encrypted communication service" through which "every type of communication . . . can be viewed *only* by the intended recipient," *WhatsApp Inc. v. NSO Grp. Tech. Ltd.*, 17 F.4th 930, 933 (9th Cir. 2021), and Plaintiffs do not allege that Meta knew about these statements. Thus, *a fortiori*, Plaintiffs fail to allege that Meta knew these scammers were using WhatsApp to "unload[]" shares of stock from a "secret offering" not disclosed to the market. *See* FAC ¶¶ 83-84.

Because the FAC does not—and cannot—plead factual allegations showing Meta actually knew the third-party scammers were engaged in the alleged fraudulent activity, Plaintiffs' aiding and abetting fraud claim fails at the first step—actual knowledge—and should be dismissed.

***Second,*** Plaintiffs fail to plausibly allege Meta knowingly or purposefully assisted the underlying fraud, as they must, to allege "substantial assistance." "[T]he substantial assistance prong of a claim for aiding and abetting fraud must be pled with heightened specificity." *Marcelos*

*v. Dominguez*, 2008 WL 2788173, at \*9 (N.D. Cal. July 18, 2008). "'Substantial assistance requires a significant and active, as well as a knowing participation in the wrong[.]'" *Pratt v. Higgins*, 2023 WL 4564551, at \*10 (N.D. Cal. July 17, 2023). Plaintiffs must allege Meta "'reach[ed] a conscious decision to participate in tortious activity for the purpose of assisting another in performing a wrongful act.'" *Barrett v. Apple Inc.*, 523 F. Supp. 3d 1132, 1145 (N.D. Cal. 2021).

Plaintiffs do not plausibly allege Meta "acted to aid the primary tortfeasor '*with knowledge of the object to be attained*.'" *Casey v. U.S. Bank Nat. Assn.*, 127 Cal. App. 4th 1138, 1146 (2005). They fail to allege Meta even knew *of* the fraud, *supra* 11-13, and thus do not allege Meta knew its services were *assisting* in that fraud's commission. *Id.* at 1152 (banks that lacked knowledge of conduct "did not know that [their services] . . . w[ere] assisting [in] . . . the primary violation"). Nor do Plaintiffs' allegations regarding Meta's advertising tools—e.g., that the "tools . . . created and developed hundreds of fraudulent advertisements used by the scammers," FAC ¶ 148—cure this defect. "Ordinary business transactions may satisfy the substantial assistance element if the defendant *actually knew* those ordinary transactions assisted the commission of the specific tort." *In re Mortg. Fund '08 LLC*, 527 B.R. 351, 365 (N.D. Cal. 2015). Knowledge is the crucial element, and Plaintiffs do not allege Meta "'actually knew [its conduct] w[as] assisting . . . in committing a specific tort.'" *In re First Alliance Mortg. Co.*, 471 F.3d at 995.

Plaintiffs also fail to plausibly allege Meta "'reached a conscious decision to participate' in the [fraud]," *Barrett*, 523 F. Supp. 3d at 1145, or acted with "the purpose of assisting another in performing a wrongful act," *Howard*, 2 Cal. App. 4th at 749. Rather, they assert only "failure to act allegations . . . insufficient to establish substantial assistance for purposes of aiding and abetting liability." *Diaz*, 2018 WL 2215790, at \*8. *Barrett* is instructive. The plaintiffs there claimed Apple aided and abetted tortious scams using iTunes gift cards by "transferr[ing] payments to parties it knew or could have known were engaging in unlawful activity, . . . retain[ing] funds it knew or could have known were received because of unlawful activity, and . . . ma[king] misleading or false statements regarding its ability to respond to unlawful activity." 523 F. Supp. 3d at 1145. Despite claims that Apple "knew that the gift card scams were illegal yet

processed payments associated with the scams anyway," the plaintiffs failed to plead substantial assistance because they "d[id] not allege that Apple gave any specific authorization to the [alleged scammers] *other than the authorization granted to all Apple Developers and Apple IDs*." *Id.* at 1148. Instead, Apple merely "failed to revoke previously granted authorizations." *Id*. That "failure[] to act . . .  fail[ed] to show a 'conscious decision to participate.'" *Id.* at 1149; *see also Diaz*, 2018 WL 2215790, at *8.

