UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOSHUA BOUCK, et al.,

Plaintiffs,

v.

META PLATFORMS, INC.,

Defendant.

Case No.  25-cv-05194-RS

**ORDER DENYING IN PART AND GRANTING IN PART MOTION TO DISMISS SECOND AMENDED COMPLAINT WITH LEAVE TO AMEND**

This case is the latest installment in an expanding genre: suits against social media companies for participating in the creation and promotion of fraudulent advertisements. Plaintiffs here are victims of a pump-and-dump scheme involving shares of a Chinese penny stock, China Liberal Education Holdings Ltd. ("CLEU"). The scammers targeted Plaintiffs on Facebook and Instagram (both Meta products) through advertisements for investment groups promising handsome returns. When a plaintiff clicked on the ad, he was led to a group on WhatsApp (another Meta product) wherein the scammers would persuade the plaintiff to purchase CLEU shares. Those shares ended up being nearly worthless.

Plaintiffs, on behalf of themselves and a putative class, sued Meta, averring that Meta participated in the creation and promotion of these fraudulent advertisements with knowledge that they were fraudulent. They assert five causes of action: aiding and abetting fraud; negligence; breach of contract; violation of the California Unruh Civil Rights Act, Cal Civ Code § 51; and unjust enrichment. Plaintiffs also assert claims for promissory estoppel and breach of the covenant

of good faith and fair dealing as alternatives to their breach of contract claim. Meta has moved to dismiss, arguing that section 230 of the Communications Decency Act bars all liability and that, in any event, Plaintiffs' claims fail on the merits. However, the averments in the complaint, construed in the light most favorable to Plaintiffs, raise a dispute of fact as to whether Meta contributed materially to the alleged illegality of the ads and, therefore, whether section 230 applies.

On the merits, Plaintiffs have successfully stated some of their claims. Their claims for aiding and abetting fraud, negligence, and unjust enrichment can proceed. However, their claims for breach of contract and a violation of the Unruh Act are deficient. Therefore, Meta's motion to dismiss is denied in part and granted in part with leave to amend.

## I. BACKGROUND[1]

Meta is a technology company that, as relevant here, operates Facebook, Instagram, and WhatsApp. Facebook and Instagram's core business is selling advertisements that are targeted at the platforms' users. According to the complaint, Meta's aggressive development of its advertising business has led to a proliferation of fraud on its platforms. A common variant is the investment scam, wherein scammers impersonating celebrities, prominent investors, and reputable investment firms lure unsophisticated users into "investment groups" through the promise of outsized returns. For example, the scammers here spread an advertisement on Instagram in which Kevin O'Leary—a businessman well-known for his role on Shark Tank—appears to advertise a private group in which stock tips are shared. In another scam advertisement, Savita Subramanian—Bank of America's head of U.S. equity and quantitative strategy—looks to be promoting spots in a "free trading training" group that boasts "95% accuracy" and 30-40% daily returns.

Plaintiffs clicked on these and other advertisements and were added or invited to private WhatsApp chats. In the WhatsApp chats, scammers posing as financial advisors provided periodic investment recommendations. On January 22, 2025, scammers in certain WhatsApp groups started

---

[1] All well-pleaded averments are accepted as true for purposes of this motion.

United States District Court
Northern District of California

to promote shares of CLEU, predicting returns of up to 380% in 20 to 30 days. They also promised to reimburse investors for any losses up to 80% on their CLEU investments. The ruse succeeded. Plaintiffs quickly hovered up shares of CLEU, causing the share price to rise from $5.32 on January 21, 2025, to $7.90 on January 29, 2025—an increase of more than 48%.

Of course, it was all too good to be true. Unbeknownst to Plaintiffs, the scammers' co-conspirators were standing on the other side of these trades. They acquired 240 million shares of CLEU in a secret offering and were unloading the shares through these scam WhatsApp investment groups. On January 30, 2025, the market learned of this enormous supply overhang, causing CLEU's share price to plummet to $0.15. Plaintiffs estimate that the loss to the putative class was more than $300 million.

Plaintiffs brought this suit against Meta, broadly averring that it helped to create the advertisements for the investment groups despite knowing that they were a scam. Meta has moved to dismiss, arguing that all of Plaintiffs' claims are barred by section 230 of the Communications Decency Act, 47 U.S.C. § 230, which prevents holding a provider of an interactive computer service, like Meta, liable for content provided by a third party. Even if section 230 does not apply, Meta contends that Plaintiffs' claims fail on the merits.

