**MORRIS KANDINOV LLP**
Leonid Kandinov
550 West B Street, 4th Floor
San Diego, CA 92101
(619) 780-3993
leo@moka.law

Aaron T. Morris
Andrew W. Robertson (admitted *pro hac vice*)
William H. Spruance
305 Broadway, 7th Floor
New York, NY 10007
Tel. (212) 431-7473
aaron@moka.law
andrew@moka.law
william@moka.law

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| JOSHUA BOUCK, et al., | Case No. 3:25-cv-05194-RS |
| Plaintiffs, | **PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS SECOND AMENDED COMPLAINT FOR LACK OF JURISDICTION** |
| v. | |
| META PLATFORMS, INC., | |
| Defendant. | Judge: Hon. Richard Seeborg |
| | Courtroom 2, 19th Floor |
| | Date: June 11, 2026 |
| | Time: 1:30 PM |

**PRELIMINARY STATEMENT**

After this Court rejected the arguments in its original Motion to Dismiss, Meta has now pivoted to an entirely new, but equally unpersuasive argument. Despite having litigated these and substantially similar claims in this District for nearly a year since the filing of this Action in June 2025, Meta now contends that Plaintiffs' claims are "jurisdictionally barred by the Securities Litigation Uniform Standards Act" ("SLUSA"). *See* Motion to Dismiss for Lack of Jurisdiction (the "Jurisdiction Motion" or "Mot.") (ECF No. 74).

There is good reason Meta did not advance its new-found SLUSA argument in any of the three motions to dismiss it previously filed in this Action: SLUSA has no application here. SLUSA requires that traditional securities claims be litigated under the federal securities laws and precludes "artful pleading" of such claims as state-law causes of action. But Plaintiffs do not allege Meta engaged in securities violations. Rather, Plaintiffs' claims arise from Meta's advertising business and its violations of state law by fostering relationships with scammers and facilitating their fraudulent conduct. Even if the scammers utilized securities to carry out their scheme, that does not transform Meta's wrongdoing into securities fraud or preclude Plaintiffs from pursuing traditional state-law remedies.

Nor is there any inconsistency between Plaintiffs' arguments that SLUSA does not apply to Meta's conduct and Plaintiffs' claim that Meta is liable for the losses they suffered from the scammers' pump-and-dump scheme. Even though Meta did not make a misrepresentation "in connection with" a securities transaction for purposes of SLUSA, Meta's fraudulent advertisements were a "substantial factor" leading to Plaintiffs' victimization, and Plaintiffs' losses were a foreseeable result of Meta's wrongdoing.

As more fully set forth below, Meta's Motion should be denied.

**FACTUAL AND PROCEDURAL BACKGROUND**

A.      **Meta's Advertisements Lure Victims Into a Fraudulent Scheme**

Plaintiffs and other members of the proposed Class are users of Meta's Facebook and Instagram social media platforms who were lured into a fraudulent scheme through advertisements

that Meta helped to create. *See* ¶¶ 7, 19.[1] The ads impersonated celebrities, well-known investors, and legitimate financial advisory firms whose likenesses, branding, and other information had been appropriated and exploited by the scammers. ¶¶ 72-74. The ads encouraged users to join fake investment clubs, which promised access to professional stock recommendations, but in reality were a front for scammers to carry out a pump-and-dump scheme. ¶¶ 71, 75-77. Links in the ads brought users into WhatsApp groups where scammers posing as financial professionals engaged with victims to build rapport, provide market commentary, and make investment recommendations. ¶¶ 79-84.