Plaintiffs cannot evade this conclusion based on Meta's generally available advertising tools. *See Barrett*, 523 F. Supp. 3d at 1145; *Diaz*, 2018 WL 2215790, at *8. Plaintiffs acknowledge that "*[t]he CLEU scammers used* these advertising tools to deploy an array of advertisements" to users. FAC ¶ 123. Nor do allegations that Meta was generally financially incentivized to host ads from Chinese advertisers, *id.* ¶¶ 48-51, suffice to show Meta consciously decided to participate in the CLEU scheme; Plaintiffs make no effort to tether these general allegations to the CLEU scheme, and admit that 70% of such ads are not fraudulent. *Id.* ¶ 49. Meta's alleged involvement consists of not preventing the scammers from using Meta's neutral tools to create their ads, not "remov[ing] the ads . . . [,] implement[ing] safeguards to prevent them from recurring," or limiting access to the tools that third-party scammers "used . . .  to deploy" the ads. *Id.* at ¶¶ 113, 123. Plaintiffs cannot pin aiding and abetting liability on Meta for merely not revoking access to services "granted to all [advertisers]." *Barrett*, 523 F. Supp. 3d at 1148. Such "failure to act allegations . . .  are insufficient to establish substantial assistance." *Diaz*, 2018 WL 2215790, at *8.

**B. Plaintiffs Fail To Adequately Allege Breach Of Contract (Count II), Breach Of The Implied Covenant Of Good Faith And Fair Dealing (Count III), Or Promissory Estoppel (Count IV)**

**1. Plaintiffs fail to plausibly allege an enforceable promise.**

Plaintiffs' contract, implied covenant, and promissory estoppel claims each fail because Plaintiffs do not identify an enforceable promise that Meta breached. "[B]reach of contract may be established on the basis of either an express provision of the contract or on the implied covenant of good faith and fair dealing." *Kroetch v. BAC Home Loan Servs.*, 2011 WL 4502350, at *3 (N.D. Cal. Sept. 27, 2011). "[T]o state a claim for breach of an implied covenant of good faith and fair

dealing, the specific contractual obligation from which the implied covenant . . . arose must be alleged." *Id.* This implied covenant "is limited to assuring compliance with the express terms of the contract, and cannot be extended to create obligations not contemplated by the contract." *Id.* And among other elements of a promissory estoppel claim, Plaintiffs must allege "a promise clear and unambiguous in its terms." *Oster v. Caithness Corp.*, 2017 WL 3727174, at * 13 (N.D. Cal. Aug. 30, 2017).

Plaintiffs identify three purported promises supporting those claims: "[1] that Meta 'does not allow' investment scam ads, [2] has processes in place to review advertisements for compliance with Meta's policies, and [3] will 'take appropriate action' when it becomes aware of content that violates its policies." FAC ¶¶ 154, 163, 168. As set forth in detail above, *supra* 6-8, none of these supposed promises manifest any intention by Meta to create enforceable obligations.

The statement that Meta "does not allow" deceptive content is coupled with "aspirational statements," *Morton*, 2021 WL 1181753, at *5, that Meta "aim[s]" to combat and remove such content—not that it promises to do so. *Supra* 6-7. And this language is found in Meta's Community Standards, which establish standards for users' behavior—not Meta's. *Id.* "[M]erely stating that Facebook does not allow users to post harmful content and that they will remove [such content] is mere[ly] 'a general monitoring policy'"—not a "'promise [made] with the constructive intent that it be enforceable.'" *Lloyd*, 2022 WL 4913347, at *9. As for the purported promise that Meta would have processes in place to review advertisements as a general matter—which Plaintiffs nowhere allege Meta failed to do, only that the processes did not result in the removal of the specific content at issue—Meta's Terms are explicit that these processes are used to identify where Meta "*may* be able to help." *Supra* 7. And Plaintiffs truncate the third purported promise, obscuring that Meta's Terms state that Meta "*may* take appropriate action," which "may include" content or account moderation. *Id.* In other words, each of these supposed promises, at most, "simply restates Meta's ability to exercise editorial discretion," rather than establishing an enforceable promise. *Shared*, 2022 WL 4372349, at *3.