## II. LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), the complaint must allege sufficient facts which, if accepted as true, "state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

United States District Court
Northern District of California

## III. DISCUSSION

A. <u>Section 230</u>

Section 230(c)(1) of the Communications Decency Act provides that "[no] provider . . . of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230. Section 230 is an affirmative defense, so Meta bears the burden of showing it applies. *See Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 738 (9th Cir. 2024). Therefore, Plaintiffs can defeat a motion to dismiss based on section 230 "simply [by] plead[ing] facts demonstrating a potential factual dispute that could affect whether the defense applies." *Rabin v. Google LLC*, 725 F.Supp.3d 1028, 1031 (N.D. Cal. 2024). "Only when the plaintiff pleads itself out of court—that is, admits all the ingredients of an impenetrable defense—may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6)." *Durnford v. MusclePharm Corp.*, 907 F.3d 595, 604 (9th Cir. 2018).

Plaintiffs do not contest that Meta is a "provider . . . of an interactive computer service." 47 U.S.C. § 230(c)(1). They also concede that their claims, at least in part, seek to hold Meta liable as a "publisher or speaker" of the fraudulent advertisements. *Id.* The dispute is thus over whether Meta is an "information content provider" of the fraudulent ads. *Id.*

The statute defines the term "information content provider" to "mean[] any person or entity that is responsible, in whole or in part, for the creation or development of information provided through . . . any other interactive computer service." 47 U.S.C. § 230(f). Therefore, if Meta was sufficiently involved in the "creation or development" of the fraudulent ads, then those ads were not just "provided by" the scammers—they were also provided by Meta.

What it means to "create" or "develop" content on the internet is not self-evident. *See Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1269 (9th Cir. 2016). The Ninth Circuit considered that question in *Fair Housing Council of San Fernando Valley v. Rommates.Com, LLC*, 521 F.3d 1157 (9th Cir. 2008) (en banc). The court there acknowledged that a capacious understanding of those terms, especially "develop," could sweep in "the functions of any ordinary search engine—indeed, just about any function performed by a website." *Id.* at 1167. To do so, the court observed, "would

ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS
CASE No. 25-cv-05194-RS

4

defeat the purposes of section 230 by swallowing up every bit of immunity that the section otherwise provides." *Id.* On the other extreme, defining the key terms too narrowly would read the phrase "in part" out of the statute and bar liability for genuine co-developers. *See id.* Ultimately, the Ninth Circuit settled somewhere in the middle: "[A] website helps to develop unlawful content, and thus falls within the exception to section 230, if it *contributes materially* to the alleged illegality of the conduct." *Id.* at 1168 (emphasis added).

Plaintiffs aver that Meta contributed materially to the fraudulent ads through three tools offered in its Ads Manager suite. The first is called "Flexible Format." SAC ¶ 127. Plaintiffs explain that through Flexible Format, "Meta automatically optimizes the ad and shows it in the format that Meta predicts may perform best" by "selecting the specific images and other content that will be included, the layout, the platform (Facebook or Instagram), and how the ad will be displayed to a particular user (*e.g.*, in the user's feed, as a story, etc.)." *Id.* (internal quotation marks omitted).

The second tool is called "Dynamic Creative." SAC ¶ 128. Dynamic Creative "takes multiple media, such as images and videos, and multiple ad components, such as images, videos, text, audio, and calls-to-action, and then mixes and matches them in new ways to improve . . . ad performance." *Id.* In that way, "[i]t allows the advertiser to automatically create personalized creative variations for each person who views the ad, with results that are scalable." *Id.* (internal quotation marks omitted).

The third tool is called "Advantage+ Creative." SAC ¶ 129. Advantage+ Creative uses generative AI to apply "creative enhancements" to optimize advertisements. These "enhancements" include AI-generated text and images, which alter the contents of the advertisements to improve performance. "The alterations may include modifications to images (such as applying different text overlays or modifying the image background), generating variations of the ad's text to target different audiences, and inserting 'Call to Action' buttons, such as a link to purchase a product or join a WhatsApp group." *Id.* According to the complaint, "[t]he CLEU scammers used these advertising tools to deploy an array of advertisements that were

optimized to target a range of different Facebook and Instagram users" including "at least 86 different variations of ads featuring Ms. Subramanian." *Id.* ¶ 134 (emphasis omitted).