### B.    Scammers Perpetrate a Pump-and-Dump Scheme in CLEU Securities

Beginning in January 2025—*months after* victims had been lured into the scheme by Meta's advertisements—the scammers began recommending that WhatsApp group members purchase shares of China Liberal Education Holdings Ltd. ("CLEU"), a Chinese penny stock then listed on NASDAQ. ¶ 84. The scammers predicted the price of CLEU stock would appreciate significantly in the near future and pressured victims to buy quickly, claiming that waiting even a few days would cause them to miss out on the stock's rise. ¶¶ 85-86. The scammers continued to recommend additional purchases of CLEU at higher price points over the coming days, pressuring victims to liquidate other investments, move cash from other accounts, and even take out loans to fund their purchases. ¶ 87.

Unbeknownst to the victims, the company had secretly issued 240,000,000 shares to the CLEU scammers in a private offering in late December 2024, which had not been publicly disclosed. ¶ 13. The scammers' recommendations were designed to drive up CLEU's stock price and create a market for their co-conspirators to unload their secret shareholdings. ¶ 90. The market became aware of the 240,000,000 previously undisclosed shares in the early hours of January 30, 2025, causing the stock price to fall precipitously before U.S. markets opened that day. ¶ 91. CLEU's stock price collapsed to less than $0.15, causing hundreds of millions of dollars in losses. ¶ 92.

While Meta is alleged to have lured victims into the scheme through fraudulent Facebook and Instagram advertisements, it is not alleged to have made any statements about CLEU specifically.

---

[1] Citations in the form "¶ __" are to Plaintiffs' Second Amended Class Action Complaint (ECF No. 49). Unless otherwise indicated, all emphasis herein is added.

**C.**    **Plaintiffs Bring This Action, and Meta Moves to Dismiss Without Arguing SLUSA or Otherwise Challenging This Court's Jurisdiction**

Plaintiffs filed their initial Class Action Complaint on June 20, 2025 asserting various claims under California state law on behalf of themselves and a proposed Class of victims of the CLEU scheme. *See* ECF No. 1. Meta then filed three motions to dismiss, two of which were fully briefed. *See* ECF Nos. 26, 39, and 56. In each of those motions, Meta argued that Plaintiffs' claims are barred by Section 230 of the Communications Decency Act, 47 U.S.C. § 230 ("Section 230"), and that Plaintiffs failed to allege essential elements of their claims.

In none of its prior motions to dismiss did Meta argue that Plaintiffs' claims are barred by SLUSA or that this Court lacks subject matter jurisdiction. Meta raised its SLUSA argument only *after* this Court issued its decision denying Meta's motion to dismiss the Second Amended Complaint, in which the Court rejected Meta's marquee Section 230 argument and held that Plaintiffs had adequately alleged claims for aiding and abetting fraud, negligence, and unjust enrichment. *See generally Bouck v. Meta Platforms, Inc.*, 2026 WL 810036 (N.D. Cal. Mar. 24, 2026).

<strong>ARGUMENT</strong>

**I.**    **SLUSA DOES NOT BAR PLAINTIFFS' CLAIMS**

SLUSA was part of a legislative effort in the late 1990s to stamp out abusive securities litigation, including "strike suits" that weaponized the burdens of class action litigation to extract nuisance settlements of claims that were largely without merit. *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81-82 (2006). Congress initially enacted the Private Securities Litigation Reform Act (the "PSLRA") in 1995 to impose numerous reforms on class actions under the federal securities laws, including heightened pleading standards and procedures for appointment of lead plaintiffs and counsel. *See id.* Congress enacted SLUSA three years later in response to evidence that litigants had been attempting to avoid the PSLRA's reforms by recasting under state law claims that traditionally had been pursued under the federal securities laws. *See id.* at 82. To eliminate the use of "artful pleading" and "forum shopping" to circumvent the PSLRA, SLUSA bars class action plaintiffs from asserting state-law claims based on conduct governed by the federal securities laws. *See Anderson v. Edward D. Jones & Co., L.P.*, 990 F.3d 692, 699 (9th Cir. 2021).