If there were any doubt that these statements fell short of creating enforceable promises, Meta's Terms would eliminate it. The Terms state that Meta "make[s] no guarantees that [its

Products] will always be safe, secure, or error-free," Meta "do[es] not control or direct what people and others do or say, and [Meta] is not responsible for their actions or conduct (whether online or offline) or any content they share (including offensive, inappropriate, obscene, unlawful, and other objectionable content)." FAC Ex. A at 11-12 (§ 4.3). That "express disclaimer" is fatal to Plaintiffs' breach-of-contract claim. *See Young*, 2010 WL 4269304, at *3 (dismissing breach of contract claim where similar disclaimer in Facebook's terms undermined the alleged promise to remove certain content); *see also Damner v. Facebook Inc.*, 2020 WL 7862706, at *7 (N.D. Cal. Dec. 31, 2020); *Barfuss v. Live Nation Ent., Inc.*, 2025 WL 1843207, at *5 (C.D. Cal. May 14, 2025).

Plaintiffs accordingly fail to plausibly allege "any express contractual provision that was breached," *Curl v. CitiMortgage, Inc.*, 2014 WL 5321063, at *2 (N.D. Cal. Oct. 17, 2014) (collecting cases), dooming their breach of contract claim (Count II). For the same reasons, Plaintiffs fail to identify "a promise clear and unambiguous in its terms" that could support their promissory estoppel claim (Count IV). *Oster*, 2017 WL 3727174, at * 13. And Plaintiffs fail to identify "the specific contractual obligation from which the implied covenant of good faith and fair dealing" (Count III) allegedly arises, *Kroetch*, 2011 WL 4502350, at *3, instead alleging vaguely that "[t]he ToS contains enforceable promises that Meta made . . ., including, without limitation, the promises set forth above," FAC ¶ 163. It does not save this claim to allege Meta "frustrated" the "rights of Plaintiffs . . .  to be targeted only with advertisements that had been subjected to Meta's advertising review system and determined to comply with Meta's stated policies." *Id.* ¶ 164. Plaintiffs do not—and cannot—identify any contractual provision that establishes the purported "right" interfered with, and the implied covenant "cannot be extended to create obligations not contemplated by the contract." *Kroetch*, 2011 WL 4502350, at *3.

**2.    Plaintiffs' promissory estoppel claim is independently deficient.**

Plaintiffs' promissory estoppel claim fails for two additional reasons. *First*, "[u]nder California law, a plaintiff 'cannot state a claim for promissory estoppel [where] a valid contract, supported by consideration, governs the same subject matter as the alleged promise.'" *Realtek Semiconductor Corp. v. LSI Corp.*, 2013 WL 4778140, at *1 (N.D. Cal. Sept. 6, 2013). Here, Plaintiffs allege "[t]he ToS constitute an agreement between Meta and [its] users . . . , including

Plaintiffs." FAC ¶ 95. And Plaintiffs effectively concede that the contract governs "the same subject matter" as their promissory estoppel claim, given that they identify, near-verbatim, the same purported promises supporting both claims. *See id.* ¶¶ 154, 168. That is fatal to their promissory estoppel claim.

*Second*, Plaintiffs fail to allege additional essential elements of their promissory estoppel claim. In addition to a "promise clear and unambiguous in its terms," which they have failed to allege, Plaintiffs must also allege that they relied on a purported promise and that their "reliance [was] both reasonable and foreseeable." *Oster*, 2017 WL 3727174, at *13. But Plaintiffs offer only conclusory allegations that their supposed reliance on the purported promises—which are not promises at all—was reasonable and foreseeable. *E.g.* FAC ¶ 170 ("Plaintiffs . . . reasonably relied on Defendant's promises when using Meta's products."). To the contrary, any reliance would have been neither reasonable nor foreseeable given Meta's express disclaimer of any obligation to remove potentially harmful third-party content. *Supra* 7-8.