These averments, taken as true, evidence a fact dispute over whether Meta "contribute[d] materially to the alleged illegality of the advertisements." *Roommates.Com*, 521 F.3d at 1168. The alleged illegality stems from the advertisements' content—*i.e.*, the false statements made to Facebook and Instagram users that induced them to click on the ads. Plaintiffs have averred that Meta participated in the construction of the ads by literally *generating*, using artificial intelligence, the images and text in the advertisements. That degree of participation is not protected by section 230.

Courts in this district have reached the same result on comparable facts. In *Forrest v. Meta Platforms, Inc.*, a prominent businessman sued Meta for its role in creating advertisements in which scammers impersonated him endorsing sham cryptocurrency investments. *See* 737 F.Supp.3d 808 (N.D. Cal. 2024). Meta moved to dismiss, arguing that it was immune from liability under section 230 because Forrest did not adequately aver that it contributed materially to the development of the fraudulent ads. *See id.* at 816. The district court, however, denied the motion, concluding that the plaintiff had raised a "quintessential factual disagreement" concerning Meta's role in the creation of the ads by averring that Meta "drives and ultimately determines what the completed, paid-for ads will look like" and offers generative AI tools that "automatically optimize[ ] ads to versions the audience is more likely to interact with." *Id.* at 818 (alteration in original).

If anything, Plaintiffs' averments are stronger here. The district court in *Forrest* accepted that optimizing the appearance of an ad to drive engagement was enough of a contribution to the ads' illegality to preclude section 230 immunity. *See* 737 F.Supp.3d at 818. Here, in addition to averring facts which, if proven, would establish that Meta altered the ads' appearance to maximize impressions, Plaintiffs have averred that Meta's tools allowed the scammers to produce "AI-generated text and images" for use in the ads through its Advantage+ Creative tool. SAC ¶ 129. That is more than enough to aver "that the tools affect ad content in a manner that could at least

potentially contribute to their illegality." *Forrest*, 737 F.Supp.3d at 818.

Meta contends that these tools are "neutral" and that while they offer a menu of options to advertisers, the offending content was exclusively provided by the scammers. In Meta's view, the Ninth Circuit's decision in *Carafano v. Metrosplash.com, Inc.* makes clear that section 230 precludes liability. 339 F.3d 1119 (9th Cir. 2023). *Carafano* concerned a suit against Matchmaker.com, an online dating service. *See id.* at 1121. To create an online profile, Matchmaker enabled users to "select answers to more than fifty questions from menus providing between four and nineteen options" and asked users to fill out an open-ended essay question. *Id.* One user created a fake profile of a prominent actress using various sexually suggestive answers to the pre-set questions and a similarly suggestive essay response. *See id.* When other users contacted that user through the site, he revealed the actress's home address and telephone number. *See id.*

The actress sued Matchmaker under various tort theories, but Matchmaker successfully found refuge under section 230. *See id.* at 1125. It was true, the panel acknowledged, that Matchmaker "facilitated the expression of information of individual users" by creating pre-set questions and offering a menu of possible responses to those questions. *See id.* Nonetheless, section 230 applied because "*the selection* of the content was left exclusively to the user." *Id.* at 1124 (emphasis added). Matchmaker did not choose the response or write the essays, and, in fact, "no profile ha[d] any content until a user actively creat[ed] it." *Id.*

The problem for the plaintiff in *Carafano* was that Matchmaker's role was limited. It "deci[ded] to structure the information provided by users" to enhance the efficacy of its service, but it did not endeavor to create the information itself. *Carafano*, 339 F.3d at 1124–24. Here, by contrast, Plaintiffs have averred that Meta created the offending information by generating some of the false statements that tricked them into the investment scheme. In dicta, that is precisely the kind of situation in which *Carafano* imagined section 230 would *not* apply. *See id.* at 1125 ("[T]he statute would still bar Carafano's claim unless Matchmaker created or developed the particular information at issue.").

To understand the difference between the facts of *Carafano* and Plaintiffs' averments,

*United States District Court*
*Northern District of California*

consider just one example from the operative complaint. Plaintiffs aver that the scammers used Meta's Advantage+ Creative tool which, as explained, uses artificial intelligence to enhance whatever message the user inputs. If a user, for example, tells the tool that he is interested in an ad promising astronomical weekly investment returns, Advantage+ Creative will spin up a slew of ads that include the provided language and other language, images, and videos it decides will be effective in promoting the user's chosen message. In fact, a journalist from Reuters ran an experiment in which he told Advantage+ Creative that he wanted an ad asking users if they were "interested in making 10% weekly returns." SAC ¶ 131. Advantage+ Creative generated a slew of ads saying just that *and* new ads with language like "Tired of living paycheck to paycheck?  Break the cycle and start earning steady weekly income with our proven system." *Id.* ¶ 132. The reporter did not come up with that (patently fraudulent) language; it was all Meta.