"[A] claim is not automatically SLUSA-barred merely because it involves securities." *Fleming v. Charles Schwab Corp.*, 878 F.3d 1146, 1153 (9th Cir. 2017). Congress was mindful that states have an interest in policing and providing a remedy for fraud, even where the fraud involves securities in some way, and it took pains in SLUSA to preserve the availability of those state-law remedies. *See Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 391-92 (2014) ("numerous provisions" in SLUSA "purposefully maintain[] state legal authority").

With the twin goals of eliminating "artful pleading" of securities claims, while also avoiding undue interference with legitimate state interests, Congress defined the scope of SLUSA preclusion to closely track traditional federal securities claims under the Securities Act of 1933 and the Securities Exchange Act of 1934. Specifically, SLUSA applies where the plaintiff brings:

> (1) a covered class action (2) based on state law claims (3) alleging that defendants made a misrepresentation or omission or employed any manipulative or deceptive device (4) in connection with the purchase or sale of (5) a covered security.

*Anderson*, 990 F.3d at 699 (quotations omitted).

Although SLUSA has been regarded as "jurisdictional," as with any other motion to dismiss, the Court must "construe the pleadings in the light most favorable to the non-moving party," and the defendant may not "recast" the complaint's allegations to bring them within SLUSA's scope. *Anderson*, 990 F.3d at 699-700.

Meta's attempt to use SLUSA to shield itself from accountability to Plaintiffs should be rejected because (a) application of SLUSA here would undermine, rather than give effect to, the purpose of the statute; and (b) the fraudulent ad content created by Meta was not "in connection with" the purchase or sale of any securities, as that phrase has been interpreted under SLUSA.

A.    **Application of SLUSA Here Would Be Contrary to the Purpose of the Statute**

Plaintiffs' claims do not present the concerns SLUSA was enacted to address. There can be no suggestion this action is a "strike suit": Plaintiffs and the Class suffered devastating harm, including more than $300 million in losses, and the Complaint sets forth detailed factual allegations establishing Meta's role and culpability. Nor have Plaintiffs engaged in "forum shopping": they

brought this action in the federal court specified in Meta's own Terms of Service. *See* ¶ 31. Nor have Plaintiffs engaged in "artful pleading" to bring state-law claims based on conduct traditionally governed by the federal securities laws: the misconduct alleged is governed by state law and does not implicate the federal securities laws.

Although Meta is an issuer of its own securities and is subject to the federal securities laws to that extent, this case has nothing to do with Meta's securities or its public statements about those securities. Instead, this action focuses on Meta's role as a quasi-advertising agency and its relationships with its advertising customers, for whom it develops and deploys advertisements, and the users of its social media platforms who are the target audience for those ads. ¶¶ 32-39, 51-56. Plaintiffs allege that Meta breached its common law and statutory duty of care by fostering relationships with advertisers that it knew or should have known were engaged in fraud and by developing ads that were used to lure users of its platforms into fraudulent schemes. ¶¶ 163-170; 184-190. These are quintessentially matters of state law, as Meta's Terms of Service acknowledge. *See* Ex. A to Am. Compl. (ECF No. 50) ¶ 4.4 ("[T]he laws of the State of California will govern these Terms and any claim, cause or action, or dispute."); Cal. Civ. Code § 1714; *see also Forrest v. Meta Platforms, Inc.*, 737 F. Supp. 3d 808, 820 (N.D. Cal. 2024) (noting California's broad duty of care). Meta's argument that SLUSA precludes enforcement of its state-law duties merely because this particular scam was carried out using securities would unduly interfere with important state interests in regulating Meta's advertising business practices. *See Anderson*, 990 F.3d at 700 ("To interpret SLUSA too broadly 'would interfere with state efforts to provide remedies for victims of ordinary state-law frauds.'" (quoting *Troice*, 571 U.S. at 391)).