### C.    Plaintiffs Fail To Adequately Allege Negligence (Count III)

Plaintiffs' negligence claim still suffers from the same deficiencies. They still fail to allege the "essential element" of duty. *Melton v. Boustred*, 183 Cal. App. 4th 521, 529 (2010). Duty "is not universal; not every defendant owes every plaintiff a duty of care," and it exists only "if the 'plaintiff's interests are entitled to legal protection against the defendant's conduct.'" *Brown v. USA Taekwondo*, 11 Cal. 5th 204, 213 (2021).

Here, Plaintiffs seek to impose a duty on Meta not for actions Meta took, but because Meta allegedly failed to prevent third-party scammers from using Meta's tools to defraud them. "When analyzing a duty of care in the context of third-party acts, California courts distinguish between 'misfeasance' and 'nonfeasance.'" *Dyroff*, 934 F.3d at 1100. Misfeasance is "when a defendant makes the plaintiff's position worse," while nonfeasance is "when a defendant does not help a plaintiff." *Id.* at 1100-1101. Only with misfeasance is "an ordinary duty of care" created "where none may have existed before." *Id.* Nonfeasance, by contrast, creates a duty only if there is a "special relationship." *Melton*, 183 Cal. App. 4th at 531; *see also Planet Green*, 2025 WL 869209, at *2 ("[O]ne 'who has not created a peril is not liable in tort merely for failure to take affirmative

action to . . . protect another' from the acts of a third party, absent a special relationship.").

Plaintiffs allege only nonfeasance. They allege Meta was negligent in providing generally available, content-neutral tools that "enhance[ed] fraudulent content used in the ads," and in failing to "prevent the creation of the ads," "identify and remove th[e] ads," "implement reasonable policies and procedures," and "warn . . . users of the risk . . . from . . . scam ads." FAC ¶¶ 176-178. In *Dyroff*, the Ninth Circuit held similar "content-neutral functions . . . did not create a risk of harm" nor made the Plaintiff "worse off," and thus constituted only nonfeasance. 934 F.3d at 1100-1101; *see also Planet Green*, 2025 WL 869209, at *2. No duty of care arises from merely providing "communication platform[s] . . . [that] do[] not by [themselves] create a risk of third-party misuse." *Ziencik v. Snap, Inc.*, 2023 WL 2638314, at *5 (C.D. Cal. Feb. 3, 2023). "No website could function if a duty of care was created when a website facilitates communication, in a content-neutral fashion, of its users' content." *Dyroff*, 934 F.3d at 1101. Plaintiffs' failure-to-warn theory does not change this conclusion. As in *Dyroff*, it is "misguided" to construe a "failure to warn claim" as "misfeasance." *Id.* at 1100; *see also, e.g., Doe No. 14 v. Internet Brands, Inc.*, 2016 WL 11824793, at *4 (C.D. Cal. Nov. 14, 2016) (website's alleged "fail[ure] to warn . . . users of the danger presented by the criminal acts of a third party" was nonfeasance).

Thus, to allege the existence of a duty, Plaintiffs must plausibly allege they had a "special relationship" with Meta. They do not. Courts have recognized only a few "special relationships" including those "between business proprietors . . ., restaurants, and bars, and their tenants, patrons, or invitees," "common carriers and passengers," "innkeepers and their guests," and "mental health professionals and their patients." *Delgado v. Trax Bar & Grill*, 36 Cal. 4th 224, 235-236 & n.14 (2005). These relationships "generally involve some kind of dependency or reliance." *Olson v. Children's Home Soc'y*, 204 Cal. App. 3d 1362, 1366 (1988). Here, Plaintiffs assert Meta has "a special relationship with Plaintiffs," FAC ¶ 174, but offer no factual allegations supporting that threadbare legal conclusion. For example, they do not allege—nor could they—that Meta's services create any heightened dependency. Instead, they allege only the standard website-user relationships that courts have repeatedly deemed insufficient to establish a "special relationship." *See Dyroff*, 934 F.3d at 1101; *Bogard v. TikTok Inc.*, 2025 WL 604972, at *9 (N.D. Cal. Feb. 24,