Because the complaint avers that the scam CLEU ads were created using these tools, it is at least plausible that some of the illegal content (*i.e.*, the fraudulent statements in the ads) was created by Meta, not by the scammers. Without question, Advantage+ Creative and the other tools in Meta's advertising suite would not have come up with that language without the inspiration from the scammers, but that language is still the creation of Meta.

At bottom, the question in this case—as in most section 230 cases—is whether Plaintiffs are attempting to hold Meta vicariously liable for the actions of its users. They are not. They do not aver that Meta "passively acquiesc[ed]" to the fraud; they allege Meta worked with the scammers to gin up the offending posts. *Roommates.com*, 521 F.3d at 1169 n.24. If those averments are borne out by the evidence, it will be enough to disrobe Meta of section 230 immunity.

B. <u>Failure to State a Claim on the Merits</u>

Even if it is not protected by section 230 immunity, Meta contends that Plaintiffs' claims fail on the merits. Plaintiffs have asserted five causes of action under California law: aiding and abetting fraud, breach of contract, negligence, a violation of the Unruh Act, and a claim for unjust enrichment. Plaintiffs have successfully stated a claim for aiding and abetting fraud, negligence,

ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS
CASE NO. 25-cv-05194-RS

8

and unjust enrichment. They have failed to state a claim for breach of contract or a violation of the Unruh Act.

### i. Aiding and Abetting Fraud

"California has adopted the common law rule that [l]iability may ... be imposed on one who aids and abets the commission of an intentional tort if the person ... *knows* the other's conduct constitutes a breach of a duty and gives substantial assistance or encouragement to the other to so act." *In re First All. Mortg. Co.*, 471 F.3d 977, 993 (9th Cir. 2006) (emphasis in original) (internal quotation marks omitted). Meta argues that it neither had knowledge of the scammers' conduct nor substantially assisted in the execution of their scheme.

Plaintiffs attempt to show knowledge by pointing to widely known evidence on the proliferation of fraud on Meta's platforms. They aver, for example, that Meta has been repeatedly subject to lawsuits stemming from similar schemes and that various market observers have publicly discussed the growing trend of fraud on Meta's platforms. They also aver that Meta itself acknowledged the proliferation of fraud, stating in September 2024 that "[s]cammers often use public figures and celebrities' images to bait people into engaging with scam content, including ads." SAC ¶ 68.

In addition, Plaintiffs aver that Meta had an "ad review system" in place to screen ads for "violation of [Meta's] policies." SAC ¶ 111. According to the complaint, this screening process "starts automatically before ads begin running" and conducts a review of "the specific components of an ad, such as images, video, text, and targeting information." *Id.* Apparently, none of the fraudulent CLEU ads were flagged in this review process.

Meta's argument largely focuses on the generalized nature of Plaintiffs' averments. That is, Meta contends knowledge that fraud is occurring generally on its platforms could not have given "actual knowledge of the specific primary wrong" at issue in this case. *First All.*, 471 F.3d at 993. In a vacuum, that argument has merit. Under California law, knowledge that something illegal is occurring on a defendant's platform does not establish that the defendant knew of the particular illegal conduct that injured the plaintiff. *See Diaz v. Intuit, Inc.* 2018 WL 2215790, at *1 (N.D.

ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS
CASE NO. 25-cv-05194-RS

Cal. May 15, 2018) (dismissing an aiding and abetting claim where plaintiffs averred that defendant "has known for years that fraudsters exploit [its] lax security in order to open fraudulent accounts" and "kn[ew] of widely reported data breaches involving identify theft [and fraud]").

This argument, however, ignores the second half of Plaintiffs' theory: that when Meta saw the ads in its ad review process, Meta acquired actual knowledge of their fraudulence. To be sure, in many cases a defendant could not be charged with actual knowledge of fraud simply because the fraud passed through a routine review process. For that reason, many cases arising in the financial fraud context have required a plaintiff bringing an aiding and abetting claim to show that the defendant had some extra knowledge about the primary fraudster in order to create an inference that the defendant knew of the fraud and passed it through the review process anyways. *See, e.g.*, *First All.*, 471 F.3d at 994 (declining to overturn an aiding-and-abetting verdict where plaintiffs adduced evidence that the bank "received reports that detailed the fraudulent practices in which [the primary fraudster] was engaged"); *In re Woodbridge Investments Litig.*, 2020 WL 4529739, at *6 (C.D. Cal. August 5, 2020) (denying motion to dismiss where plaintiff averred that the defendant and the primary wrongdoer had a "close business relationship" and defendant was "aware[] of banking activity inconsistent with [the primary wrongdoer's] business model").