Furthermore, Defendant's argument that "[p]arallel litigation" arising out of the CLEU scheme requires that SLUSA apply here is belied by *Troice*. *See* Mot. at 5. The pending securities class action involves claims against *other participants* in the CLEU scheme based on *their particular involvement* in that scheme, which did implicate the federal securities laws, such as facilitating a secret offering of CLEU securities to the scammers and their co-conspirators and making false and misleading statements to manipulate CLEU's stock price. *See generally Shah v. China Liberal Education Holdings Ltd.*, Case No. 1:26-cv-00823 (S.D.N.Y.), ECF No. 1. As the Supreme Court

recognized in *Troice*, the fact that some participants in a fraudulent scheme may face liability under the federal securities laws does not foreclose a plaintiff from pursuing state-law remedies against other participants whose conduct—like Meta's here—does not implicate the federal securities laws. *Troice*, 571 U.S. at 385, 391-92, 394 (sustaining state-law claims against law firms and insurers for aiding and abetting Ponzi scheme, notwithstanding that other participants faced liability under federal securities laws).

### B. Meta's Fraudulent Ads Were Not "In Connection With" Any Purchase or Sale of Securities

The Supreme Court clarified in *Troice* that SLUSA's "in connection with" prong requires a showing of materiality. *See id.* at 387. That is, the alleged misrepresentation must be "material to a decision by one or more individuals (other than the fraudster) to buy or sell a 'covered security.'" *Id.* Consistent with well-established principles of materiality under the federal securities laws, a "material" connection must be "a connection that matters," and a connection matters only "where the misrepresentation makes a significant difference to [the] decision to purchase or sell a covered security." *Id.* at 387-88.

The Ninth Circuit has recognized that *Troice* marked a "shift" in the Supreme Court's approach to SLUSA's "in connection with" requirement. *See Anderson*, 990 F.3d at 703. Whereas under *Dabit*, it was enough that the misrepresentation or omission "coincide" with a securities transaction, post-*Troice* courts must "inquir[e] into the materiality of the alleged misrepresentation or omission to the purchase or sale of a covered security" to determine if there is a "connection that matters" between the two. *See id.* at 702-03.

Materiality is established where the alleged misstatement "relate[s] to the nature of the securities, the risks associated with their purchase or sale, or some other factor with similar connection to the securities themselves." *In re Robinhood Outage Litig.*, 495 F. Supp. 3d 831, 834 (N.D. Cal. 2020) (internal quotations omitted); *see also Ambassador Hotel v. Wei-Chuan Inv.*, 189 F.3d 1017, 1026 (9th Cir. 1999) ("in connection with" requirement satisfied where alleged "[d]eception relate[s] to the value or merit of the securities in question"). Here, however, Plaintiffs do not allege that Meta's fraudulent advertisements even mentioned CLEU securities, much less contained false or misleading

information about CLEU specifically. Instead, the fraudulent content consisted of the impersonation of celebrities, well-known investors, and advisory firms while promoting fake investment clubs. *See* ¶¶ 71-74. Although the ads told targeted Facebook and Instagram users that investment club members would have access to stock recommendations and promised extravagant returns, the ads did not mention CLEU or any other specific securities or issuers by name. *See, e.g.*, *id.* ¶¶ 75-78; *see also* *Abada v. Charles Schwab & Co., Inc.*, 127 F. Supp. 2d 1101, 1103 (S.D. Cal. 2000) ("in connection with" requirement not met when "defendant's conduct [has] nothing to do with the trading of any *particular* security").

Nor do Plaintiffs contend that Meta's fraudulent ads were "done to induce the purchase" of CLEU securities, as required to establish a material connection. *Stoyas v. Toshiba Corp.*, 896 F.3d 933, 951 (9th Cir. 2018). Instead, Meta's involvement was at an earlier stage in the scheme and was done to induce Plaintiffs into the antecedent act of engaging with the scammers in the WhatsApp groups. The scammers then groomed Plaintiffs for months and ultimately induced them to purchase CLEU shares, as Meta acknowledged in briefing its prior motions to dismiss. *See, e.g.*, ECF No. 44 at 7 ("[I]t was the 'scammers posing as financial professionals'—not Meta—that 'personally engaged with victims' on WhatsApp groups to encourage them to buy CLEU shares.").