2025) (content-reporting mechanisms did not give rise to a "special relationship"); *Pirozzi v. Apple Inc.*, 913 F. Supp. 2d 840, 851-852 (N.D. Cal. 2012) (no "special relationship" merely because of Apple's "control over the user experience from development of the Apple Devices to selection of the Apps available at the Apps Store"); *Doe No. 14*, 2016 WL 11824793, at *4-6 (website had no "special relationship" with its users requiring website to warn users of known risk).

Plaintiffs' negligence claim is also barred by California's "economic loss rule" which "provides that 'there is no recovery in tort for negligently inflicted "purely economic losses," meaning financial harm unaccompanied by physical or property damage.'" *Gerber v. Twitter, Inc.*, 2024 WL 1354449, at *6 (N.D. Cal. Mar. 29, 2024) (quoting *Sheen v. Wells Fargo Bank, N.A.*, 12 Cal. 5th 905, 922 (2022)). The rule applies where, as here, "the parties are in contractual privity" and "the claim is not independent of the contract." *Id.* (quoting *Moore v. Centrelake Med. Grp., Inc.*, 83 Cal. App. 5th 515, 535 (2022)). "In application, this rule means that tort damages, such as 'damages for mental suffering and emotional distress[,] are generally not recoverable in an action for breach of an ordinary commercial contract in California." *White v. FCA US LLC*, 2022 WL 3370791, at *4 (N.D. Cal. Aug. 16, 2022) (quoting *Erlich v. Menezes*, 21 Cal. 4th 543, 558 (1998)).

Plaintiffs' negligence claim seeks to hold Meta liable for the same conduct that forms the basis for their contractual and quasi-contractual claims—i.e., for allegedly failing to "prevent the creation of" or "to identify and remove" the challenged ads. FAC ¶ 176. And the harm they allege resulted from this conduct was purely economic, amounting to money lost as a result of being induced to participate in the CLEU scammers' scheme and alleged resulting "mental suffering and emotional distress," *White*, 2022 WL 3370791, at *4. As in other cases alleging harm from allegedly fraudulent ads on Meta's services, Plaintiffs' negligence claim here fails under the economic loss rule. *See Calise*, No. 21-cv-06186, Dkt. 62 at 11-12.

**D.    Plaintiffs Fail To Adequately Allege A Violation Of The Unruh Civil Rights Act (Count VI)**

As before, Plaintiffs' claim under Cal. Civ. Code § 51 (the "Unruh Act") should be dismissed because Plaintiffs fail to allege intentional discrimination in the provision of "accommodations, advantages, facilities, privileges, or services." Cal. Civ. Code § 51(b). To state

a claim, Plaintiffs must allege they were "denied the full and equal accommodations, advantages, facilities, privileges, or services in a business establishment" and that a protected characteristic "was a motivating factor for this denial." *Birdwell v. AvalonBay Cmtys., Inc.*, 742 F. Supp. 3d 1024, 1045 (N.D. Cal. 2024). Additionally, because the Act prohibits only "intentional discrimination," a plaintiff must allege "'willful, affirmative misconduct.'" *Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 425 (9th Cir. 2014). Plaintiffs therefore must "allege, and show, more than the disparate impact of a facially neutral policy." *Id.* Here, Plaintiffs' Unruh Act claim should be dismissed because they fail to allege that Meta denied or provided unequal access to a public accommodation on account of their protected characteristics, or that any discrimination by Meta was willful.