Here, by contrast, no extra knowledge is required. That is because the advertisements are facially ridiculous. Take just one example from the complaint:



United States District Court
Northern District of California

That is Savita Subramanian, one of Wall Street's most respected market observers, purporting to offer stock tips in a WhatsApp group. Though Ms. Subramanian is employed by Bank of America, the trading training is being promoted by something called "AI Investment." She is advertising *daily* potential returns that are roughly three to four times the average *annual* return of U.S. equity markets, all for free. Even a cursory look would warrant suspicion that the ad is fraudulent. Meta cannot, with a straight face, claim otherwise. If Plaintiffs succeed in convincing a jury that this ad (and others that are equally preposterous) passed Meta's ad review process, the jury would be entitled to infer that Meta had actual knowledge of the fraud at the time the ads went out to its users.

Meta's response to this theory of knowledge is confounding. It claims that it was not aware of the nature and content of the ads (or at least that Plaintiffs did not aver that it was) because its ad review process "rel[ies] heavily on automated technological systems" and "may not detect all policy violations." Dkt. 58, at 9. Yet Meta does not explain why that matters. It was *Meta's* decision to use technological review tools to screen ads, and it does not now get to claim it had no idea what was going on because it tasked some software program with doing the first pass.

In any event, Meta plausibly acquired knowledge that it was aiding and abetting a fraud well before the ad passed through a review system. As explained, Plaintiffs have plausibly averred that the scammers used Meta's generative-AI tools for advertisers to perpetrate the fraud. At the moment a scammer asked Advantage+ Creative to generate an ad using a celebrity, a secret chat room, and the promise of unfathomable riches, there is at least a fact question on whether Meta acquired knowledge that it was aiding and abetting a fraud.

Largely because Plaintiffs have adequately averred knowledge, they have also adequately averred Meta's participation in the fraud. Under California law, "[t]he focus of a challenge to an aiding-and-abetting claim generally is whether participation was *knowing,* as opposed to whether it occurred at all." *AngioScore, Inc. v. TriReme Med., LLC*, 70 F. Supp. 3d 951, 960 (N.D. Cal. 2014). Therefore, "even routine operations may constitute substantial participation if done with knowledge." *Id.* Plaintiffs here have averred that Meta contributed to the fraud by participating in

the creation and dissemination of the ads. If knowledge is established, nothing more is required. Therefore, Meta's motion to dismiss as to the aiding and abetting fraud claim is denied.

### ii.     Breach of Contract

Plaintiffs next assert a claim for breach of contract. The most basic predicate for a successful breach of contract claim is the existence of an enforceable contractual promise. Plaintiffs assert that the enforceable promises are in Meta's Terms of Service (ToS), which reads that Meta "do[es] not allow[] [c]ontent that attempts to scam or defraud users and/or businesses by means of … [offering] investment opportunities where the opportunity is of a 'get-rich-quick' nature and/or claims that a small investment can be turned into a large amount… [or] investment opportunities where returns on investment are guaranteed or risk-free." SAC ¶ 107. Plaintiffs interpret that provision as imposing two duties on Meta: (1) to prevent third parties from posting offending content on its platforms and (2) not to contribute to the proliferation of such content.

Both theories fail for the same reason: The provision of the ToS on which Plaintiffs rely does not expressly or impliedly impose a binding contractual obligation on Meta to do anything. It is much more naturally read as a creating a duty *of its users* not to pollute Meta's platforms with scam investment ads. In fact, the ToS goes on to explain that "[t]hese guidelines outline our standards regarding the content *you* post to Facebook and *your* activity on Facebook and other Meta Products." SAC, Ex. A, at 13.

That reading is buttressed by other provisions in the ToS. To the extent the ToS even mentions Meta doing something to prevent fraud, it speaks only in aspirational terms—explaining that Meta "aim[s] to protect users and businesses from being deceived out of their money, property or personal information" by "removing content and combatting behavior that purposefully employs deceptive means." SAC, Ex. B, at 2. Meta, however, never *promises* to take concrete steps to effectuate that aspiration.