Courts have recognized that SLUSA does not apply in analogous circumstances where misrepresentations are alleged only to have induced the plaintiffs to establish a relationship with a particular broker, rather than causing them to purchase any particular security. In *Anderson*, the defendant argued that SLUSA precluded plaintiffs' claims because plaintiffs alleged that the fraud caused them to change "their investment behavior" and find a "new broker." 990 F.3d at 706. The Ninth Circuit ruled that SLUSA did not preempt the claims because "[c]hoosing a broker or specific type of account is fundamentally different than choosing to buy or sell a covered security." *Id*. The Court explained that the "choice of a broker-dealer" is "not intrinsic to the investment decision itself." *Id*.; *see also SEC v. Goble*, 682 F.3d 934, 943 (11th Cir. 2012) (§ 10(b) materiality requirement "mean[s] an investment decision—not an individual's choice of broker-dealers").

Similarly, in *Abada*, the Southern District of California ruled that SLUSA preemption did not apply because the "defendant's conduct had nothing to do with the trading of any particular security

. . . but merely involved the relationship between [defendant] and its customers." 127 F. Supp. 2d at 1103 (denying motion to dismiss the action because defendant's statements did not "concern[] the risk of a particular investment or investment system"). And in *Robinhood*, the court refused to apply SLUSA where plaintiffs alleged a broker had induced them into a relationship by misrepresenting its services and capabilities, but did not make any security-specific misrepresentations. *See* 495 F. Supp. 3d at 835. The Court ruled that the alleged conduct was "well outside the boundaries of the claims that Congress intended to preclude under SLUSA" and that defendant did not provide "any good reason for transforming the claims . . . into securities violations." *Id*.

Just as in *Anderson*, *Abada*, and *Robinhood*, Meta's fraudulent ads induced Plaintiffs to establish a relationship with the scammers, but that decision did not intrinsically involve the purchase or sale of CLEU securities. Indeed, the ads did not say anything about CLEU or any other specific security, and Plaintiffs did not purchase any CLEU shares until months later. Although the purchase of CLEU (or other manipulated securities) was a foreseeable and causally related consequence of Meta's inducement of Plaintiffs into interacting with the scammers, Meta's ads were not "in connection with" the purchase of CLEU shares for purposes of SLUSA.

Defendant's sole citation in support of its "in connection with" analysis pre-dates the Ninth Circuit's shift in analysis following *Troice* and is factually distinct in any event. In *Scala v. Citicorp Inc.*, victims of a Ponzi scheme sued the Citigroup family of financial institutions for their role in aiding and abetting a fraud perpetrated by Joseph Viola. *See* 2011 WL 900297, at *2 (N.D. Cal. Mar. 15, 2011). Importantly, *Scala* was decided before *Troice*, which requires an assessment of the materiality of the "connection" between the alleged misrepresentations and a specific securities transaction. *See Anderson*, 990 F.3d at 702. *Scala* relied heavily on the Supreme Court's earlier decision in *Dabit*, which it regarded as requiring "very broad reading" of the "in connection with" requirement that would be satisfied "even if the alleged fraud merely 'coincide[s]' with a securities transaction," and could be satisfied even if "the securities transactions may never have occurred." *Scala*, 2011 WL 900297, at *5-7 (alteration in original). Insofar as *Scala* relied on that "very broad reading" to hold that SLUSA applied to allegations that the Citi defendants helped lure clients into Viola's scheme, that is no longer the law post-*Troice*. *See Anderson*, 990 F.3d at 706 n.8 ("some pre-

*Troice* cases held that a broker-investor relationship satisfied the 'in connection with' requirement," but those are "in contrast to the post-*Troice* cases").