### 1. Plaintiffs do not allege Meta denied or restricted access to a public accommodation.

Plaintiffs' claim fails because they still do not allege Meta denied or restricted their access to a public accommodation. The Unruh Act is not a freestanding prohibition against any discrimination. Instead, "a person suffers discrimination under the Act when the person presents himself or herself to a business with an intent to use its services but encounters an exclusionary policy or practice that prevents him or her from using those services." *White v. Square, Inc.*, 7 Cal. 5th 1019, 1023 (2019). For example, an Unruh Act claim may be adequately alleged where members of certain racial groups are required to pay only in cash while others are permitted to purchase items "on credit," or where "a male plaintiff visited several 'car washes on "Ladies' Day,"'" and was denied access to discount prices offered to female customers. *Id.* at 1026, 1030. As for websites, a violation of the Unruh Act requires, among other things, that the site's "terms and conditions exclude [the plaintiff] from full and equal access to its services." *Id.* at 1023; *accord Thurston v. Omni Hotels Mgmt. Corp.*, 69 Cal. App. 5th 299, 307 (2021). "[T]here is no support in statutes nor in the case law for a[n] Unruh Act claim where plaintiff . . . was not denied access to services." *Hardy v. California*, 2006 WL 563049, at *3 (N.D. Cal. Mar. 7, 2006).

Here, Plaintiffs do not plausibly allege they were denied access to any public accommodation. They do not allege they were denied or restricted access to Meta's services—

based on their race or any other reason. Nor do they allege they were denied or restricted from accessing ads on Meta's services. This failure to allege exclusion under Meta's Terms from "full and equal access to [Meta's] services" dooms their Unruh Act claim. *White*, 7 Cal. 5th at 1023.

Plaintiffs also do not allege that race or ethnicity determined *whether* they encountered one of the "fraudulent advertisements." *See* FAC ¶¶ 182-187. In alleging the ads "were disproportionately served to Facebook and Instagram users with racial or ethnic backgrounds matching those of the purported investors featured in the scam ads," *id.* ¶ 184, Plaintiffs merely assert that *all* users interested in investing, *id.* ¶¶ 126, 130, that received the ads were likely to see an ad featuring an investor with the same racial or ethnic background. They do not, however, allege that *only* individuals from specific racial or ethnic groups either received or were prevented from seeing the CLEU ads. *See id.* ¶¶ 126-134. And Plaintiffs do not allege that the substantive terms of the ads varied across racial or ethnic groups; all ads allegedly offered investment advice, touted favorable results, and urged the viewer to join for investment advice. *Id.*

Even had Plaintiffs alleged the ads were targeted to particular racial groups—they do not— that would not state an Unruh Act claim. Nor does their actual, more limited allegation that users served the CLEU ads were likely to see ads with a person that shared their race. Merely tailoring or targeting advertising, even based on race, is lawful and commonplace absent something more that makes it unlawful. "[G]athering information about one's intended market and attempting to customize the information then provided is as old as the saying, 'know your audience.'" *OpenTV, Inc. v. Netflix Inc.*, 76 F. Supp. 3d 886, 893 (N.D. Cal. 2014). For example, "[a] soft-drink manufacturer seeking to envelop its product in an aura of good will and harmony may portray a group of persons of widely varying nationalities and races singing a cheerful tune on a mountaintop," while "[a] chain of fast-food retailers may use models of the principal races found in urban areas where its stores are located." *Ragin v. N.Y. Times Co.*, 923 F.2d 995, 1001 (2d Cir. 1991). Indeed, even allegations that a defective product was "aggressively target-market[ed]" to a particular racial group were not unlawful where it was not also alleged, for example, that the marketing was "exclusively targeted to" that group or that the product was sold at "different prices or on different terms than [to] other races." *Stringer v. Combe, Inc.*, 2017 WL 6539779, at *5 (N.D.

Cal. Dec. 21, 2017). Tailored ads become unlawful only when combined with something *more*—usually an intentional, race-based exclusion or restriction of access. *See id.* So too under the Unruh Act, where any alleged discrimination is unlawful only if coupled with a denial of equal access to services, *supra* 20-22, and willful discriminatory intent, *infra* 23-24. Neither is alleged here.