Plaintiffs respond that elsewhere in the ToS, Meta states in no uncertain terms that it *will* take action against violating content, and that it leverages "dedicated teams around the world . . . to detect misuse of [its] products." SAC, Ex. A, at 4–5; *see* SAC ¶ 105 ("Meta states that the

United States District Court
Northern District of California

'policies define what is and isn't allowed on Meta's technologies. If content goes against our policies, we take action on it.'"). These admonitions are also not enforceable contractual promises either—they are warnings about what Meta will do if the *user* violates the ToS. That is, they announce an enforcement mechanism to ensure that Meta's users comply with *their* binding contractual obligations.

A court in this district encountered a nearly identical argument in *Lloyd v. Facebook*, where the plaintiff sought to enforce these precise provisions of Meta's ToS as contractual commitments. *See* 2022 WL 4913347, at *9 (N.D. Cal., October 3, 2022). The court there dismissed the breach of contract claim, explaining that "merely stating that Facebook does not allow users to post harmful content and that they will remove them is mere[ly] 'a general monitoring policy'" that, under Ninth Circuit precedent, does not suffice to create a contractual promise. *Id.* (quoting *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1108 (9th Cir. 2009)). Though that case involved only allegations that Meta *failed* to prevent the violating content (as opposed to assisted in the creation of the content), the court's decision turned on an antecedent question: whether the ToS bound Meta at all. *See id.* ("There are no other facts that would indicate that Facebook made a promise with the constructive intent that it be enforceable.") (internal quotation marks omitted). Plaintiffs have offered no compelling reason to construe the same terms differently here.

For similar reasons, Plaintiffs' alternative claims for promissory estoppel and for breach of the covenant of good faith and fair dealing fail as well. Promissory estoppel is a doctrine which applies only where a defect in contract formation causes the contract to fail. *See Horne v. Harley-Davidson, Inc.*, 660 F. Supp. 2d 1152, 1162 (C.D. Cal. 2009). Plaintiffs' problem here is not that contract formation failed (indeed, Meta concedes that *a* contract exists), it is that the contract does not include the provision that Plaintiffs are now seeking to enforce. Promissory estoppel cannot add a promise to a contract that it otherwise lacks.

The covenant of good faith and fair dealing, which is impliedly a part of every contract, requires "that neither party will do anything which will injure the right of the other to receive the

benefits of the agreement." *Carson v. Mercury Ins. Co.*, 210 Cal. App. 4th 409, 429 (2012) (internal quotation marks omitted). The purpose of the covenant is to "mak[e] effective the agreement's promises." *Id.* As explained, Plaintiffs are not invoking the covenant of good faith and fair dealing because they were unable to realize the benefits of the promises in the contract, they are invoking it *to create new promises*. That the covenant cannot do. Therefore, Plaintiffs' alternative formulations of the breach of contract claim are dismissed.

> ### iii.    Negligence

"To state a claim for negligence in California, a plaintiff must establish the following elements: (1) the defendant had a duty, or an obligation to conform to a certain standard of conduct for the protection of others against unreasonable risks, (2) the defendant breached that duty, (3) that breach proximately caused the plaintiff's injuries, and (4) damages." *Dent v. Nat'l Football League*, 902 F.3d 1109, 1117 (9th Cir. 2018). Meta argues that it owed no duty to Plaintiffs and that Plaintiffs' negligence claim is barred under the economic loss rule.

Meta's assertion that it owes no duty to Plaintiffs depends on an assumption that Plaintiffs allege only *nonfeasance*, rather than *misfeasance*. "Misfeasance is when a defendant makes the plaintiff's position worse while nonfeasance is when a defendant does not help a plaintiff." *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1100. (9th Cir. 2019). In California, only misfeasance creates an ordinary duty of care. *See id.* at 1101. By contrast, where nonfeasance is averred, a duty of care arises only if there is a "special relationship" between the plaintiff and defendant. *See Melton v. Boustred*, 183 Cal. App. 4th 521, 532 (2010).