Moreover, *Scala*'s allegations are materially different from those here because the Citi defendants were financial institutions engaged in conduct directly related to securities transactions and matters traditionally governed by federal securities laws. For example, Citi allowed Viola to open accounts to hold client funds and deliberately failed to monitor the accounts in violation of its internal policies and federal regulations, despite previously closing Viola's accounts for suspected fraud. *Id.* at *2. Further, Citi representatives met with Viola's clients, recommended that they transfer their portfolios to Viola's accounts, and approved millions of dollars worth of transfers, despite knowing Viola was conducting a Ponzi scheme. *Id.* at *3. Here, in contrast, the claims against Meta arise from its advertising services, which are governed by state law, and Meta did not engage in securities-related conduct, even if the scammers ultimately used securities transactions to carry out their scheme.

## II.    DEFENDANT'S CAUSATION ARGUMENTS ARE UNAVAILING

Meta suggests that a holding that its actions were not "in connection with" the purchase of CLEU securities for purposes of SLUSA would foreclose a showing of "causation" for purposes of Plaintiffs' tort claims. *See* Mot. at 5. Meta's argument conflates distinct concepts that serve different purposes and require different showings.

As discussed above, SLUSA's "in connection with" prong establishes the scope of the statute's preclusive effect by ensuring the claims in question are sufficiently connected to a securities transaction that any liability should be governed by, and only by, the federal securities laws. In contrast, the doctrine of proximate cause defines the extent of a tortfeasor's liability such that it is liable only for the "foreseeable" consequences of its negligence and does not face liability for harm that "is more aptly described as mere fortuity." *See Paroline v. United States*, 572 U.S. 434, 445 (2014). Here, although Meta did not make any representations about CLEU securities or induce any Plaintiff to purchase those shares as required to satisfy SLUSA, the purchase of CLEU (or other manipulated securities) clearly was a foreseeable consequence of developing scam advertisements designed to promote fraudulent investment groups, as required to establish proximate cause.

Similarly, the "substantial factor" requirement establishes the scope of aiding and abetting liability by requiring a showing that the defendant's "assistance . . . was a substantial factor in causing the harm suffered." *Am. Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 1476 (2014) (quotations omitted). Again, that requirement is satisfied here, even though Meta is not alleged to have made any misrepresentations regarding CLEU or to have induced any Plaintiff to purchase CLEU shares. Meta's ads were the critical first step in the scheme, which induced Plaintiffs to engage with the scammers, who, in turn, induced Plaintiffs to purchase CLEU shares.

Meta's attempt to conflate the causation elements of Plaintiffs' tort claims with SLUSA's "in connection with" standard is unsupported by any case law, statutory text, or legal principles. In any event, any such argument is procedurally improper because Meta failed to argue lack of causation in its prior motions to dismiss. *See* Fed. R. Civ. P. 12(g)(2).

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that Defendant's Motion be denied in its entirety. Insofar as the Court grants the Motion in whole or in part, Plaintiffs respectfully submit that dismissal should be without prejudice and with leave to amend. *See Hampton v. Pac. Inv. Mgmt. Co. LLC*, 869 F.3d 844, 847 (9th Cir. 2017) (dismissal pursuant to SLUSA must be without prejudice).

Dated: May 14, 2026                    */s/ Andrew W. Robertson*

**MORRIS KANDINOV LLP**
Leonid Kandinov (279650)
550 West B Street, 4th Floor
San Diego, CA 92101
Tel. (619) 780-3993
leo@moka.law

**MORRIS KANDINOV LLP**
Aaron T. Morris
Andrew W. Robertson (admitted *pro hac vice*)
William H. Spruance
305 Broadway, 7th Floor
New York, NY 10007
Tel. (212) 431-7473
aaron@moka.law
andrew@moka.law
william@moka.law

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of May 2026, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF system.


*/s/ Andrew W. Robertson*