This case is thus unlike, for example, *Liapes v. Facebook, Inc.*, which allowed an Unruh Act claim to proceed past the pleading stage where it was alleged that discriminatory ad targeting prevented certain groups from seeing certain insurance ads *at all*. 95 Cal. App. 5th 910, 922-924 (2023). There, the plaintiffs alleged that ad tools "expressly ma[d]e distinctions based on gender and age when creating the target audience for insurance ads," such that women and older individuals *did not receive* insurance ads that other individuals received. *Id.* at 923. The plaintiffs there thus alleged that they were excluded from receiving (restricted access to) certain ads based on their protected traits. *Id.* at 922-924. Conversely, Plaintiffs here allege only that some users received CLEU ads depicting individuals of similar racial or ethnic backgrounds as themselves—they do not allege any denial or restriction of access to ads on Facebook or Instagram or that a user's race or ethnicity determined whether they received a CLEU ad. Plaintiffs thus do not allege the CLEU ads denied access to any public accommodation, dooming their Unruh Act claim.

### 2.     Plaintiffs do not allege that any alleged discrimination was willful.

Plaintiff's Unruh Act claim also fails because they still plead no facts supporting a plausible inference that any alleged discrimination was willful. To state a claim, Plaintiffs must allege "willful, affirmative misconduct" with the specific intent "to accomplish discrimination on the basis" of a protected trait. *Koebke v. Bernardo Heights Country Club*, 36 Cal. 4th 824, 853-854 (2005). The Unruh Act "requires allegations supporting 'willful, affirmative misconduct' with the specific intent 'to accomplish discrimination on the basis of [a protected trait].'" *Martinez v. Cot'n Wash, Inc.*, 81 Cal. App. 5th 1026, 1036 (2022). Allegations of "knowledge that a protected right is substantially likely to be infringed upon, and a failure to act upon that knowledge," are insufficient. *Greater L.A. Agency on Deafness, Inc.*, 742 F.3d at 427.

Here, Plaintiffs' theory of discrimination turns on the allegedly fraudulent nature of the challenged ads, *see* FAC ¶ 182 ("Meta violated the Unruh Act by targeting fraudulent

advertisements . . . to Plaintiffs and the Class"), but Plaintiffs do not allege that Meta had any knowledge of the fraudulent nature of the ads, much less the underlying fraudulent scheme. Plaintiffs claim Meta had knowledge of other fraudulent ad schemes, *id.* ¶¶ 113-116, but this general knowledge of other schemes is insufficient to allege the specific intent "to accomplish discrimination on the basis" of a protected trait with regard to the particular ads at issue. *Koebke*, 36 Cal. 4th at 853-854. Similarly, even if it were true (it is not) that Meta generally "chose to prioritize ad performance and engagement by designing its advertising tools to enable, facilitate, and contribute to race-and-ethnicity-based targeting," FAC ¶ 186, that still stops short of alleging, as Plaintiffs must, that Meta specifically intended to accomplish discrimination via the CLEU scammers' use of its generally available tools. And, as in *Stringer*, Plaintiffs nowhere allege that the challenged ads were "exclusively targeted" to a particular demographic group (or groups), which rebuts any finding of "intentional discrimination." 2017 WL 6539779, at *5.

Because Plaintiffs fail to allege Meta knew about the CLEU scheme, knew the ads were fraudulent, or specifically intended to discriminate against individuals based on race by serving CLEU ads to them, Plaintiffs have not alleged Meta undertook any "willful, affirmative misconduct" with the specific intent "to accomplish discrimination on the basis" of a protected trait. *Koebke*, 36 Cal. 4th at 853-854. Plaintiffs' Unruh Act claim should be dismissed.