Meta's assumption that Plaintiffs aver only nonfeasance is mistaken. Their principal contention is that Meta actively assisted in the creation of the fraudulent advertisements, thereby "mak[ing their] position worse." *Dyroff*, 934 F.3d at 1100. In truth, Meta's argument on this point is just a repackaged version of its section 230 argument, and it fails for the same reason. Taking the facts pleaded in the complaint as true, Plaintiffs have averred that Meta did more than just sit idle as fraudsters roamed freely on their platforms. Therefore, no "special relationship" need be pleaded for the case to move forward. *See Forrest*, 737 F.Supp.3d at 821 ("Meta again argues that

United States District Court
Northern District of California

the complaint establishes that the challenged ads were entirely created by third parties, and that Meta is under no duty to control the conduct of third parties except in the presence of a special relationship. But this is again a premature factual retort to Dr. Forrest's allegation that Meta *did* play an active role in creating the ads he challenges.") (emphasis in original).

Meta's second argument is that the economic loss rule bars Plaintiffs' negligence claim. "The economic loss rule provides that 'there is no recovery in tort for negligently inflicted "purely economic losses," meaning financial harm unaccompanied by physical or property damage.'" *Gerber v. Twitter, Inc.*, 2024 WL 1354449, at *6 (N.D. Cal. Mar. 29, 2024) (quoting *Sheen v. Wells Fargo Bank, N.A.*, 12 Cal. 5th 905, 922 (2022), *reh'g denied* (June 1, 2022)). "It applies when 'the parties are in contractual privity and the plaintiff's claim arises from the contract (in other words, the claim is not independent of the contract).'" *Id.* (quoting *Moore v. Centrelake Med. Grp., Inc.*, 83 Cal. App. 5th 515, 535 (2022), *review denied* (Dec. 14, 2022)).

However, as explained, the contract between the parties does not cover this course of conduct. Indeed, it does not impose on Meta *any* obligations to police conduct on its platforms as consideration for its users' contractual promises. Therefore, permitting a tort action would not cause the law of contract and the law of tort to dissolve into each other—the prevention of which is the stated rationale of the economic loss rule. *See Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 988 (2004).

Meta insists that Plaintiffs' negligence claim "seeks to hold Meta liable for the same conduct on which the contractual and quasi-contractual claims are based—allegedly failing to 'prevent the creation of' or 'to identify and remove' the ads." MTD, at 22 (quoting SAC ¶ 187). That, however, glosses over the distinction between the claims. The complaint makes clear that the negligence claim is *also* based on Meta's averred contribution to the fraudulent scheme—that is, its development of the offending ads. *See* SAC ¶ 188 ("Meta actively . . . assisted the CLEU scammers . . . by materially contributing to the development of the scam ads, including generating, manipulating, and enhancing fraudulent content used in the ads."). Meta does not, and cannot, contend *that* activity was the subject of the contract between the parties, making it actionable

United States District Court
Northern District of California

without implicating the economic loss rule. Therefore, Meta's motion to dismiss is denied as to Plaintiffs' negligence claim.

### iv.    Unruh Act

Section 51(b) of the California Civil Code provides, in relevant part, that all individuals, regardless of race or national origin, shall be "entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Plaintiffs aver that Meta violated the Unruh Act by targeting certain scam CLEU ads to them on account of their race or national origin. Specifically, they aver that Meta's advertising tools targeted ads featuring celebrities and investors that shared their race or national origin to make it more likely that Plaintiffs would engage with the ad and succumb to the scam.

This is not a well-pleaded violation of the Unruh Act. The Supreme Court of California has explained that "[i]n general, a person suffers discrimination under the [Unruh] Act when the person presents himself or herself to a business with an intent to use its services but encounters an exclusionary policy or practice that prevents him or her from using those services." *White v. Square, Inc.*, 7 Cal. 5th 1019, 1023 (2019). Plaintiffs here aver that they were *targeted* because of their race or national origin, not that they were excluded from anything. Whatever moral condemnation that merits, it is not a violation of the Unruh Act.

The cases on which Plaintiffs rely prove that point. They first point to *Liapes*, 95 Cal. App. 5th 910 (2023). There, the plaintiff brought a putative class action under the Unruh Act, alleging that Facebook "does not provide women and older people equal access to insurance ads on its online platform." *Id.* at 915. The court of appeal held that the plaintiffs had stated an Unruh Act claim because they alleged that Facebook "categorically excluded" women and older people from receiving insurance advertisements on its platforms. *Id.* at 923. That denied them the equal access to Facebook's services that the Unruh Act guarantees.