### E.    Plaintiffs Fail To Adequately Allege Unjust Enrichment (Count VII)

Plaintiffs' unjust enrichment claim fails twice over. First, there is no standalone cause of action for unjust enrichment, which is instead a request for restitution. *See Herskowitz v. Apple Inc.*, 940 F. Supp. 2d 1131, 1148 (N.D. Cal. 2013) (collecting cases and dismissing unjust enrichment claim). While courts "may 'construe the cause of action as a quasi-contract claim seeking restitution,'" *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015), "a plaintiff may not 'pursue or recover on a quasi-contract claim if the parties have an enforceable agreement [on] a particular subject matter,'" *Copart, Inc. v. Sparta Consulting, Inc.*, 339 F. Supp. 3d 959, 983-984 (E.D. Cal. Sept. 10, 2018).

There is such an agreement here, and any quasi-contract claim for restitution is thus barred. Plaintiffs allege they "entered into a . . . contract with Meta consisting of the [Terms]." FAC ¶ 153.

And those Terms expressly rebut Plaintiffs' claim that Meta is obligated to remove allegedly fraudulent ads. *Supra* 6-8, 16-17. The subject matter of Plaintiffs' unjust enrichment claim as alleged—restitution based on Meta's alleged failure to "prevent the creation of" or "monitor, detect, and remove" scam ads, FAC ¶ 193—is thus covered by the parties' "enforceable agreement." *See Copart*, 339 F. Supp. 3d at 983-984; *see also O'Connor v. Uber Techs., Inc.*, 58 F. Supp. 3d 989, 1000-1001 (N.D. Cal. 2014) (dismissing implied-in-fact contract claim because it would have imposed obligations expressly disclaimed by contract provisions relevant to subject matter at issue). Plaintiffs' unjust enrichment claim should be dismissed.

## III. DISMISSAL SHOULD BE WITH PREJUDICE GIVEN PLAINTIFFS' PRIOR AMENDMENT

Dismissal without leave to amend is appropriate where "[f]urther amendment would simply be a futile exercise." *Parents for Privacy v. Barr*, 949 F.3d 1210, 1239 (9th Cir. 2020). That is the case where, for example, "Plaintiff['s] legal theories fail," regardless of any deficiencies in their factual allegations. *Id.* That is particularly appropriate here, where the futility of amendment is due in part to the operation of Section 230, which is designed to protect providers like Meta not only from "ultimate liability," but also from "having to fight costly and protracted legal battles." *Roommates*, 521 F.3d at 1175. Courts have repeatedly dismissed claims barred by Section 230 with prejudice. *See, e.g., Sikhs for Just., Inc. v. Facebook, Inc.*, 697 F. App'x 526, 526 (9th Cir. 2017) ("Because [the] claim is barred by [Section 230], . . . leave to amend . . . would have been futile. . . . [T]he district court properly dismissed . . . [the] claim with prejudice."); *Castronuova v. Meta Platforms, Inc.*, 2025 WL 1914860, at *4 (N.D. Cal. June 10, 2025) (collecting cases).

No additional facts could cure the fundamental legal deficiencies in Plaintiffs' claims, which cannot overcome Section 230 immunity and fail to allege essential elements of each of the causes of action alleged. Plaintiffs have already had a "prior opportunit[y] for substantive amendments to address the deficiencies identified by [Meta]'s prior motion to dismiss." *Wong v. Fay Servicing, LLC*, 2017 WL 950863, at *6 (N.D. Cal. Mar. 10, 2017). Their failure to cure the deficiencies—despite that opportunity—confirms that further amendment would be futile.

### CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Dated: October 15, 2025

Respectfully submitted,

By:/s/ Sonal N. Mehta
WILMER CUTLER PICKERING HALE AND DORR LLP
SONAL N. MEHTA (SBN 222086)
Sonal.Mehta@wilmerhale.com
JESSICA LEWIS (SBN 302467)
Jessica.Lewis@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

ARI HOLTZBLATT (SBN 354631)
Ari.Holtzblatt@wilmerhale.com
ALLISON SCHULTZ (*pro hac vice*)
Allison.Schultz@wilmerhale.com
NATHANIEL W. REISINGER
 (*pro hac vice*)
Nathaniel.Reisinger@wilmerhale.com
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6443

*Attorneys for Defendant Meta Platforms, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of October, 2025, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System.

*/s/ Sonal N. Mehta*

Sonal N. Mehta