Plaintiffs try to spin *Liapes* into a general prohibition on targeting based on protected characteristics, but in doing they rely on selective quotations from *Liapes* that obscure the central holding. For example, Plaintiffs emphasize that the court of appeal there credited the plaintiffs'

United States District Court
Northern District of California

allegation that "Facebook engaged in intentional discrimination by designing and employing ad tools that expressly make distinctions based on gender and age when creating the target audience for insurance ads." 95 Cal. App. 5th at 923. That is no different, Plaintiffs argue, than what they have averred here: that Meta's ad tools made distinctions based on race and national origin to decide to whom to show the scam ads.

That statement was made in the context of the court's discussion of who was responsible for the gender- and age-based targeting: Facebook or the third-party advertisers. It was not a statement of law about what practices are proscribed by the Unruh Act. *See Liapes*, 95 Cal. App. 5th at 923 (concluding, *in the next sentence*, that "Facebook, not the advertisers, classifies users based on their age and gender"). In any event, overreliance on that quote papers over the crucial difference between the two cases. In *Liapes*, the plaintiffs were *not* the group that was targeted. In that way, they "encounter[ed] an exclusionary policy or practice that prevent[ed] [them] from using [Facebook's] services." *White*, 7 Cal. 5th at 1023. Here, Plaintiffs were the group that was targeted. Far from encountering an *exclusionary* practice, they encountered an *inclusionary* one— it is just that they wish they were not included.

Plaintiffs also rely on *Koire v. Metro Car Wash*, in which they claim the Supreme Court of California rejected the argument that the Unruh Act "prohibits only the *exclusion* of a member of a protected class from a business establishment." 40 Cal.3d 24, 29 (1985). Here too, Plaintiffs place far too much weight on a decontextualized statement from an otherwise inapposite case. In *Koire*, what the Supreme Court of California really rejected was a construction of the Unruh Act that would have proscribed only practices that fully excluded an individual from a business on account of a protected characteristic, rather than more limited practices like offering the same products to men and women at different prices. *See id.* ("The scope of the statute clearly is not limited to exclusionary practices. The Legislature's choice of terms evidences concern not only with access to business establishments, but with equal treatment of patrons in all aspects of the business."). Indeed, *Koire* itself concerned a car wash that refused to give a man the same discount it gave women on "Ladies' Day." *See id.* at 27. Unlike Plaintiffs here, the man there was *denied*

something, even if that something was not complete access to the defendant's services.

In sum, to state a claim under the Unruh Act, Plaintiff must aver that they were denied access to, or the benefits of, a business on account of a protected characteristic. As they have not done so, Meta's motion is granted as to this claim.

### v.    Unjust Enrichment

Finally, Plaintiffs seek "disgorgement of all profits Meta unjustly realized from ads utilized in connection with the CLEU Scheme." SAC ¶ 206. Though there is no standalone claim for unjust enrichment or restitution under California law, those terms "describe the theory underlying a claim that a defendant has been unjustly conferred a benefit through mistake, fraud, coercion, or request." *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (internal quotation marks omitted). "The return of that benefit is the remedy typically sought in a quasi-contract cause of action." *Id.* (internal quotation marks omitted). Therefore, "[w]hen a plaintiff alleges unjust enrichment, a court may construe the cause of action as a quasi-contract claim seeking restitution." *Id.* (internal quotation marks omitted). Meta appears to concede that Plaintiffs' claim for unjust enrichment here is properly understood as one sounding in quasi-contract and seeking restitution.

Meta argues that Plaintiffs cannot seek restitution because they have averred the existence of an enforceable contract covering the same subject matter. *See Lance Camper Mfg. Corp. v. Republic Indem. Co.,* 44 Cal. App. 4th 194, 203, 51 Cal. Rptr. 2d 622, 628 (1996) ("[I]t is well settled that an action based on an implied-in-fact or quasi-contract cannot lie where there exists between the parties a valid express contract covering the same subject matter.").

Plaintiffs, however, are permitted to plead a claim for breach of contract and a claim for breach of a quasi-contract seeking restitution in the alternative. *See Astiana*, 783 F.3d at 762; Fed. R. Civ. P. 8(d)(2). That would seem especially appropriate where, as here, the former claim cannot yet survive a motion to dismiss. Therefore, Meta's motion to dismiss as to this claim is denied.

### IV. CONCLUSION

For the foregoing reasons, Meta's motion to dismiss is denied in part and granted in part

ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS
CASE NO. 25-cv-05194-RS

United States District Court
Northern District of California

with leave to amend. Any amended complaint must be filed within 21 days of the date of this order.

**IT IS SO ORDERED**.

Dated: March 24, 2026

_____
RICHARD SEEBORG
Chief United States District Judge